GARY M. RESTAINO
United States Attorney
District of Arizona
KATHERINE V. FOSS
Assistant U.S. Attorney
Arizona State Bar No. 029124
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
katherine.foss@usdoj.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | **CV 19-00422-TUC-RM** |
| Plaintiff, | **DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| United States of America, | |
| Defendant. | |

Defendants, following LRCiv 56.1(a), set forth the following material facts in support of his motion for summary judgment.

**DEFENDANTS' STATEMENT OF FACTS**

1.      From February 15, 2018, to December 4, 2020, Pinson was incarcerated at USP Tucson.  Exhibit B, Rey Declaration at ¶ 7.

2.      Pinson is serving an aggregate sentence of 252 months for violations of 18 U.S.C. § 871(A), Threats Against the President; 18 U.S.C. § 1001(A)(2), False Statement; 18 U.S.C. § 876(C), Threatening a Juror, and 18 U.S.C. § 876, Mailing Threatening Communications.  Exhibit B, Rey Declaration at ¶ 8.

3.      No federal statute, policy or regulation sets out a specific requirement that each cell in the Special Housing Unit must be equipped with a functioning duress button or alarm.  Rather, the applicable policy merely requires that inmates "must be provided with the means to notify staff of a fire or similar emergency. This can be accomplished

by duress alarms, audible supervision, visual supervision, or other reliable means."
Exhibit B, Rey Declaration at ¶ 21; Exhibit B, Att. 10, Excerpt of BOP Program
Statement 1600.13.

4.      In addition to the installed duress alarms, inmates in SHU at USP Tucson
are subject to constant audible supervision by staff, as each range of SHU is connected to
the common working area by a locked grate that allows sounds to pass through.  Exhibit
B, Rey Declaration at ¶ 21.

5.      The non-mandatory nature of the duress alarms is confirmed by the BOP
SHU Program Statement, which explains "Duress buttons, if present, will be utilized only
for emergency and/or life threatening situations, to include health related issues."  Exhibit
B, Rey Declaration at ¶ 22; Exhibit B, Att. 8 at 11 (emphasis added).

6.      Though not mandated by policy, all USP Tucson cells are equipped with a
duress alarm.  Exhibit B, Rey Declaration at ¶ 23.

7.      When inmates in SHU are assigned to a cell, whether by new placement in
SHU or cell rotation, the inmate is instructed to inspect the cell and check the toilet,
shower, sink, and duress alarm for function.  The duress alarm button is activated during
each of these cell placements, to ensure it works.  This procedure ensures that inmates are
not housed in a cell without a functional alarm, and confirms for staff that if a duress
alarm ends up damaged or tampered, the tampering was done by one of the inmates
housed in that cell. Exhibit D, Dukett Declaration at ¶ 3; Exhibit E, Kurtz Declaration at ¶
3; Exhibit B, Rey Declaration at ¶ 23.

8.      In terms of regular preventative maintenance, the duress alarm system in
SHU is inspected on a quarterly basis. Exhibit C, Orton Declaration at ¶ 4.

9.       During this preventative maintenance, the officers' console is inspected
and at least two inmate duress alarms are selected for activation.  Exhibit C, Orton
Declaration at ¶ 4.

10.     The preventative maintenance schedule does not recommend each
individual duress button be tested for function.  Exhibit C, Orton Declaration at ¶ 4.

1       11.     Prior to the July 12, 2019 incident in this case, the most recent preventative

2   maintenance service and inspection of the SHU duress alarm system took place on May

3   15, 2019.  No issues were detected with the system. Exhibit C, Orton Declaration at ¶ 4.

4       11.     Most of the individual duress buttons inside SHU cells are not visible from

5   outside the cell.  This is one of the reasons that inmates are required to inspect and check the

6   duress alarm for function, including activating it, whenever they are assigned to a cell.

7   Exhibit C, Orton Declaration at ¶ 5.

8       12.     Plaintiff never reported that her cell lacked a functional duress button.

9   Exhibit D, Dukett Declaration at ¶ 2; Exhibit E, Kurtz Declaration at ¶ 2; *See* Declaration

10   of Marco Othon at 1-2.

11       13.     If Plaintiff had reported to any prison staff that her cell lacked a functional

12   duress button, prison staff would have reported this information to the SHU Lieutenant

13   for inmate re-assignment to a new cell, and entry of a facilities department work order.

14   Exhibit D, Dukett Declaration at ¶ 2; Exhibit E, Kurtz Declaration at ¶ 2; Exhibit F,

15   Othon Declaration at ¶ 2; Exhibit C, Orton Declaration at ¶ 6; Exhibit G, Vasquez

16   Declaration at ¶ 5.

17       14.     The USP Tucson SHU has a capacity of 238 inmates.  At the time of the

18   July 12, 2019 incident, only 159 of those places were occupied.  If Plaintiff or inmate

19   Mahkimetas had informed staff of an issue with their duress alarm, they would have been

20   re-assigned to a different cell.  Exhibit B, Rey Declaration at ¶ 24.

21       15.     No staff reported any issues with the duress alarm system in SHU between

22   the May 15, 2019, preventative maintenance and July 12, 2019.   Exhibit C, Orton

23   Declaration at ¶ 7.

24       16.     On July 15, 2019, James Orton received a facility work request for the

25   duress alarm system in SHU, which explained that the duress alarm in SHU cell 140 was

26   not functioning properly due to the switch/button being disconnected.  The inmates

27   assigned to cell had been moved to another cell. Exhibit C, Orton Declaration at ¶ 8.

28       17.     The cover plate had been removed from the wall, and the wires behind it,

connecting the button to the system, had been completely ripped out.  The button and switch plate had been replaced, so the tampering was not immediately evident from looking at the button. James Orton had to pull new wire to reconnect the duress alarm. Exhibit C, Orton Declaration at ¶ 9.

18.    Plaintiff testified at her deposition that the button and switch plate were missing altogether, and there was an empty hole with hanging wires. Deposition at 25:4-9.

19.    While a few other duress alarm buttons also needed minor repairs that day, this was the only duress alarm that had been tampered with in this way and damaged so severely. Exhibit C, Orton Declaration at ¶ 10.

20.    One of the cell's most recent occupants had most likely removed the wire, which is prized contraband for SHU inmates who use it for a variety of things.  Exhibit C, Orton Declaration at ¶ 10.

21.    Late on the evening of July 12, 2019, an officer conducting rounds in the USP Tucson Special Housing Unit (SHU) observed that both inmates in cell Z02-140, Ricki Mahkimetas and Jeremy Pinson, appeared to have injuries consistent with a fight. The inmates were removed from the cell, separated, hand held metal detected, photographed and medically assessed.  Exhibit B, Rey Declaration at ¶ 10; Exhibit B, Att. 3 at 2.

22.    Plaintiff never mentioned the currently-alleged sexual nature of the July 12, 2019 incident with inmate Mahkimetas to either BOP or outside hospital medical staff at the time of the incident. Exhibit B, Rey Declaration at ¶ 11; Exhibit B, Att. 4, Excerpt of Medical Records July 12, 2019 – July 13, 2019.

23.    Inmate Pinson first reported the currently-alleged sexual nature of the July 12, 2019 incident with inmate Mahkimetas on July 15, 2019, in a note provided to a BOP psychologist.  Exhibit B, Rey Declaration at ¶ 12; Exhibit B, Att. 5, Investigative report TCP-19-0198 at 7; Exhibit B, Att. 6, Written Request from Plaintiff.

24.    Inmate Pinson made no report of any threat precipitating the fight between

him and inmate Mahkimetas, nor of him allegedly reporting such a threat to staff, instead stating that the fight had started suddenly. Exhibit B, Rey Declaration at ¶ 13; Exhibit B, Att. 7, July 15, 2019 Medical Encounter Report, at 1 ("So we were in the cell talking and something I said set him off and he started to attack me."); *see also* Exhibit B, Att. 5 at 3.

25.    Plaintiff did not report that she told Officer Vasquez that inmate Mahkimetas had threatened her in her Request for Administrative Remedy. Exhibit B, Att. 6.

26.    Plaintiff did not report that she told Officer Vasquez that inmate Mahkimetas had threatened her in her SF-95. Doc. 43, Att. 1 to Exhibit A.

27.    Plaintiff did not list Officer Vasquez as a witness on her SF-95. Doc. 43, Att. 1 to Exhibit A.

28.    Inmate Pinson confirmed this story to psychology staff, noting that Mahkimetas became upset with her because she confronted him over assaulting a mentally ill inmate in general population, and elaborated upon it when speaking with investigating staff on July 17, 2019, explaining "I said to Ricki, I didn't want to listen to war stories. Nobody in prison gets browny points for beating up a retard. In his mind he had to put me back in my place." Exhibit B, Rey Declaration at ¶ 13; Exhibit B, Att. 5 at 3,7.

29.    While at the conclusion of the investigation into this incident inmate Pinson's claims regarding inmate Mahkimetas' actions could not be substantiated, it was determined that a separation needed to be placed between the inmates.  Exhibit B, Rey Declaration at ¶ 14; Exhibit B, Att. 5 at 8.

30.    There had been no separation or other threat information suggesting a problem between these inmates before the incident.  Exhibit B, Rey Declaration at ¶ 14.

31.    No federal statute, policy or regulation sets out the precise steps that must be taken to ensure the safety of a prisoner.  Instead, the program statements, which are based on regulations and statutes, provide that the decisions are left to the discretion and judgment of the Bureau personnel performing threat assessments.  Exhibit B, Rey

Declaration at ¶ 15.

32.     28 C.F.R. § 541.27 gives explicit discretion to prison staff to evaluate threats by providing that an inmate "may" be placed in SHU as a protection case if, "based on evidence," staff believes his safety may be seriously jeopardized by placement in the general population.  Exhibit B, Rey Declaration at ¶ 16; Att. 8, Program Statement 5270.10, Special Housing Units at 8.

33.     An inmate may be placed in administrative detention status for protective custody if the inmate is a victim of an assault or is being threatened by other inmates, if the inmate is threatened because he or she is perceived to have provided information or assistance to staff or law enforcement authorities or if the inmate refuses to enter the general population because of concerns for his or her safety.  Exhibit B, Att. 8 at 6-8. Whenever an inmate is placed in protective custody, staff conducts an investigation to verify the reason for the placement.  If the need for protective custody is verified, the inmate will, at the Warden's discretion, remain in such custody or be transferred to an institution where protective custody may not be necessary.  If the staff investigation fails to verify the need for protective custody, the inmate will be returned to the general population.  Exhibit B, Rey Declaration at ¶ 17.

34.     Investigating staff weigh information from a number of sources in determining the validity of an alleged threat and how to respond to the threat.  Such factors include the source and credibility of the information at the staff members' disposal, the resources available to address credible threats and the rights of inmates at the institution.  Exhibit B, Rey Declaration at ¶ 18.

35.     Policy does not dictate a particular response to an inmate's reported threat; instead it affords the officials discretion to exercise correctional judgment in evaluating and responding to an alleged threat.  Exhibit B, Rey Declaration at ¶ 19.

36.     The discretion involving the process of investigating threats that is afforded by policy does not disappear when those threats allegedly involve threats of a sexual nature.  BOP's duty to immediately act in the face of a threat of sexual abuse only arises

when the agency determines the inmate is "subject to a substantial risk of imminent sexual abuse," and there is still discretion in the appropriate response, which "could include monitoring the situation, changing housing assignments, changing work assignment, placing alleged victim and perpetrator in Special Housing, etc."  28 C.F.R. § 115.62; Exhibit B, Rey Declaration at ¶ 20; Exhibit B, Att. 9 at 38-39.

37.     Immediate separation of the involved inmates is mandated only in the case of an allegation of sexual abuse, which requires contact to have occurred, and not required for allegations of harassment or threats. 28 C.F.R. § 115.64; Exhibit B, Rey Declaration at ¶ 20; Exhibit B, Att. 9 at 40.

38.     Plaintiff did not ever give Officer Vasquez a note or verbally inform him that she felt unsafe in her cell or was being threatened by her cellmate.   Exhibit G, Vasquez Declaration at ¶¶  3-4.

39.     Plaintiff did not make any statements to Officer Vasquez before or after the incident about any sexual threat involving her cell mate.  Exhibit G, Vasquez Declaration at ¶ 4.

40.     Plaintiff did not testify at her deposition that the assault was caused because her cellmate thought she was a snitch. Exhibit A, Pinson Deposition.

41.     Plaintiff testified at her deposition that she reported the threats to Officer Vasquez verbally, not with a note. Exhibit A, Pinson Deposition 13:21-15:4; 19:8-20:18.

42.     Plaintiff's First Amended Complaint alleges that she passed two notes to Officer Vasquez, but does not allege she told him verbally. Doc. 22 at 5.

43.     Plaintiff testified that her cellmate pulled down her pants and underwear, but she did not testify that there had been any touching or other sexual contact. Exhibit A, Pinson Deposition 22:23-24:17.

44.     Pinson testified that after her cellmate first hit her, she was knocked to the ground and remained there until the officer came into the cell. Exhibit A, Pinson Deposition 20:19-24:17.

45.     Pinson testifies that other inmates were making noise and trying to get

1  attention during the assault, and she believes Inmate Sims may have hit her duress button.

2  Exhibit A, Pinson Deposition 27:6-15.

3

4      RESPECTFULLY SUBMITTED this 22nd day of February, 2022.

5                                        GARY M. RESTAINO
                                         United States Attorney
6                                        District of Arizona

7
                                         *s/Katherine V. Foss*
8                                        KATHERINE V. FOSS
                                         Assistant U.S. Attorney
9                                        *Attorneys for Defendant*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 8 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants.   Additionally, on February 23, 2022 the attached document has been sent via U.S. Mail to:

Jeremy Pinson
Register Number 16267-064
U.S.P. - COLEMAN
U.S. PENITENTIARY
P.O. BOX 1034
COLEMAN, FL 33521
*Plaintiff Pro Se*

*s/L.Conlisk*