

FILED _____ LODGED
_____ RECEIVED _____ COPY

MAR 1 0 2022

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

United States District Court
District of Arizona

Jeremy Pinson,
V.
United States of America

CV 19-00422-TJC-RM

Response to Motion to Dismiss, Or In The Alternative
For Summary Judgment

Comes now the pro se plaintiff to respond in Opposition to the dispositive Motion (Doc. 76) she received. A Statement Of Facts is filed separately herewith pursuant to LCivR 56.1

I. The Facts
The facts in this matter are contested by the parties. Ultimately, on July 12, 2019 in a cell in the USP Tucson Special Housing Unit inmate Ricki Maximetas savagely beat the Plaintiff while attempting to rape her. (See Statement Of Facts (Plaintiff)("SOFP") SOFP 21-23). At this time, Plaintiff and the assailant were housed in a cell with an inoperable duress alarm an essential tool of notifying staff of emergencies (PSOF 7-14). This housing assignment was improper. (id.). Nothing was done to fix the button nor reassign plaintiff to a cell with an operable duress alarm. (id.) Plaintiff repeatedly sought to be protected by her attacker (PSOF 24, 28, 30). BOP policy required staff to act on her report of Maximetas threat to rape her (PSOF 31-37).

-1-

## II. Arguments and Authorities

## A. Defendants Motion Should Be Converted Wholly To One For Summary Judgment

Defendants characterize their Motion as one for both Fed. R. Civ. P. 12(b)(1) and 56. The Motion contains numerous exhibits outside the four corners of the Complaint, and is improper. A motion to dismiss is to be made before an Answer is filed. Fed. R. Civ. P. 12(b). After such, it becomes a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c). In practice, the two motions generally amount to the same thing and are governed by the same legal standards. Craigs Inc. v. General Elec. Capital Corp., 12 F.3d 686, 688 (7th Cir. 1993); Delhomme v. Caremark Rx Inc., 232 F.R.D. 573, 576 n.2 (N.D. Tex. 2005).

The defendants Answer was filed already filed months ago. (Doc. 39). When a motion is submitted backed by evidence (i.e. affidavits, or documentary exhibits) the Court must either ignore them or convert the motion into a Motion for summary judgment. Fed. R. Civ. P. 12(b); GFF Corp. v. Associated Wholesale Grocer's Inc., 130 F.3d 1381, 1384 (10th Cir 1997); Lown v. Salvation Army, Inc., 393 F.Supp.2d 223, 224 (S.D.N.Y. 2005).

As such, the Motion should strictly be treated as one for summary judgment.

### B. The Court Does Not Lack Subject Matter Jurisdiction

1.    The Government argues generally that the Federal Tort Claims Act has a "limited juris-dictional grant" (Doc. 76 at 3-5) and that there exists a "discretionary function exception" to that grant (Id.). As a general matter, the plaintiff does not contest that these legal matters exist and on their face are valid. However, they don't preclude plaintiff's claims in this case at all.

2.    Beginning on Page 5 of their Motion (Doc. 76) the USA relies on the "discretionary function exception" ("DFE") to assert as a matter of law alone this case is barred by the DFE. (Id. at 5-11). But defendants rely on evidence outside the Complaint as well as speculation about the legal bases plaintiff seeks relief. As such the Rule 12 motion is untimely as well as improperly asserted. The DFE standing alone does not preclude suit to everyone in any given situation and dismissal at this stage would be improper. See, Estate of Smith v. Shartle, Case No. 18-CV-00323-RCC (D. Ariz. Mar. 9, 2020)(denying dispositive motion on case involving inmate's murder in the USP Tucson SHU).

3. Disputed Material Facts preclude the DFE from being decided at this stage of the proceedings. Generally, a Court must find "that there are no genuine issues as to any material fact and that the Movant is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). A "material" fact is one that "might effect the outcome of the suit under the governing law" (id.). A "genuine" issue exists "if evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. 248.

In determining whether there is a genuine issue of material fact, the Court must view all facts and make all reasonable inferences in favor of the non-moving party. Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Circumstantial evidence can create an issue of material fact barring summary judgment. See e.g., Smith v. Maschner, 899 F.2d 940, 949 (10th Cir. 1990). And when important unanswered questions in the moving party's factual claims. In Bradich v. City of Chicago, 413 F.3d 688 (7th Cir 2005), although the three officers involved swore that they were not liable, the district court could not grant summary judgment based on defendants sworn assertions because to do so would

have been to draw inferences in the Moving party's favor. Like Bradich, defendants ask the Court to consider only their version of facts and to Improperly ignore of found plaintiffs evidence incredible. This Court is not supposed to decide disputed facts or assess credibility on a motion like Doc. 76. See, Masson v. New York Magazine Inc., 501 U.S. 496, 520 (1991); Scott v. Coughlin, 344 F.3d 282, 289-90 (2d Cir. 2003)(holding court impermissibly engaged in credibility determinations and weighing of contradictory evidence); Sanders-El v. Spielman, 38 F.Supp. 2d 438, 439 n.1 (D.Md. 1999)(stating "it would seem that the law must entertain the possibility that health care providers in a prison setting might bring certain biases to their occupation"); Brooks v. Kyler, 204 F.3d 102, 107-08 & n.4 (3d Cir. 2000); Green v. Branson, 108 F.3d 1296, 1304 (10th Cir. 1997) (noting claim of falsification of medical records after a use of force). This is exactly why the Ninth Circuit reversed this Court's grant of Summary Judgment in Pinson v. Unknown Party, No. CV 13-002059-DCB (D.Ariz.) yet the defendants invite this Court to make the same error once again.

4. Duress Alarms: The USA presents evidence in the form of sworn declarations that if the

plaintiff had told her the duress button alarm in SHU Cell 140 was inoperable she would have been reassigned to a different cell. (See, Def. Statement of Facts at 7; Kurtz, Othon and Dukett Declarations). At her deposition plaintiff testified that she told Dukett, and he personally saw the duress alarm was inoperable, but he did not fix it nor reassign her. (See Plaintiff's Deposition, Doc. 77, Ex. A at 24-28).

Further, it is undisputed BOP policy allows for multiple means of notifying SHU staff of an emergency. (Def's Stmt. of Fact ("DSOF") 3). What is disputed is whether once the BOP chooses a means of alerting staff to an emergency, which at USP Tucson was duress alarms in SHU (See Decl. of Orton, Doc. 77).

Next, whether or not a duress alarm alone was mandatory under BOP policy, defendants submit no evidence that they had discretion to deviate from the local choice to equip all USP Tucson SHU Cells with duress alarm buttons once selected under Program Statement 1600.13  There is zero evidence any USP Tucson SHU inmate, other than plaintiff, was housed in a cell similarly without a duress alarm even though the defense submits they found multiple inoperable alarms after plaintiff was assaulted, (Orton Decl. at 10, Doc. 77, Ex. C), but do not indicate whether those

assignment FTCA Claims like Alfrey V. United
States, 276 F.3d 557 (9th Cir. 2002). This is a
material fact, in dispute, which precludes
summary judgment. (See McDaniels, Att. A).

5. Next the defendants urge the Court to
   consider as fact their sworn assertions
   that plaintiff's notification that her cell
Mate was threatening to rape her (Plaintiff's
Dep. at pages 15-16, 17, 19, 21-22, Doc. 77 Ex.A),
did not trigger a mandatory response because
the threat to rape her was not an allegation
yet of "sexual abuse". (Doc. 77, Ex. B, Rey
Decl. at 20).
   This fiction is disgusting. It begs the
Court to hold that BOP staff do not hold
any duty to protect a human being from
their prospective rapist until the rape has
been consummated. That an attorney for the
United States would even argue such is a
Sad fact. In fact, the Court should take
judicial notice of the following victim impact
Statement of a BOP staff member at USP
Tucson about the ongoing sexual misconduct
of inmates in SHU: (See, e.g. United States
V. Clayton Jemine (D.Ariz.) and United States
V. Shaun Rudy Knox (D.Ariz.)). Fed. R. Evid.
201 et seq.

cells housed inmates like plaintiff.

Defendant claims even with an inoperable duress alarm plaintiff could alert staff by their audible supervision of the 159 inmates in SHU (See DSOF 14, 43 Doc. 77 Rey Decl. at 21, 24). But this assertion is undermined by the fact staff illegally watched movies in the SHU staff Control Booth (PSOF 4, Doc. 77 Ex. 6 at 43). The evidence also shows inmates screamed, kicked cell doors, and activated their duress alarms to help plaintiff. (See Doc. 77, Ex. 6 at Page 43). Even if the court rules a duress alarm isn't a mandatory policy that was ignored, the DFE would still be defeated under the "negligent guard theory". See, e.g. McDaniels v. Smith, No. 18-CV-00238-JPH (S.D. Ind., Sept. 30, 2021) (Attachment A) ("Whether the duress alarm was intentionally deactivated or ignored, these are material facts in dispute regarding whether there was a breach of duty so summary judgment is not appropriate"); See also ᵃ Padilla v. United States, No. 09-CV-5654, 2012 WL 12882367, at *6 (C.D. Cal., Oct. 9, 2012) (a guards actions are not immune from suit under the discretionary function exception when the negligent guard theory applies); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006). For instance, in Padilla v. USA the Court distinguished its case from other similar cell

7

But this applicability of the DFE in such a circumstance is not the first time BOP has attempted to evade liability in such a case.

In James v. Lacroix, No. 16-cv-00138 (W.D. La. Apr. 17, 2017) a federal district court denied the United States' attempt to use the DFE where a prisoner alleged "his cellmate was threatening to kill him if he did not perform oral sex on him" but a staff member said "that she didn't care and" then "walked away" (Attachment **B**, Page 2). In the PREA law, Congress required the Attorney General to promulgate regulations concerning sexual abuse prevention which would be binding upon the Federal Bureau of Prisons. 42 U.S.C. 15607. Regulations were created, 28 **CFR** 115.5 et seq., as well as new policies which went into effect on June 24, 2015. (Att. 2, Page 2). Thus, "there are now BOP rules that provide a non-discretionary and specific course of action for the staff" to follow "when reporting and dealing with inmate complaints of sexual abuse and harrassment." (id., at Page 4). When staff "failed to follow the BOP procedures for handling his ~~sex~~ complaint of sexual harrassment, the discretionary function exception to liability under the FTCA is not applicable." (Id.,

8

The intent of Congress that "perpetrators of sexually abusive behavior will be disciplined and, when appropriate, prosecuted." See Riascos-Hurtado v. United States, 2015 WL 3603965 at *2 (E.D. N.Y. 2015) was not the case with plaintiff as the victim. Less than 30 days after his brutal attack and attempted rape plaintiff's assailant was released into general population. (Doc. 77, Ex. B, Att. 5, Page 47).

Another apt example is the case of Michael Lynn Holmes v. United States, No. 18-CV-00487 (S.D. Ind. May 26, 2021). In Holmes, the Court denied summary judgment in an FTCA case where the USA asserted the DFE also precluded relief or liability. "Thus as explained in Palay, the discretionary function exception requires not only a finding that there is no mandatory policy on the alleged conduct, but also a conclusion that the officials actually exercised some discretion" (Att. 6 at 5). So, "although it is possible that this decision was the result of permissible policy judgments, it is also possible that the prison officials simply ignored Holmes' objections and the risk that Spratley posed without weighing relevant policy considerations." (Att. 6 Page 5). "the United States therefore has not shown that the discretionary function exception applies" (id.).

9

Assuming, arguendo, that there was no mandatory policy, there is no evidence as to whether any correctional official exercised any judgment in not separating plaintiff from Makhimetas when he began to threaten her with rape.

The only competent evidence from anyone with personal knowledge of the events of July 12, 2019 is the Declaration of Miguel Vasquez who first claims he "do not recall inmate Pinson ever giving me a note or verbally informing me that she felt unsafe in her cell or was being threatened by her cellmate." (Doc. 77, Ex. G, Page 1, Paragraph 3). Then he contradicts himself and says he does recall and it never occurred. (Id. at Paragraph 4).

The Vasquez declaration denies he was ever aware of Makhimetas' threat, it does not say he performed any discretionary act grounded in any policy. Without such evidence the United States has not met its burden to support the DFE affirmative defense. See, Holmes, Att. 3 at 5 (citing Cf. Lipsey v. United States, 879 F.3d 249, 255 (7th Cir. 2018)).

As such, summary judgment should be

10

denied. The BOP's "zero tolerance" policy on sexual abuse or harrassment (Doc. 77, Ex. B, Att. 9 at Page 69), did not permit Vasquez to ignore Makhimetas' rape threats.

6. The Court should take judicial notice of the decision by the federal court in the case of United States v. D.W., 198 F. Supp. 3d 18 (E.D.N.Y. 2016) which details extensive evidence, including testimony of BOP Executives, of the threat to vulnerable inmates like the plaintiff. (See Att. D, Excerpts of United States v. D.W.).

7. Undermining the Key Decl. (Doc. 77, Ex. B) asserting staff duty to respond was not triggered absent "contact", the USP Tucson policy states,

"All staff members are responsible for detecting and monitoring the potential for sexually abusive behaviors to include sexual harrassment and must intervene" (Plaintiff's Statement of Facts, Ex.   )  "This intervention includes immediate and direct notification to the Operations Lieutenant. All staff will assume any report of sexual victimization, regardless of the source of the report is credible". (id.) (emphasis added).

11

8. The continual reliance on Alfrey v. United States, (Doc. 76 at 8), 276 F.3d 557 (9th Cir. 2002) and Calderon v. United States, (Doc. 76 and 7), 123 F.3d 947, 950 (7th Cir. 1997) are misplaced. Because this case is distinguishable for several reasons:

(i) Alfrey predates both Congress' passage of the Prison Litigation Reform Act as well as the DOJ regulations and BOP policies enacted after its passage.

(ii) Alfrey concerned a placement of an inmate with a victim he would later murder and the assertion that the DFE precluded liability as the housing decision fit in the DFE's scope. This case concerns how staff responded to specific credible threats and failure to house plaintiff in an operable duress-alarm equipped cell.

(iii) Calderon was later clarified by the Seventh Circuit as BOP attempted to argue that the DFE "always" shields the government from liability for inmate violence. See Keiler v. United States, 771 F.3d 1021, 1023 (7th Cir. 2014)(Attachment 5 at 4). The Seventh Circuit noted, "We reject the governments argument that all prisoner

attacks fall within the discretionary function exception." (Att. E at 5).

(iv) Calderon is a decision often misused by U.S. Attorneys. See footnotes 1, 2 to Holmes v. USA (Att. C at Page 8). "This is not an isolated incident. The United States has supported a discretionary function defense with the same sources in other cases" and the "Court has made clear that Calderon does not control."

(v) Alfrey is not the silver bullet the USA describes it to be as the Ninth Circuit has made clear before. See, Doe v. USA, 510 Fed. Appx. 614, 616 (9th Cir. 2013) ("Alfrey does not shield that decision ...") (Att. F).

## C. Plaintiff's Sexual Assault Claim Is Not Barred By the PLRA

Counsel next asserts that 42 U.S.C. 1997e bars her claim of attempted sexual assault. (Doc. 76 at 11-12). Plaintiff's emotional injuries stemming from the incident are covered by the physical injury under 42 U.S.C. 1997e. The citation to Oliver v. Keller, 289 F.3d

623, 629 (9th Cir. 2002) holding that the PLRA requires more than de minimis physical injury is irrelevant. Plaintiff's injuries were very serious. She suffered a broken nose, periorbital hematoma of her right eye, Contusions (Doc. 77, Ex. B, Att. 4) at her PREA exam 3 days later medical staff noted " Multiple traumas to the face, her right eye almost swollen shut" (Plaintiffs Stmt. of Facts, at    , Ex.    ). These are not de minimis. See e.g. Law v. McDaniel, 2008 WL 4371771, *2-3 (D.Nev., Aug. 30, 2008)(bruises met physical injury requirement); Evans v. Alameida, 2006 WL 618298, *1 (E.D.Cal., Mar. 10, 2006); Ogden v. Chesney, 2003 WL 22225763 (E.D.Pa. Sept. 17, 2003)(sniffing genitals was sufficient to withstand summary judgment); Critically, the word "or" between "physical injury" and "sexual act" moots defendants' whole argument. Federal law defines physical injury as "(A) a cut, abrasion, bruise, burn or disfigurement; (B) physical pain; (c) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body no matter how temporary" 18 U.S.C. 831 (f)(5); (accord 18 U.S.C. 1365 (h)(4); 18 U.S.C. 1515 (a)(5); 18 U.S.C. 1864(d)(2)). "When Congress uses, but does not define a particular word, it is presumed to have adopted that

word's established meaning." See United States v. Myers, 972 F.2d 1566, 1572 (11th Cir. 1992)(citing Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 813 (1989)). The PLRA doesn't define "physical injury" but the "bodily injury" definition in Title 18 is indistinguishable for purposes of this Motion. A simple look at the after-attack photos (which defendant chose to omit from its Motion) plainly shows the plaintiff suffered a "physical injury" that included an attempted rape.

D. Defendant Is Not Entitled To Summary Judgment On Liability

At this juncture, Summary judgment cannot be granted if this Court recognizes the disputed material facts or views the evidence in favor of the nonmoving party as it must. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This Court "must consider as evidence in his opposition to summary judgment all of [Plaintiff's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [Plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct" Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).

In support of its final argument, that the plaintiff has failed to establish the defendant is entitled to summary judgment on liability (Doc. 76 at 12) requires the Court to ignore or discredit all of the evidence plaintiff submitted. To believe only the defendants evidence. And to look deeper and more meaningfully into perceived inconsistencies than are warranted. This is not the proper role of the Court.

Under Arizona law a reasonable trier of fact could find that:

(1) defendants owed a general duty to plaintiff under 18 U.S.C. 4042

(2) Forseeability is a component of the duty and causation elements.

(3) A reasonable person would have foreseen the lack of a duress alarm, which had been installed in ALL SHU cells for notifying staff of an emergency, is seriouse enough to induce them to take precautions to avoid the likelihood of harm (i.e., no means to alert staff when being assaulted).

(4) A reasonable person would have foreseen that Maxhimetas, who plaintiff testified had come to SHU for assaulting another vulnerable inmate and a history of other assaults (Doc. 77, Ex. A, Pages 12-14, 16-19),

16

should have been separated from plaintiff
when he began threatening to harm and rape
her. Especially given BOP's "zero tolerance"
policy on sexual abuse and harassment.

If staff had not violated policy, and been
lazy or careless in attention to duty, the
plaintiff could not have been assaulted or
injured as severely as she was. She would
not live, even slow, with this legacy:

"I don't like people behind me. I don't
-- I get very upset with loud noises.
My treating doctors tell me that the
ultimately posttraumatic stress disorder
or syndrome, whatever, is not something
that I can really control."
(Doc. 77, Ex. A, Dep. at Pages 46-48).

At trial, the trier of fact, will decide whether
the evidence most favors the plaintiff or not
after having heard all the witnesses. The
defense suggests that Officer Vasquez would've
done the right thing in any given situation.
His claim is supported by, among others, an
officer Kurtz. But Kurtz, and others, are
accused in an extensively detailed complaint
of negligence and deliberate indifference
leading to the death not only of a USP

17

Tucson SHU inmate. See Estate of Smith v. Shartle et al., No. 10-cv-00323-RCC (D. Ariz. at Doc. 1). That complaint details the deaths of dozens of other BOP inmates.

In sum, defendants ask the Court to treat this as an isolated incident that warrants closure of this action well before a trial. The plaintiff urges the Court to follow the example of the other district courts attached hereto who denied the same request by the USA to other victims in its vicious system. A trial should decide this case, not by summary judgment.

E. This Court Should Appoint Counsel

This Court, if it denies defendants motion, should appoint counsel to try this case. Defendants have previously expressed they do not oppose such. (Doc. 72). And a case facing a trial is best handled by counsel. See, Pinson v. Unknown Party, No. 13-cv-02059-DCB (D. Ariz., Doc. 150 — Order Appointing Counsel Following Remand From Ninth Circuit Reversing Grant of Summary Judgment).

Conclusion

Wherefore, for the aforegoing reasons this

18

Court should deny the Motion (Doc. 76).

Jeremy Pinson #16267-064
USP Coleman II
PO Box 1034
Coleman FL 33521
Plaintiff - Pro Se

## Certificate of Service

I certify service of this Motion upon the Court via U.S. Mail, on 3-4-2022, in a first-class postage prepaid envelope given to my unit team for mailing. An ECF Notice shall provide AUSA Foss a copy as I do not have access to a photocopier.

Jeremy Pinson

19

ATTACHMENT A

---

**JOSEPH ANTHONY MCDANIELS, Plaintiff, v. SMITH, et al., Defendants.**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, TERRE HAUTE DIVISION**
**2021 U.S. Dist. LEXIS 188162**
**No. 2:18-cv-00238-JPH-MJD**
**September 30, 2021, Decided**
**September 30, 2021, Filed**

---

**Counsel**        {2021 U.S. Dist. LEXIS 1}JOSEPH ANTHONY MCDANIELS, Plaintiff, Pro se, Seattle, WA.

For SMITH, Nurse (first name unknown), UNITED STATES OF AMERICA, J. BAKER, SIS (first name unknown), Defendants: Jackson Taylor Kirklin, UNITED STATES ATTORNEY'S OFFICE (Indianapolis), Indianapolis, IN.

**Judges:** James Patrick Hanlon, United States District Judge.

**Opinion**

**Opinion by:**        James Patrick Hanlon

**Opinion**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

After two to three days without his prescription medications, Joseph McDaniels, an inmate at FCC **Terre Haute**, collapsed in his cell and was taken by ambulance to an emergency room at a local hospital. The medical staff at the hospital resumed Mr. McDaniels' cardiac medications, and his condition improved to baseline within a couple days.

Mr. McDaniels alleges that defendants Lt. Baker and Nurse Smith acted with deliberate indifference to his serious medical need by failing to provide him with his cardiac medications. Specifically, Mr. McDaniels argues that Lt. Baker refused to let him take his self-carry cardiac medications with him to the Special Housing Unit, causing a lapse in medication. And when he brought the issue to Nurse Smith's attention later that day, she allegedly failed{2021 U.S. Dist. LEXIS 2} to make efforts to retrieve his cardiac medications or order additional doses of his cardiac medications from the pharmacy.

Mr. McDaniels also brings a negligence claim against the United States under the Federal Tort Claims Act on the theory that one or more correctional officers disabled the duress alarm in his cell, which prevented him from calling for help before his collapse.

The defendants have moved for summary judgment. For the reasons that follow, the defendants' motion for summary judgment is **GRANTED in favor of Lt. Baker and DENIED as to Nurse Smith and the United States**.

I.

**SUMMARY JUDGMENT STANDARD**

DISHOT                                    1

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or **{2021 U.S. Dist. LEXIS 3}** declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones-those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 573 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

II.

**FACTUAL BACKGROUND**

**A. Joseph McDaniels{2021 U.S. Dist. LEXIS 4}**

In August 2017, Mr. McDaniels was a convicted federal prisoner at the Federal Correctional Complex in **Terre Haute**, Indiana ("FCC-TH"). Dkt. 79-1, p. 62; dkt. 82-1, p. 2, para. 4. He was 48 years old and suffering from several chronic medical conditions, including atrial fibrillation, cardiomyopathy, mixed hyperlipidemia, congestive heart failure, obstructive sleep apnea, morbid obesity, gastroesophageal reflux disease ("GERD"), neuropathy, and insulin dependent diabetes mellitus. Dkt. 79-1, p. 2, para. 5; dkt. 79-3, p. 2.; dkt. 79-17; dkt. 79-20; dkt. 82-1, p. 22.

Mr. McDaniels was taking multiple prescription medications to treat these conditions:

NPH insulin and regular insulin for diabetes;

venlafaxine and capsaicin cream for neuropathy;

omeprazole for GERD;

vitamin D ointment for his skin;

diltiazem and digoxin to control his heart rate and manage atrial fibrillation;

metoprolol, atorvastatin, and hydrochlorothiazide to treat high blood pressure, control his heart rate, and manage fluid retention;

warfarin (Coumadin) to prevent blood clots, heart attack, and stroke; and

DISHOT                                          2

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



a CPAP machine to treat obstructive sleep apnea and reduce his risk of sudden cardiac death or stroke.{*2021 U.S. Dist. LEXIS 5*}*See* dkt. 79-1, pp. 41-46; dkt. 79-2; dkt. 79-17, p. 2; dkt. 79-20, p. 3; dkt. 82, pp. 2-3, para. 5.

Mr. McDaniels received insulin and venlafaxine from nursing staff in his cell. Dkt. 79-1, p. 42; dkt. 79-9. This is referred to as "pill line." *Id.*

Mr. McDaniels "self-carried" all other medications. Dkt. 79-2, p. 2. For self-carried medications, the inmate is given an allotment of medication, usually for about 2 weeks or 30 days, and is responsible for self-administering that medication at the appropriate times. Dkt. 79-1, p. 43.

When Mr. McDaniels receives his cardiac medications, his resting heart rate is generally between 60 to 100 beats per minute. Dkt. 79-1, p. 45. Without these medications, his resting heart rate may elevate to 170 to 180 beats per minute. *Id.*

### B. Defendants

At all times relevant to the events described in the Complaint:

Jamie Baker was employed as a Lieutenant with the Special Investigative Services for FCC-TH. Dkt. 79-5. His job duties included investigating inmate misconduct, responding to security threats, and other activities relating to law enforcement within FCC-TH. *Id.*

Michele Smith was employed as a registered nurse in the Special Housing Unit ("SHU") at FCC-TH.{*2021 U.S. Dist. LEXIS 6*} Dkt. 79-7.

### C. Mr. McDaniels Is Transferred to the SHU During A Drug Trafficking Investigation

FCC-TH consists of FCI **Terre Haute**, a medium-security prison, and USP **Terre Haute**, a maximum-security prison. Dkt. 79-1, p. 10. The SHU is a segregation unit where inmates are kept in isolated cells for close to 24 hours per day. Dkt. 82-1, p. 4, n. 4.

On August 3, 2017, Lt. Baker intercepted a letter addressed to Mr. McDaniels' son regarding an attempt to smuggle drugs into FCC-TH. Exh. 79-5. As part of his investigation, Lt. Baker took Mr. McDaniels that same day from his cell at FCI **Terre Haute** to a holding cell for questioning, and then escorted him to a transport van to be moved to the SHU. Dkt. 79-1, pp. 24-25; dkt. 79-5, paras. 7, 8; 82, p. 3, para. 11. Mr. McDaniels told Lt. Baker that he had not had breakfast, was diabetic, and needed his medications. Dkt. 79-1, pp. 24-25, 104; dkt. 82, p. 3, paras. 12-13. Lt. Baker told Mr. McDaniels, "They will get you whatever you need [at the SHU]," and put him on a transport van headed to the SHU. Dkt. 79-1, p. 26; dkt. 82-1 at p. 3, para. 14. Lt. Baker had no further contact with Mr. McDaniels until after he was hospitalized. Dkt. 79-1 at 26.

### D.{*2021 U.S. Dist. LEXIS 7*} Mr. McDaniels' Medical Treatment in the SHU

Mr. McDaniels did not receive any medical care related to his cardiac conditions from the time he was transported to the SHU until his collapse and emergency hospitalization two days later. Dkt. 79-9; dkt. 82-1, p. 4, para. 22.

Nurse Smith was a registered nurse working in the SHU. Dkt. 79-7, para. 4. She, along with other medical staff in the SHU, was notified that Mr. McDaniels was being transferred to the SHU and was classified as "Care 3 Medical." *Id.* at para. 5; dkt. 79-8. This care classification informed Nurse Smith that Mr. McDaniels "had been identified as having complex or chronic health conditions that require frequent clinical contacts to maintain stability and prevent medical complications." *Id.* She understood the purpose of this notification was "to notify medical staff about Mr. McDaniels' impending arrival at the SHU, so that medical staff could provide him with medical care while he was

DISHOT                                                                                      3

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



in this unit." *Id.*

On Mr. McDaniels' first evening in the SHU, Nurse Smith went to his cell and administered his insulin injections. Dkt. 82-1, p. 4, paras. 17-19; dkt. 79-9. In the SHU, medical staff periodically come around to dispense medication{2021 U.S. Dist. LEXIS 8} to inmates. In doing so, medical personnel stop and watch the inmate while he takes his medication. Dkt. 79-1, p. 31. Nurse Smith was the first medical staff member Mr. McDaniels interacted with following his transfer. Dkt. 82-1, p. 4, para. 17. During their visit, Mr. McDaniels "specifically asked [Nurse Smith] about [his] heart medications and about [his] CPAP machine."1 Dkt. 79-1, p. 29. Nurse Smith told Mr. McDaniels, "[S]top whining . . . we don't do that over here." *Id.*

Immediately following this visit, Nurse Smith sent an email to other SHU medical staff to notify them that Mr. McDaniels needed to receive his evening dose of venlafaxine from the pill line. Dkt. 79-7, para. 8; dkt. 79-10, p. 2. She sent a second email to other BOP personnel inquiring about the location of Mr. McDaniels' CPAP machine. Dkt. 79-7, para. 9; dkt. 79-11, p. 2.

At approximately 7:00 a.m. the following morning, August 4, 2017, Mr. McDaniels received his regular insulin injection. Dkt. 79-9 at p. 2.

Around noon the next day, Nurse Smith learned that Mr. McDaniels' CPAP machine had not been transported to the SHU. Dkt. 79-7, para. 10. At 12:23 p.m. she sent another email instructing BOP staff to "PLEASE PICK{2021 U.S. Dist. LEXIS 9} UP [MR. MCDANIELS'] CPAP IN FCI PHARMACY AND BRING [IT] OVER TODAY." Dkt. 79-7, para 10 (all caps in original). Gregory Reeson, a pharmacist at FCC **Terre Haute**, replied that the CPAP machine was "already in the suitcase" and that he was "refilling [Mr. McDaniels'] [venlafaxine] because the pill pack only had 4 capsules in it." Dkt. 79-7, para. 11.

In the evening of August 4, 2017, Nurse Smith again administered an insulin injection to Mr. McDaniels in the SHU and provided him with his Effexor. Dkt. 79-9 at p. 2.

Medical staff in the SHU make rounds to dispense medications numerous times throughout the day. This results in a "continual flow" of medical personnel administering medications to inmates in the SHU. Dkt. 79-1, p. 31-32.

### E. Duress Alarm System in the SHU

Each cell in the SHU is equipped with an emergency duress alarm. Dkt. 79-15, para. 5. There is a button on the inside of each cell that, when pushed, activates the duress alarm. *Id.* When the duress button in the cell is pushed, it activates an alarm in the panel of the SHU "control bubble," the secure area where correctional officers monitor the inmates. *Id.* at para. 7. Once the alarm goes off, a correctional officer must walk{2021 U.S. Dist. LEXIS 10} down the range to the cell where the alarm button was pressed and reset the alarm. *Id.* at 8. To reset the alarm, the officer must use a key to activate a switch located immediately outside the cell door. *Id.* at para. 9. If a correctional officer does not reset a duress alarm in a timely manner, an additional alarm will go off in the Main Control room for USP **Terre Haute**. *Id.* at para. 8.

During the two days Mr. McDaniels spent in the SHU before his collapse, he pressed the duress button in his cell approximately 50 times. Dkt. 79-1, pp. 36-37. The purpose of these alarms was to notify prison officials that he had not received his cardiac medications and CPAP machine and to report his deteriorating condition. Dkt. 1, p. 5; dkt. 79-1, p. 38; dkt. 82-1, p. 5, paras. 25-30. The first couple times he pushed the duress button, an officer came to the door of his cell and asked, "What is your emergency? What is going on?" dkt. 79-1, pp. 37-38. After that, however, no one responded. *Id.* at 37.

DISHOT                                                    4

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

On his second day in the SHU, Mr. McDaniels encountered a correctional officer and asked, "Why was nobody answering my [duress] button?" Dkt. 79-1, p. 36-37. The correctional officer answered, "Because I{2021 U.S. Dist. LEXIS 11} turned it off." *Id.* at 37.

The United States has presented evidence disputing Mr. McDaniels' assertion that correctional staff disabled the duress alarm in his cell. FCC Facilities Manager Blake Lott submitted an affidavit about his familiarity with the duress alarm system. According to Mr. Lott:

> SHU staff cannot disable the duress alarm switches or turn off the duress alarm system without causing damage to it. If such damage occurred, the Facilities Department would be notified of it. Records maintained by the Facilities Department from August 2017, do not indicate the receipt of any notification regarding damage to the duress alarm system in the SHU. I am not otherwise aware of any indication that the duress alarm system in the SHU was damaged or otherwise disabled during this time period.Dkt. 79-15, paras. 10-12.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### B. FTCA Claim against the United States

For his claim under the Federal Tort Claims Act ("FTCA"), Mr. McDaniels alleges that correctional officers disabled the duress alarm in his cell before his collapse.

### 1.{2021 U.S. Dist. LEXIS 22} FTCA Standard

The FTCA is a limited waiver of the United States' sovereign immunity. The FTCA applies to federal inmates' claims alleging personal injuries sustained while incarcerated because of negligence of government employees. *See United States v. Muniz*, 374 U.S. 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963). The FTCA authorizes suits against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b).

State tort law of the state where the tort occurred, in this case Indiana, applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008).

Under Indiana law, to prove negligence, a plaintiff must establish by a preponderance of the evidence that the defendant: (1) owed a duty to the plaintiff; (2) breached that duty by failing to meet the appropriate standard of care; and (3) the plaintiff suffered injury as the proximate result of the defendant's failure to perform its duty. *See Parrott*, 536 F.3d at 635; *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016); *Estate of Mintz v. Connecticut Gen. Life Ins.*, 905 N.E.2d 994, 998-99 (Ind. 2009). "Summary judgment is appropriate in a negligence{2021 U.S. Dist. LEXIS 23} action where defendant demonstrates that the undisputed material facts negate at least one element of plaintiff's claim." *Halterman v. Adams County Bd. of Comm'rs*, 991 N.E.2d 987, 990 (Ind. Ct. App. 2013) (internal quotations omitted).

### 2. Duty of Care

The United States' duty of care owed to federal prisoners is established by 18 U.S.C. § 4042. *See United States v. Muniz*, 374 U.S. 150, 164-65, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963). Pursuant to § 4042, the United States owes a duty to federal inmates to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). While the United States was not required to provide access to a duress alarm as part of the duty of care, *see Jones v. United States*, No. 2:17-CV-00451-WTL-DLP, 2019 U.S. Dist. LEXIS 107726, 2019 WL 2647593, at *7 (S.D. Ind. June 27, 2019), it did so here.

### 3. Breach

Mr. McDaniels alleges that the United States breached its duty of care when the duress alarm in his cell was rendered inoperable. He argues that he tried to use the duress alarm to call for medical assistance on August 5, 2017, and to request his CPAP machine and medications. In response, the United States argues that the duress alarm system was functioning such that there could be no breach.

Construing the facts in the light most favorable to Mr. McDaniels, a guard responded the first couple times Mr. McDaniels pushed the button{2021 U.S. Dist. LEXIS 24} on the duress alarm. But thereafter, there was no response to his pushing the button numerous times. Whether the duress alarm was intentionally deactivated or ignored, these are material facts in dispute regarding whether there was a breach of duty so summary judgment is not appropriate on this element.

DISHOT                                           1

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



**4. Injury**

Mr. McDaniels argues that he was injured by BOP officers' failure to respond when he attempted to use the duress alarm. The United States argues that Mr. McDaniels cannot show that any issues with the duress alarm led to his injuries.

This again is a material fact in dispute. The United States' medical expert opined that while patients such as Mr. McDaniels may experience atrial fibrillation and low INR regardless of whether they take their medications, these issues are more likely to occur if the patient is non-compliant with their medical therapy. Dkt. 79-20, pp. 3-4. In addition, Mr. McDaniels testified that he pressed the duress alarm repeatedly before he collapsed, but no one responded. Consequently, he continued to suffer, experienced anxiety and collapsed on the floor. The hospital medical records indicate that after Mr. McDaniels received his medications he quickly stabilized.{2021 U.S. Dist. LEXIS 25} Given the evidence in the record, a reasonable factfinder could conclude that the delay in obtaining cardiac medications, attributable in part to the guards' failure to answer his duress alarms, unnecessarily prolonged and exacerbated Mr. McDaniels' pain. *See Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007); *Gil*, 381 F.3d at 662 (recognizing that 'hours of needless suffering' can constitute harm).

The United States' motion for summary judgment on the FTCA claim is **DENIED**.

DISHOT                                          2

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ATTACHMENT B

RASHOD L. JAMES VERSUS K. LACROIX, et al.
UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA, ALEXANDRIA
DIVISION
2017 U.S. Dist. LEXIS 91671
CIVIL ACTION NO. 1:16-CV-00138
April 17, 2017, Decided
April 17, 2017, Filed

**Editorial Information: Subsequent History**

Adopted by, Summary judgment granted, in part, summary judgment denied, in part by, Judgment entered by James v. Lacroix, 2017 U.S. Dist. LEXIS 92132 (W.D. La., June 14, 2017)

**Counsel**        {2017 U.S. Dist. LEXIS 1}Rashod L James, Plaintiff, Pro se, Bruceton Mills, WV.

For K LaCroix, Mike D Carvajal, Unknown Regional Director, USA, Defendants: Cristina Walker, LEAD ATTORNEY, U S Attorneys Office (SHV), Shreveport, LA.

**Judges:** Joseph H.L. Perez-Montes, United States Magistrate Judge. CHIEF JUDGE DRELL.

Opinion

**Opinion by:**        Joseph H.L. Perez-Montes

Opinion


**SUPERSEDING AND AMENDING REPORT AND RECOMMENDATION**

Defendants filed a motion for clarification as to the defense of qualified immunity (Doc. 44), which is addressed below. This Report and Recommendation supersedes the previously filed Report and Recommendation (Doc. 42).

**I. Background**

Before the Court is a complaint filed pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), and the Federal Tort Claims Act ("**FTCA**"), 28 U.S.C. §§ 2671-2680, by pro se plaintiff Rashod James ("James"). The named defendants are Mike D. Carvajal (warden of the United States Penitentiary in Pollock, Louisiana ("USP-Pollock")), K. LaCroix (a correctional officer employed at USP-Pollock), Bureau of Prisons ("BOP") Regional Director John Dee (located in Dallas, Texas), and the United States of America. James contends Defendants failed to protect him from an assault and attempted sexual assault by another inmate after he notified Officer LaCroix and asked for protection. James{2017 U.S. Dist. LEXIS 2} seeks compensatory and punitive damages and injunctive relief. James is presently incarcerated in USP-Florence in Florence, Colorado.

Defendants answered the complaint (Doc. 21) and filed a Motion to Dismiss for lack of jurisdiction (Doc. 33). James responded to that motion (Docs. 36, 40). Defendants' Motion to Dismiss is now before the Court for disposition.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

James alleges that on June 26, 2015, he activated his in-cell duress alarm, to which LaCroix responded (Doc. 1). James contends he told LaCroix that his cellmate was threatening to kill him if he did not perform oral sex on him, but LaCroix responded that she "didn't care" and said there were "no open cells," then walked away (Doc. 10). James contends his cellmate persisted in his demands, and notified both LaCroix and Carvajal, on June 27, 2015, that he was being sexually harassed (Doc. 1). James was attacked by his cellmate on June 28, 2015, causing James to suffer a broken tooth, lacerations inside his mouth, a bloodied nose, contusions to his face and head, and injuries to his ribs and spine (Doc. 1).

James filed an informal resolution attempt on June 28, 2015, asking to have his tooth repaired and contending he had written three{2017 U.S. Dist. LEXIS 3} sick calls (Doc. 1-1, p. 1/4). On July 15, 2015, James filed a grievance alleging LaCroix had failed to take any steps to protect him from an assault and attempted sexual assault by his cellmate (Doc. 1-1, p. 2/14). The BOP responded there was no evidence to support his claim and that SHU staff was required to move him if his safety was threatened by his cellmate (Doc. 1-1, p. 3/14; 33-5, p. 55/67). The BOP did not mention the fact that an attempted sexual assault was involved (Doc. 1-1, p. 3/14; 33-5, p. 55/67).

James filed a second step grievance to the regional office, again alleging his cellmate had sexually harassed him (Doc. 1-1, p. 4/14). The Regional Director assigned the case for investigation pursuant to the Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program (Doc. 1-1, p. 5/14). The investigator interviewed LaCroix, and she denied that James had notified her of any issues with his cellmate (Doc. 33-5, p. 59/67).

James also filed a federal tort claim for personal injury damages for the assault (Doc. 1-1, p. 6/14). James did not mention the sexual component of the assault, and the BOP treated the event as if it was an ordinary assault and{2017 U.S. Dist. LEXIS 4} fight (Doc. 33-5, p. 65/67). The BOP denied James' tort claim due to lack of proof that he had complained to LaCroix, and the fact that he was being given dental and medical treatment (Doc. 11, pp. 2-3).

James was transferred to USP-Florence in November 2015 (Doc. 1-1, p. 8/14).

## II. Law and Analysis

### A. The United States' Motion to Dismiss James's FTCA claim should be denied.

### 1. Standards Governing the Rule 12(b)(1) Motion to Dismiss.

Lack of subject matter jurisdiction may be found on any one of the following bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the Court's resolution of disputed facts. See Robinson v. TCI/US West Communications, Inc., 117 F.3d 900 (5th Cir. 1997). Where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. No presumptive truthfulness attaches to the plaintiff's allegations. Montez v. Dep't of Navy, 392 F.3d 147, 149 (5th Cir. 2004).

### 2. The discretionary function exception to immunity does not apply.

The United States contends this Court lacks subject matter jurisdiction over James's **FTCA** claim because the United States has not waived sovereign immunity{2017 U.S. Dist. LEXIS 5} where a federal employee exercises a discretionary function or duty.

The **FTCA** waives the United States' sovereign immunity for the torts of federal employees by granting federal district courts jurisdiction over suits for damages "caused by the negligent or wrongful act or omission of any employee of the Government. . . ." See 28 U.S.C. § 1346(b); see

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

also Longino v. U.S. Dept. of Agric., 912 F.Supp.2d 424, 429 (W.D. La. 2012) (citing Linkous v. United States, 142 F.3d 271, 275 (5th Cir. 1998)). Under the **FTCA**, the United States may be liable if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. See Longino, 912 F.Supp.2d at 429 (citing United States v. Olson, 546 U.S. 43, 44, 126 S. Ct. 510, 163 L. Ed. 2d 306 (2005)); see also 28 U.S.C. §§ 1346(b)(1), 2674. However, the **FTCA** also limits the United States's liability in certain respects. See Aretz v. U.S., 604 F.2d 417, 426 (5th Cir. 1979), on rehearing, 635 F.2d 485 (5th Cir. 1981).

The waiver of sovereign immunity under the **FTCA** does not apply to "discretionary functions." 28 U.S.C. 2680(a). The government is not liable for any claim arising from the exercise of discretion in the performance of governmental functions or duty, whether or not the discretion involved is abused. See Sutton v. U.S., 819 F.2d 1289 (5th Cir. 1987).

To determine if the discretionary function exception to the **FTCA** applies, a court must consider first whether the challenged conduct involves an element of judgment or choice. See Mitchell v. United States, 225 F.3d 361, 363 (3d Cir. 2000), writ den., 532 U.S. 1007, 121 S. Ct. 1733, 149 L. Ed. 2d 658 (2001) (citing United States v. Gaubert, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991)). Under step one of the analysis, the discretionary function{2017 U.S. Dist. LEXIS 6} exception does not apply if the challenged action in fact violated a federal statute, regulation, or policy. If a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary. Gibson, 809 F.3d at 812 (citing Spotts v. United States, 613 F.3d 559, 567 (5th Cir. 2010)). To be non-discretionary, a policy must prescribe a specific course of action for an agency or employee to follow. Gibson, 809 F.3d at 812 (citing Lopez v. U.S. Immigration and Customs Enforcement, 455 Fed.Appx. 427, 433 (5th Cir. 2011), cert. den., 568 U.S. 817, 133 S. Ct. 138, 184 L. Ed. 2d 30 (U.S. 2012)). Second, even if the challenged conduct involves an element of judgment, the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." See Mitchell, 225 F.3d 361, 363 (citing Gaubert, 499 U.S. at 322-23).

This case is governed by statutes, BOP policy, and rules implemented pursuant to the Prison Rape Elimination Act ("**PREA**"). See 28 C.F.R. §§ 115.5, et seq.; 42 U.S.C. §§ 15601, et seq.; BOP Program Statement ("PS") 5324.12 (eff. 6/4/2015).

Generally, the United States owes a duty of care to federal prisoners under 18 U.S.C. § 4042, which states, in relevant part, that the BOP shall "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." See 18 U.S.C. § 4042(a)(2). Other relevant regulations are 28 C.F.R. § 541.10(a) (relating to disciplinary{2017 U.S. Dist. LEXIS 7} action against inmates) and 28 C.F.R. § 541.22(a) (regarding placements in administrative segregation). The United States argues in its brief that those regulations afford the BOP discretion in matters of prison security, inmate discipline, and the classification and housing of inmates.

In the **PREA**, Congress required the Attorney General to promulgate regulations concerning sexual abuse prevention which would be binding upon the Federal Bureau of Prisons. See 42 U.S.C. § 15607. Statutes were created, 28 C.F.R. §§ 115.5, et seq. ("Prisons Rape Elimination Act National Standards"), and BOP Program Statement ("PS") 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, went into effect on June 24, 2015 to further the goals of the **PREA**. PS 5324.12 provides a written policy for dealing with sexual abuse and sexual harassment, including inmate against staff, inmate against inmate, and staff against inmate. PS 5324.12 further provides that (i) the BOP has a "zero tolerance" philosophy in regard to sexually abusive behavior, (ii)

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

allegations of sexually abusive behavior will receive prompt intervention upon report, and (iii) perpetrators of sexually abusive behavior will be disciplined and, when appropriate, prosecuted. <u>See Riascos-Hurtado v. United States</u>, 2015 U.S. Dist. LEXIS 73821, 2015 WL 3603965, at *2 (E.D.N.Y. 2015).

BOP rules were{2017 U.S. Dist. LEXIS 8} implemented, also effective June 24, 2015 pursuant to PS 5324.12, that follow each of the statutory regulations. BOP staff are required to follow those rules when sexually abusive behavior occurs. Pursuant to those rules, BOP staff is required to provide security to any inmate who alleges that he/she is the victim of sexually abusive behavior. Relevant statutes in 28 C.F.R. and the implementing BOP rules are:

§ 115.61, Staff and agency reporting duties- "The agency shall require all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding and incident of sexual abuse or sexual harassment that occurred in a facility." The rule at USP-Pollock states that all staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, and provide a written follow-up memorandum to document the report. The Operations Lieutenant must notify the **PREA** Compliance Manager.

§ 115.62, Agency protection duties-"When an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate." The rule at USP-Pollock provides that,{2017 U.S. Dist. LEXIS 9} in cases where the alleged perpetrator is another inmate, the Operations Lieutenant is notified immediately and immediately safeguards the inmate.

§ 115.64, Staff first responder duties-"Upon learning of an allegation that an inmate was sexually abused, the first security staff member to respond to the report shall be required to: (1) Separate the alleged victim and abuser: (2) Preserve and protect any crime scene until appropriate steps can be taken to collect any evidence;...." The USP-Pollock rule provides "[t]he staff first responder must preserve the crime scene. SIS staff are responsible for collecting information/evidence...."

§ 115.65, Coordinated response-"The facility shall develop a written institutional plan to coordinate actions taken in response to an incident of sexual abuse, among staff first responders, medical and mental health practitioners, investigators, and facility leadership." The USP-Pollock rule sets forth initial response steps which include: (1) All staff report incidents of sexual abuse to the Operations Lieutenant (see § 115.61); (2) The Operations Lieutenant immediately safeguards the inmate (see §§ 115.43, 115.62), (3) the Operations Lieutenant promptly refers all inmates reported to be the victim{2017 U.S. Dist. LEXIS 10} of sexually abusive behavior to the Health Services Unit; and (4) the Operations Lieutenant promptly refers all inmates reported to be the victim of sexually abusive behavior to Psychology Services for assessment.

Thus, there are now BOP rules that provide a non-discretionary and specific course of action for the staff at USP-Pollock to follow when reporting and dealing with inmate complaints of sexual abuse and harassment. Because James alleges that LaCroix and Carvajal violated BOP policy and rules when they failed to follow the BOP procedures for handling his complaint of sexual harassment, the discretionary function exception to liability under the **FTCA** is not applicable. The United States' motion to dismiss James' **FTCA** claim pursuant to the discretionary function exception to liability should be denied.

**B. Defendants' motion for summary judgment should be denied in part and granted in part**.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable. Hare, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct. See Douthit v. Jones, 619 F.2d 527, 533 (5th Cir. 1980). A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm, or took an action which, although not intended to do harm, was so likely to produce injury that the harm was substantially certain to result. See Douthit, 619 F.2d at 533.

**3. There are genuine issues of material fact that preclude a summary judgment on James's FTCA claim.**

The United States contends that James has not stated a claim for negligence by Officer LaCroix or Warden Carvajal. The United States argues that, although the BOP has a duty to exercise ordinary care, there is no evidence{2017 U.S. Dist. LEXIS 14} of a breach of that duty, or that such breach was the cause in fact or legal cause of James's injuries.

In order to recover, a plaintiff must show the Government was negligent in the exercise of its responsibilities. Jones v. U.S., 534 F.2d 53, 54 (5th Cir. 1976), cert. denied, 429 U.S. 978, 97 S. Ct. 487, 50 L. Ed. 2d 586 (1976). In this case, Louisiana law controls because the incident occurred in this state.

Articles 2315 and 2316 of the Louisiana Civil Code provide that every person is responsible for damages caused by fault or negligence. Bursztajn v. U.S., 367 F.3d 485, 489 (5th Cir. 2004), citing Pitre v. Louisiana Tech Univ., 95-1466 (La. 5/10/96), 673 So.2d 585, 589. The relevant inquiries are:

(1) Was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm?

(2) What, if any, duties were owed by the respective parties?

(3) Were the requisite duties breached?

(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

(5) Were actual damages sustained?If the plaintiff fails to satisfy one of the elements of this "duty-risk" analysis, the defendant is not liable. Bursztajn, 367 F.3d at 489 (citing Pitre, 673 So.2d at 589-90).

The new policy and rules for handling inmate complaints of sexual harassment and sexual assault leave BOP officers no discretion as to whether to follow those procedures. James alleges that LaCroix and Carvajal had a duty to follow those procedures for reporting his{2017 U.S. Dist. LEXIS 15} complaint and securing his safety; a breach of that duty by failing to follow those procedures; and James' resulting injuries when his cellmate attacked him the following day.

Defendants argue there is no evidence that James complained to LaCroix and Carvajal. Carvajal states in an affidavit (Doc. 33-5) that he did not sign the SHU logbook on June 27, 2015, so he was not there for James to have complained to him. However, James contends in his brief (Doc. 40) that he emailed a "cop out" to Carvajal, rather than complaining to him directly in the SHU.

Defendants submitted an unverified statement by LaCroix in which she states: "On June 26, 2015 at no time was I ever told by inmate James, Rashod Reg. No. 22665-045 that he felt his life was in any type of danger" (Doc. 33-5). LaCroix states in an affidavit that she does not remember very much about James and does not remember him complaining to her about his cellmate (Doc. 33-7). LaCroix states that she would not have ignored a compliant that an inmate feared his cellmate, but would

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

have referred it for immediate investigation and would have separated the inmates (Doc. 33-7). In his brief (Doc. 40), James repeats his contention that he{2017 U.S. Dist. LEXIS 16} complained directly to LaCroix, but she ignored his complaint.

Although Defendants argue there is no proof that James complained to LaCroix and Carvajal, he contends they ignored his complaint, which would explain why there is no evidence that he complained. Moreover, the evidence submitted by Defendants does not foreclose the possibility that James complained to LaCroix, and LaCroix simply does not remember that complaint.

Since there are genuine issues of material fact as to whether James complained to LaCroix and Carvajal about his cellmate's threats, whether they ignored his complaint, and whether they otherwise failed to follow the new rules for dealing with inmate complaints of sexual abuse, Defendants' motion for summary judgment should be denied on this issue.

**4. There are genuine issues of material fact that preclude a summary judgment on James's Bivens claims against LaCroix and Carvajal.**

James filed Bivens claims against Warden Carvajal, Officer LaCroix, and Regional Director John Dee. Under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), a plaintiff may recover damages for any injuries suffered as a result of federal agents' violations of his constitutional rights. A Bivens action is analogous to an action under § 1983, and{2017 U.S. Dist. LEXIS 17} the Fifth Circuit does not distinguish between Bivens and § 1983 claims. See Izen v. Catalina, 393 F.3d 363, 367 n.3 (5th Cir. 2005). The constitutional torts authorized by each are coextensive. Izen, 398 F.3d at 367, n.3.

For an inmate to succeed on a claim based on a failure to prevent harm, he must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) the prison official was "deliberately indifferent" to his health or safety. Failing to act with deliberate indifference to a substantial risk of harm is the equivalent of recklessly disregarding that risk. See Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Deliberate indifference is a subjective test, and it must be shown that the official actually knew of the risk of harm to the inmate. It is insufficient to show solely that the official should have known of the risk. The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. See id. at 837.

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. See id. at 841. A fact finder may conclude that a prison official knew of a substantial risk from the very{2017 U.S. Dist. LEXIS 18} fact that the risk was obvious. See id. at 842. It remains open to an official to prove that he was unaware of even an obvious risk to inmate health and safety. See id. at 844; see also Hinojosa v. Johnson, 277 Fed.Appx. 370, 374 (5th Cir. 2008). The failure of a prisoner to give any advance notice to prison officials of potential danger to the prisoner's safety is not dispositive of the issue of the official's awareness, see Farmer, 511 U.S. at 848, nor is advance notice of a substantial risk of assault posed by a particular fellow prisoner a prerequisite, see id. at 849.

A prison official who actually knew of a substantial risk to inmate health and safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted. See id. at 844.

James contends that, when he first told Officer LaCroix he was being sexually harassed and threatened with assault by his cellmate, she told him she did not care and there was no space to move him to, and walked away. James further contends he complained of the sexual harassment to both LaCroix and Warden Carvajal the next day. James contends LaCroix and Carvajal ignored his

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ATTACHMENT C

---

**MICHAEL LYNN HOLMES, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, TERRE HAUTE DIVISION**
**2021 U.S. Dist. LEXIS 99598**
**No. 2:18-cv-00487-JMS-MJD**
**May 26, 2021, Decided**
**May 26, 2021, Filed**

---

Counsel                    {2021 U.S. Dist. LEXIS 1}**MICHAEL LYNN HOLMES**, Plaintiff, Pro se, ATWATER, CA.

For UNITED STATES OF AMERICA, Defendant: Julian Clifford Wierenga, UNITED STATES ATTORNEY'S OFFICE (Indianapolis), Indianapolis, IN.

**Judges:** Hon. Jane Magnus-Stinson, United States District Judge.

Opinion

**Opinion by:**        Jane Magnus-Stinson

                                Opinion

### Order Denying Cross-Motions for Summary Judgment

Michael Holmes was assaulted by his cellmate in the Special Housing Unit (SHU) at the United States Penitentiary in Terre Haute, Indiana (USP-TH). He brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, alleging that prison officials were negligent in failing to prevent the assault.1 Holmes and the United States seek summary judgment. For the reasons that follow, the motions for summary judgment are denied.

### I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the{2021 U.S. Dist. LEXIS 2} materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v.*

1ygcases                                1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court{2021 U.S. Dist. LEXIS 3} views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Facts

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered to be undisputed except where disputes are noted.

### A. The Assault on Holmes

When correctional officers assigned Offender Spratley to Holmes's cell in July 2017, Spratley had a reputation for assaulting other inmates and possessing dangerous weapons. Dkt. 109-2 p. 3, 4, 6, 7, 8; dkt. 108-1 *Id.* p. 27, Holmes Dep. at 26:19-25. Holmes objected to sharing a cell with Spratley. He explains: "I told Mr. Tindall and Mr. Porter that{2021 U.S. Dist. LEXIS 4} I wasn't trying to take that dude back in my cell because whatever he is going through has nothing to do with me...." Dkt. 108-1 p. 27, Holmes Dep. at 26:20-23. He further states:

> I told them, man, I don't want that dude in my cell. You all know how he is. You all know how I am. I don't have time with that foolishness. Find somebody else to put him in the cell with. You know. Like this dude got so many issues, he shouldn't even [have] a cellie.

> You know, every time you turn around, [he's] getting caught with knives in his shoe, he's stabbing guys in the rec cage, he's jumping on guys with their handcuffs on, so I was trying not to be one of his victims....*Id.* p. 28, Holmes Dep. at 10-20.

On July 14, 2017, Holmes identified a change in the tenor of his relationship with Spratley. *Id.* p. 43-44, Holmes Dep., at 42:24-43:4. After spending the next day in silence, Spratley suddenly jumped on Holmes's bed at dinnertime and started stabbing him with two shanks. *Id.* p. 44, Holmes Dep. at 43:5-22. During that altercation, Holmes wrested one of those weapons - an ice pick - from Spratley and began stabbing him with it. *Id.* p. 165-67, Holmes Dep. at 164:19-166:7. Both inmates were ultimately disciplined{2021 U.S. Dist. LEXIS 5} for their involvement in the altercation. Dkt. 109, ¶¶ 6-7. Before the assault, Holmes and Spratley were not separatees, nor had Holmes ever requested protective custody from Spratley. *Id.*, p. 65, Holmes Dep. at 64:20-65:2.

Holmes alleges that Spratley had the weapons in his possession when he moved into their shared cell. Holmes has no specific evidence other than his own inference to support this allegation. *Id.* p. 99-100, Holmes Dep. at 98:25-99:4. Holmes does not actually know where or when Spratley obtained those weapons - the first time he saw them was when Spratley attacked him, approximately six days after Spratley was placed in their shared cell. *Id.*, p. 99, Holmes Dep. at 98:13-24; *see also id.* p. 52, 53, Holmes Dep. at 51:15-20, 52:12-15. In addition, Holmes does not know whether, how, or by

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

whom-if anyone-Spratley was searched or scanned before he was placed into their shared cell. *Id.*, p. 75-78, Holmes Dep. at 74:24-75:3; 75:9-18; 76:19-77:2. He further admits that Spratley could have concealed a weapon before entering the cell such that even a thorough search would not have identified it. *Id.*, p. 79-80, 83-84, Holmes Dep. at 78:21-79:1; 82:24-83:5.

## B. The BOP's Safety Measures{2021 U.S. Dist. LEXIS 6} to Prevent Contraband

The United States Bureau of Prisons (BOP) undertakes efforts to prevent the trafficking of contraband at the USP-TH. Dkt. 109, ¶ 13. These efforts include pat searches of inmates upon exiting or entering their cells; a visual search and screening with a hand-held metal detector of any inmate being admitted to the SHU as a new commitment, on return from call out, for a visit, or for any other reason; a pat search and scan of any inmate going to or returning from recreation; visual search and scanning of inmate work crews entering the SHU; scanning of all laundry and supplies before their entry into the SHU; and hand-search of laundry and supplies once they enter the SHU. *Id.* BOP officers in the SHU are also authorized, in their discretion, to write incident reports for inmates making "fish lines" or using other methods to pass materials from cell to cell. *Id.* In addition, the BOP, through its Disciplinary Hearing Office, routinely investigates incidents where weapons are found in inmates' possession and imposes discipline for such offenses. *Id.* No evidence documents what, if any, safety measures were taken before Spratley was placed in Holmes's cell or during the{2021 U.S. Dist. LEXIS 7} time that the two shared a cell.

## III. The United States' Motion for Summary Judgment

The United States argues that it is entitled to summary judgment on Holmes's claims because the claims are barred by the discretionary function exception to the FTCA. The United States also argues that there is no evidence of negligence.

## A. Discretionary Function Exception

Through the FTCA, Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees in certain circumstances, subject to various exceptions. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008). One such exception is the discretionary function exception, which maintains sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *See* 28 U.S.C. § 2680(a). The discretionary function exception is an affirmative defense to liability under the FTCA that the government must plead and prove. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014) (citing *Parrott v. United States*, 536 F.3d 629, 634-35 (7th Cir. 2008); *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008); *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952); *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 n. 2, 56 V.I. 901 (3d Cir. 2012) (collecting cases from other circuits)). To support summary judgment under the exception, the government must offer evidence that shows beyond reasonable{2021 U.S. Dist. LEXIS 8} dispute that its conduct was shielded by the exception. *Id.*

The discretionary function exception has two elements. *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997). "First, a discretionary act must be involved. In other words, the act for which liability is sought to be imposed must involve 'an element of judgment or choice.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991)). Second, "'even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Gaubert*, 499 U.S. at 322). "[T]he exception protects only governmental actions and decisions based

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

on considerations of public policy." *Id.*

The United States argues that the discretionary function exception shields it from liability on Holmes's allegations that: (1) Spratley should not have been placed in his cell; (2) officers failed to properly scan Spratley before his placement; and (3) officers failed to sufficiently prevent weapons trafficking generally.

**1. Spratley's Placement**

The United States first argues that Spratley's housing and designation are subject to the discretionary function exception.

**a. Discretionary Act**

With respect to the first element of the discretionary function exception, the{**2021 U.S. Dist. LEXIS 9**} United States points to the BOP's statutory authority under 18 U.S.C. § 4081 to classify prisoners. Section 4081 provides that prisoners should be classified: "according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to [correctional] institutions." While several polices and regulations govern placement of inmates, Holmes has not directed the Court to any mandatory polices. The United States thus has shown that deciding where to house Spratley was a discretionary act.

**b. Exercise of Discretion**

The United States, however, has not shown the second element of the discretionary function exception. The United States relies in part on *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997). In that case, Faustino Calderon reported to BOP personnel that another inmate had threatened him. *Id.* at 948. Prison personnel took no steps to protect him, and the other inmate later assaulted him. *Id.* Calderon sued under the FTCA, and the United States moved to dismiss Calderon's complaint based on the discretionary function exception. The district court granted the motion to dismiss, and the Seventh Circuit{**2021 U.S. Dist. LEXIS 10**} affirmed. The court reasoned that because there was no mandatory, non-discretionary disciplinary action that prison personnel were required to take against the inmate who threatened Calderon, any action on the part of prison personnel was purely discretionary. *Id.* at 950. The court went on to explain that Calderon did not present any facts which would support a finding that the BOP's action not to discipline the inmate who threatened him was based on grounds other than considerations of public policy. *Id.* The court stated: "It is clear that balancing the need to provide inmate security with the rights of inmates to circulate and socialize within the prison involves considerations based upon public policy." *Id.* at 951 (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).

In *Calderon*, the Court presumed, based on the complaint and the arguments before it, that the decision not to act on the alleged threats was an exercise of judgment by the prison officials. The Seventh Circuit later clarified this holding, in another case involving injuries an inmate received at the hands of fellow prisoner, reasoning that if the record does not support a presumption that the officials exercised judgment, then the United States has not shown the applicability of{**2021 U.S. Dist. LEXIS 11**} the discretionary function exception. *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003).2 The Court explained:

> Unstated but implicit in *Calderon* is the assumption that prison officials in that case had taken note of the threats against the plaintiff in that case and weighed the relevant considerations in deciding how best to act (or not) in response to those threats. There is no hint, for example, that prison officials simply ignored the reported threats, or forgot about them. The Court also held:

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

"Although *Calderon* makes clear that prison officials enjoy discretion in matters of inmate safety, we do not know at this juncture whether the actions (or inaction) leading up to the altercation in which [the inmate] was injured involved judgment." *Id.* at 431; *see also Keller*, 771 F.3d at 1024 ("[I]f prison officials behaved negligently without making a discretionary judgment of the type shielded by the exception, the discretionary function exception would not apply to their conduct.").

Thus, as explained in *Palay*, the discretionary function exception requires not only a finding that there is no mandatory policy on the alleged conduct, but also a conclusion that{2021 U.S. Dist. LEXIS 12} the officials actually exercised some discretion. *See Palay*, 349 F.3d at 432. As that court explained, in *Calderon* there was "no hint . . . that prison officials simply ignored the reported threats, or forgot about them." *Id.* Here, there is such a hint. Holmes testified that he asked not to be placed with Spratley and that Spratley was known to attack other inmates when they were not cuffed and to traffic weapons. There is no evidence as to whether any correctional official exercised any judgment in placing Spratley or in response to Holmes's objections. Without such evidence the United States has not met its burden to support the affirmative defense. *Cf. Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (applying discretionary function exception to negligence complaint where the record reflected that officials had considered security, cost, overcrowding, medical care, and the suitability of each facility to meet the needs of the prisoner when placing an inmate). Although it is possible that this decision was the result of permissible policy judgments, it also is possible that the prison officials simply ignored Holmes's objections and the risk that Spratley posed without weighing relevant policy considerations. The United States therefore has not shown that{2021 U.S. Dist. LEXIS 13} the discretionary function exception applies to Holmes's claim that Spratley was improperly placed with him over his objections.

## 2. Scanning Spratley for Weapons

The United States also argues that the discretionary function applies to Holmes's allegation that correctional officers acted negligently by failing to properly scan Spratley for weapons when placing him with Holmes.

The United States argues that 18 U.S.C. § 4042, which provides that the BOP must "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States," is not mandatory, but discretionary.

Again, by showing that the policies regarding inmate supervision are not mandatory, the United States has shown the first element of the discretionary function exception, but the United States has again not shown second element. In *Palay*, discussed above, which involved a claim of negligent inmate supervision, the Seventh Circuit identified situations in which this second element may not be met:

Perhaps the corrections officer monitoring the holdover unit at the time that the gang altercation broke out was simply asleep, for example. Or perhaps he left the unit unattended in order{2021 U.S. Dist. LEXIS 14} to enjoy a cigarette or a snack. That type of carelessness would not be covered by the discretionary function exception, as it involves no element of choice or judgment grounded in public policy considerations.*Palay*, 349 F.3d at 432. Here, there is no evidence regarding what steps correctional officials took, if any, to scan Spratley for weapons before placing him with Holmes. There is therefore no evidence that they exercised discretion and were not simply careless in doing so. The United States thus has not shown that the discretionary function exception applies to Holmes's claim that correctional officers were negligent in failing to ensure Spratley did not have weapons before placing him with Holmes.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### 3. The BOP's Overall Efforts to Prevent Weapons Trafficking

The United States also argues that the discretionary function exception applies to any claim that correctional officials at the USP Terre Haute were negligent in failing to prevent weapons trafficking in the SHU. Again, as with the allegations discussed above, the United States has not provided evidence that prison officials actually exercised any discretion in this instance to prevent Spratley from trafficking weapons and therefore has not met its{2021 U.S. Dist. LEXIS 15} burden to prove the discretionary function exception.

### B. Negligence

The United States also argues that Holmes's negligence claims fail on their merits.

Under the FTCA, a negligence claim against the United States is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, because the actions Holmes complains of occurred in Indiana, Indiana law applies. *See id.* To prove negligence under Indiana law, Holmes must establish: (1) a duty owed to him by the defendant; (2) a breach of that duty by the defendant; and (3) that the breach proximately caused the plaintiff's damages. *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010).

The United States argues that it cannot be held liable for negligence because Spratley's attack on Holmes with contraband weapons was not foreseeable. The Indiana Supreme Court has held that foreseeability is a component of the duty and causation elements. *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E. 3d 384, 389-90 (Ind. 2016). The court explained:

> [A] court's task-in determining "duty"-is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced{2021 U.S. Dist. LEXIS 16} that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" ... [in] more focused, fact-specific settings....*Id.* at 391 (quoting *Strahin v. Cleavenger*, 216 W. Va. 175, 603 S.E. 2d 197, 207 (2004)). "[T]he mere fact that a particular outcome is 'sufficiently likely' is not enough to give rise to a duty. Instead, for purposes of determining whether an act is foreseeable in the context of duty we assess 'whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it.'" *Id.* (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W. 3d 347, 366 (Tenn. 2008)).

The United States argues that the specific risk of harm to Holmes - that Spratley would sneak prohibited handmade weapons into their cell and attack him - was not known to any BOP employee before it happened. The United States asserts that while Holmes had stated an objection to sharing a cell with Spratley, his objections were not based on any particularized threat to Holmes, but because he objected to Spratley's sexual orientation and general history of unruly behavior. Because this was not foreseeable, according to the United States, it had no duty to take specific steps to protect Holmes.

But the United States misconstrues the evidence, and indeed{2021 U.S. Dist. LEXIS 17} ignores the proper standard on summary judgment, which requires the Court to construe the facts in the light most favorable to the non-movant. In fact, Holmes testified at this deposition not only that Spratley was generally unruly, but specifically that Spratley had a tendency to assault other inmates and had been caught several times with weapons. Dkt. 108-1 p. 30-31, Holmes Dep. at 29:20-30:16, p. 32, Holmes Dep. at 31:11-21, p. 41, Holmes Dep. at 40:1-8. Based on these facts a reasonable jury might find that, by placing Spratley in Holmes's cell and not actually ensuring that Spratley had no

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

weapons, the United States breached a duty to Holmes that caused his injuries.

In short, the United States has not shown its entitlement to summary judgment on Holmes's negligence claim. A reasonable trier of fact could conclude based on the facts described above that the United States breached a duty to Holmes to ensure his safety and that this breach caused his injuries.

## IV. Holmes's Motion for Summary Judgment

Holmes also moves for summary judgment on his claims. In support of his motion, he argues that the United States failed to respond properly to his discovery requests and that prison officials{2021 U.S. Dist. LEXIS 18} negligently ignored the risk that Spratley posed to him.

As discussed above, it is undisputed that Holmes asked officers not to place Spratley in his cell because Spratley had a history of violence and weapons trafficking. But Holmes has not designated evidence sufficient to show as a matter of law that prison officials acted negligently. A reasonable trier of fact thus might or might not conclude that the United States breached a duty to Holmes to ensure his safety. Accordingly, Homes is not entitled to summary judgment on his claims.

## V. Conclusion

For the foregoing reasons, the United States' motion for summary judgment, dkt. [107], and Holmes's motion for summary judgment, dkt. [108], are each **denied**. This case will proceed to settlement negotiations or trial if one is necessary.

The Court *sua sponte* reconsiders Holmes's motion for assistance with recruiting counsel, dkt. [65], and now **grants** that motion. The Court will proceed to attempt to recruit counsel to represent Holmes for the remainder of this case.

Holmes's motion to amend summary judgment in which he asserts that the United States still has not provided adequate responses to his discovery motions despite the Court's ruling{2021 U.S. Dist. LEXIS 19} granting in part his motion to compel, dkt. [121], is more properly understood to be a renewed motion to compel and is **denied without prejudice**. Once counsel is recruited to represent Holmes, the Court will entertain whether further discovery, including further interrogatory responses, is required, if recruited counsel determines it is in Holmes's best interest to pursue it. The Court notes, however, that if recruited counsel does not seek further discovery, the United States is bound by the discovery responses that have already been provided. New evidence that has not been previously disclosed will not be permitted.

**IT IS SO ORDERED**.

Date: 5/26/2021

/s/ Jane Magnus-Stinson

Hon. Jane Magnus-Stinson, Judge

United States District Court

Southern District of Indiana

**Footnotes**

1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Holmes also brought constitutional claims against individual correctional officers at FCI-TH, but those claims were dismissed for Holmes's failure to exhaust his available administrative remedies. Dkt. 77.
2

The United States relies on *Calderon* and does not mention *Palay* or other more recent Seventh Circuit cases discussed below that clarified the discretionary function exception. In fact, the United States affirms in reply in support of its motion for summary judgment that "it has been unable to identify any Seventh Circuit decision adopting" the doctrine that an "official's lazy or careless failure to perform his or her discretionary duties" removes the action from the discretionary exception. Dkt. 117 p. 7. But the Seventh Circuit said just that in *Keller* when it held that "lazy or inattentive" actions are not covered by the discretionary function exception. 771 F.3d at 1025. The Seventh Circuit provided similar instruction in *Palay*, stating that carelessness such as leaving a prison unit unattended "to enjoy a cigarette or a snack" is not covered. 349 F.3d at 432. In addition, the United States relies largely on out-of-circuit caselaw that is inconsistent with Seventh Circuit law. *See, e.g.*, dkt. 110 p. 19-20.

This is not an isolated incident. The United States has supported a discretionary function defense with the same sources in other cases in this Court, and the Court has made clear that *Calderon* does not control. *See Pronin v. United States*, 2:15-cv-183-JMS-DLP, dkt. 106 p. 9-10.

An attorney who files a brief in federal court certifies that his legal contentions "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. Fed. R. Civ. P. 11(b)(2). An attorney who practices in this Circuit "will not knowingly misrepresent" or "mischaracterize . . . authorities in any oral or written communication to the court." *Standards for Prof'l Conduct Within the Seventh Judicial Circuit*, avail. at http://www.ca7.uscourts.gov/rules-procedures/rules/rules.htm#standards (last visited May 25, 2021). An attorney who practices in Indiana "shall not knowingly make a false statement of . . . law to a tribunal" or "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." Ind. R. Prof'l Conduct § 3.3(a)(1)-(2)).

The United States' repeated reliance on *Calderon* to support its claim that it is entitled to protection from the discretionary function exception, without also addressing the requirement from subsequent, controlling law that it actually exercise that discretion, may well breach these obligations. A repeat of this argument before the undersigned in the future will result in summary denial of any motion raising it.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ATTACHMENT D

## A. Risk of Harm to Defendant While in __BOP__ Custody

The relevant __BOP__ framework concerning the protection of vulnerable inmates and use of solitary confinement is set out below. The evidentiary record strongly indicates that the defendant in this case falls within a category of individuals exceptionally vulnerable to abuse while incarcerated. Due to his risk profile, it is likely that D.W. would spend a substantial amount of time in solitary confinement, unless adequate precautions are taken by the __BOP__.

### 1. Designation to Medium or High Security Facility

While a sentencing court can make a recommendation to the __BOP__ about where a defendant should serve his prison term, the recommendation is not binding on the Bureau. In imposing a prison term, therefore, the court cannot alone ensure that programs necessary to an appropriate sentence will be available to a defendant. In this case it believes cooperation from the __BOP__ is likely. *See infra* Part VII.A.

After sentencing, inmates are designated to a correctional facility by the BOP's Designation and Sentence Computation Center ("DSCC"), "a centralized location where{**2016 U.S. Dist. LEXIS 94**} the vast majority of classification and designation decisions are made." Alicia Vasquez & Todd Bussert, *How Federal Prisoners are Placed*, 31 Crim. Just. 19, 20 (Spring 2016) ("Vasquez & Bussert"). The __BOP__ utilizes "an objective classification system that's determined by an individual's security level . . . ." Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 64:02-03 (Testimony of Mr. Wise). The five available security levels are "minimum, low, medium, high, or Administrative Max . . . ." *Id.* at 64:04. "An institution's security level assignment is based on its level of staff supervision (inmate-to-staff ratio) and security measures, {**198 F. Supp. 3d 57**} such as external patrols, towers, perimeter barriers, and internal security." Vasquez & Bussert at 19.

To determine the security level of an inmate, __BOP__ officials focus mainly on the PSR prepared by the Probation Department. The determinative issues are whether the inmate is violent and whether the offense is a violent one. *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 93:23-25 (Testimony of Mr. Wise). Once an inmate is assigned a security level, he or she is generally designated to a facility that is within that level. *See id.* at 64:02-08. Some factors may override the security level designation. For example, as a convicted{**2016 U.S. Dist. LEXIS 95**} sex offender, D.W. would not be eligible to be placed in camps-lower security facilities generally offering more programming opportunities for inmates. *See id.* at 64:09-16. Application of a public safety factor or a management variable may also affect an inmate's placement:

> The application of a [public safety factor], which is not confined to evidence of convictions, is intended to address information suggesting a need for greater security precautions. Examples include sentence length, removable alien status, sex offender status, and threat to a government official. Management variables are grounded in the "professional judgment of bureau staff" and are used to effectuate an inmate's placement at a facility inconsistent with the inmate's scored security level. This most commonly occurs when an inmate poses either a greater or lesser security risk than his or her assigned security level denotes or to facilitate program participation (e.g., permit completion of residential drug treatment despite a drop in security level). Vasquez & Bussert at 21.

Also to be considered is the Judgment and Commitment Order-including any recommendation from the sentencing judge-and any applicable sentencing objectives. *See* Hr'g{**2016 U.S. Dist. LEXIS 96**} Tr., Nov. 23, 2015, ECF No. 101, at 64:17-65:09 (Testimony of Mr. Wise). Ms. Rodman testified:

> [Q.] Does the __BOP__ also try to incorporate judicial input on these issues?

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

A. Yes, we do.

Q. How does that work?

A. The judge would put the recommendations on the actual Judgment and Commitment order.

Q. Okay. What kind of recommendations is the **BOP** receptive to receiving?

A. Programming or geographical location are ordinarily the ones that we get frequently.

Q. Can a judge also just highlight concerns he has?

A. Absolutely. *Id.* at 179:02-13; *see also* Vasquez & Bussert at 20 (stating that "[t]he designation process begins when the case documents-the judgment and commitment order, the presentence report (PSR), and the marshals request for designation (USMS 129)-are uploaded to eDesignate and electronically transmitted to the [BOP's Designation and Sentence Computation Center]" and noting "the critical role that the PSR plays in the designation process").

Congress has directed the **BOP** to take into consideration any statement made by the sentencing court "concerning the purposes for which the sentence to imprisonment was determined to be warranted" or "recommending a type of penal or correctional facility as appropriate." 18 U.S.C. § 3621(b)(4). While **{2016 U.S. Dist. LEXIS 97}** judicial recommendations **{198 F. Supp. 3d 58}** are not binding, the Bureau strives to follow them where possible. Recent **BOP** data indicates that "the *Bureau currently complies with 74 percent of recommendations*, wholly or in part." Vasquez & Bussert at 21 (emphasis added). Practical realities may sometimes limit the extent to which the **BOP** will implement a judge's recommendation:

Although they are not binding, Congress has directed the **BOP** to account for judicial recommendations relative to placement and programming decisions. The Bureau strives to follow all judicial recommendations where possible, recognizing that they "are carefully thought out and are important to" sentencing courts. *According to* **BOP** *data, the Bureau currently complies with 74 percent of recommendations, wholly or in part.*

Recommendations are usually set forth in the judgment and commitment order's imprisonment section. . . . Courts may wish to frame recommendations in terms of the reasons underlying them.

. . .

Despite best efforts, the Bureau may be unable to follow courts' recommendations due to conflict with policy or sound correctional management. Reasons for not meeting recommendations vary. For one, a recommendation may be for placement at an institution **{2016 U.S. Dist. LEXIS 98}** that is not commensurate with an offender's security level (e.g., to a low security prison where the offender qualifies for medium security) or at [an] institution without capacity to accept additional inmates at the time of designation. There may also be security considerations, such as separatee issues (avoiding placement of an offender with a codefendant against whom he or she cooperated, or vice versa) or efforts to balance populations of known gang members through the system. Finally, a recommended program may not be offered at the institution recommended . . . . *Id.* (emphasis added).

This description of the Bureau's attempts to comply with judicial recommendations was confirmed by Mr. Wise at the evidentiary hearing:

Q. What role does that recommendation, or what weight [is] that recommendation given in the Bureau's designation?

1ybcases                                           2

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

A. It's been my experience *it's always considered*. They'll look at that and they'll consider it. If it's within the realm of policy, their existing policy, if it's an appropriate designation, they'll try to satisfy that recommendation, but if it's outside their policy, their classification system, they generally won't follow the recommendation.

Q. And are**{2016 U.S. Dist. LEXIS 99}** there other reasons why, in individual cases, a judge's recommendation is not followed?

A. Sure. It could be population pressures, there may be no beds available at a particular facility, or it may be overcrowded .

. . .

There may be some overriding issues that would mandate a different kind of placement; for example, the Court might recommend a particular correctional facility, but the individual has medical problems that can't be addressed at that facility and has to go to a different kind for mental health problems.

So there are other reasons for not following a judicial recommendation besides just that it's outside the custody level or security level . . . .**{198 F. Supp. 3d 59}** Hr'g Tr., Nov. 23, 2015, ECF No.101, at 65:10-66:07 (emphasis added).

Determinations as to which inmates will be housed in one of the BOP's nine Sex Offender Management Programs (*see infra* Part IV.C.1) are also made by the **BOP** through its DSCC unit. Access to intensive resident Sex Offender Treatment Programs is usually limited to the last three years of an offender's sentence, and participation is voluntary:

[C]ourts need not recommend sex offender treatment or placement in one of the Bureau's nine sex offender management programs (SOMPs).**{2016 U.S. Dist. LEXIS 100}** Inmate participation in sex offender treatment is wholly voluntary and limited to the final portion of an offender's sentence, that is, the last approximate three years depending on severity of need. Further, determinations as to which inmates will be housed at a SOMP are made by DSCC officials. It is often the case that certain sex offenders (e.g., an inmate convicted of possession of child pornography with no history of inappropriate contact with minors) will be housed in FCI general populations.Vasquez & Bussert at 21-22; *see also infra* Part IV.C.

In the instant case, the parties agreed that D.W. is likely to be classified as either a medium or high security inmate. *See, e.g.,* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 67:03-12 (Testimony of Mr. Wise). He would therefore be ineligible for designation to low-security facilities. *Id.* at 67:13-22 (Mr. Wise explained that if D.W. "scores for medium security or high security, he's got to go, unless there's some really significant overriding reason, he's going to go to at least a medium-security facility"); *see also id.* at 67:24-68:04 (explaining that if D.W. were classified as a high security prisoner, he could potentially be assigned to a medium security facility;**{2016 U.S. Dist. LEXIS 101}** "because of some vulnerability issues that [the **BOP**] may perceive . . . even if he scores in the high security level they may drop him to a medium").

Medium or high security facilities are inherently more dangerous than lower security ones, as explained by Mr. Wise:

As you get into the medium and high-security level institutions, *you're dealing with inmates with longer sentences, more sophisticated criminal backgrounds, greater histories of violence*. They know they're going to be there for a substantial period of time. [I]n the lower security levels, they may tolerate things for a while. In the higher security level institutions, *they know they're going to*

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

*have to deal with this for a long time; and so, it's -- they're somewhat less tolerant.Id.* at 71:14-22 (emphasis added). The dangers faced by defendant are likely to be compounded by the overcrowding plaguing most **BOP** institutions. *See Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections Final Recommendations 15-17 (Jan. 2016) (describing the "overcrowding and poor conditions of confinement" in the federal prison system). Overcrowding increases security risks and limits the availability of services such**{2016 U.S. Dist. LEXIS 102}** as medical treatment and other programs. *See id.* at 17 ("In addition to creating security problems, overcrowding undermines the BOP's ability to provide programs, health services, case planning, and treatment that can help those in prison successfully return to the community."); *cf. Brown v. Plata*, 563 U.S. 493, 517-26, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011) (overcrowding in California State prison was primary cause of Eighth Amendment violations).

### {198 F. Supp. 3d 60} 2. Prison Rape Elimination Act ("PREA")

The government has long recognized that prison rape is a problem. It has taken serious steps to tackle this pervasive issue. Yet, despite its efforts, rape and other forms of sexual assault continue to occur in **BOP** facilities.

In 2003 Congress passed the Prison Rape Elimination Act ("PREA"). *See* 42 U.S.C. §§ 15601-15609 (2003). PREA was a response to reports of the high prevalence of male rape in prison.

Congress found that although "[i]nsufficient research has been conducted and insufficient data reported on the extent of prison rape . . . experts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison," with several inmates suffering "repeated assaults." *Id.* at § 15601(2). It was observed that inmates suffering from mental illness and young offenders were at greater risk**{2016 U.S. Dist. LEXIS 103}** of sexual victimization. *Id.* at § 15601(3).

PREA recognized that inmates who experience sexual violence in prison are less likely to successfully reenter society. The Act notes that "[v]ictims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison." *Id.* at § 15601(11). Sexually assaulted inmates are also more likely to commit crimes once they reenter their communities. *Id.* at § 15601(8) ("Prison rape endangers the public safety by making brutalized inmates more likely to commit crimes when they are released[.]").

Recognizing that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," PREA created the National Prison Rape Elimination Commission ("NPREC"). *Id.* at §§ 15601(13), 15606. The NPREC was tasked with issuing a report on the impact of prison rape and recommendations as to national standards aimed at improving the "detection, prevention, reduction, and punishment of prison rape." *Id.* at § 15606(e).

A report and recommendations were issued in June 2009. *See* National Prison Rape Elimination Commission Report (June 2009),  . Based in part on that report,**{2016 U.S. Dist. LEXIS 104}** the Department of Justice issued proposed rules in 2011, which were implemented the following year and are binding upon the **BOP**. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 76 Fed. Reg. 6248-6302 (Feb. 3, 2011); 28 C.F.R. § 115 (2012); 42 U.S.C. § 15607.

The rules address, among other issues: supervision and monitoring to protect inmates against sexual abuse; training of staff "on key topics related to preventing, detecting, and responding to sexual abuse;" the screening of inmates "for [the] risk of being sexually abused," providing that the "screening information be used to inform housing, bed, work, education, and program assignments,"

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

with the goal of keeping inmates "at high risk of victimization away from those at high risk of committing abuse;" the provision of medical and mental health care; and improved processes for the submission of grievances by inmates. *See* Gov't Opp'n Post-Hr'g Mem., Ex. 701 (Executive Summary, National Standards to Prevent, Detect, and Respond to Prison Rape, Dep't of Justice Final Rule (May 2012)) at 4-9.

### a) **BOP** PREA Program Statement

The BOP's Program Statement on Sexually Abusive Behavior Prevention and Intervention Program ("PREA Program Statement") provides a written policy implementing the rules adopted pursuant to PREA. *See* Def.'s Ex. R (**BOP** Program{**198 F. Supp. 3d 61**} {**2016 U.S. Dist. LEXIS 105**} Statement, Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) ("PREA Program Statement")). It provides guidelines to address sexually abusive behavior in **BOP** facilities, including between inmates, as well as between inmates and staff members. Included is the binding language from the federal regulations and the **BOP** implementing instructions. The purpose of the guidelines is to help detect incidents, prevent sexually abusive behavior, educate staff on how to timely and appropriately intervene, as well as document, report and investigate incidents, and discipline perpetrators. *See id.* at 1.

Pursuant to the PREA Program Statement, all incoming inmates are to be screened "for risk of victimization and abusiveness" within 72 hours of entering an institution. *Id.* at § 115.41. "[A]t a minimum," the intake screening shall consider the following factors in order to determine an inmate's risk of being subjected to sexual abuse:

> (1) Whether the inmate has a mental, physical, or developmental disability;
>
> (2) The age of the inmate;
>
> (3) The physical build of the inmate;
>
> (4) Whether the inmate has previously been incarcerated;
>
> (5) Whether the inmate's criminal history is exclusively nonviolent;
>
> (6){**2016 U.S. Dist. LEXIS 106**} Whether the inmate has prior convictions for sex offenses against an adult or child;
>
> (7) Whether the inmate is or is perceived to be gay, lesbian, bisexual, **transgender**, intersex, or gender nonconforming;
>
> (8) Whether the inmate has previously experienced sexual victimization;
>
> (9) The inmate's own perception of vulnerability; and
>
> (10) Whether the inmate is detained solely for civil immigration purposes.*Id.* at § 115.41(d).

The guidelines expressly recognize that inmates may possess several characteristics rendering them vulnerable to sexual abuse while in prison:

> Some inmates are "at risk" for victimization due to one or a combination of factors such as physical appearance (small in stature, effeminate, etc.); demeanor (weak/nonassertive, anxious, depressed); special situations (e.g., high-profile, sexual activity with a child, first-time offender); or special needs (cognitive limitations, social inadequacy, developmental disability, etc.).*Id.* An inmate's "risk of victimization or abusiveness" is to be reassessed "within a set time period, not to exceed 30 days from the inmate's arrival at the facility" as well as "when warranted due to a referral, request, incident of sexual abuse, or receipt of additional{**2016 U.S. Dist. LEXIS 107**}

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

information that bears on the inmate's risk of sexual victimization or abusiveness." *Id.* at §
115.41(f)-(g).

The information obtained through this initial screening process is then to be used to:

inform housing, bed, work, education, and program assignments with the goal of keeping
separate those inmates at high risk of being sexually victimized from those at high risk of being
sexually abusive.

Once an inmate has been identified as a victim or perpetrator, or as "at risk" for victimization or
perpetration, Unit Management should review classification options. These options may include
transfer to a special treatment program (e.g., Sex Offender Management Program), transfer to a
greater **{198 F. Supp. 3d 62}** or lesser security facility (e.g., management variable), application
of a [public safety factor] (e.g., sex offender), or changes in housing units, cell assignments, work
assignments, and/or education assignments.*Id.* at § 115.42(a); *see also* Hr'g Tr., Nov. 23, 2015,
ECF No. 101, at 148:21-25 (Ms. Rodman testifying that the purpose of the provisions is "[t]o
ensure the appropriate housing and program and treatment options for inmates"). The
information is also used to determine whether an inmate should be referred to Psychology
Services**{2016 U.S. Dist. LEXIS 108}** for treatment. *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101,
at 149:25-150:06.

### b) **BOP** PREA Intake Screening

In order to elicit this information, upon arrival to a **BOP** facility, an "intake screening form" is filled
out. The form includes questions aimed at determining the risks associated with placing the particular
inmate in the general population. An excerpt from the form is set out below:

INMATE INTERVIEW

DATE / TIME ARRIVED: __ TIME INTERVIEWED: __

INTERVIEWER COMMENTS: __

CIRCLE ONE:

I HAVE / HAVE NOT RECEIVED A BUREAU OF PRISONS "ADMISSIONS AND ORIENTATION
BOOKLET" DEFINING MY "RIGHTS AND RESPONSIBILITIES" AND THE "PROHIBITED ACTS
AND DISCIPLINARY SEVERITY SCALE".

DO YOU WISH TO SELF-IDENTIFY YOUR SEXUAL ORIENTATION, GENDER IDENTITY, ANY
DISABILITIES, AND/OR SELF-PERCEPTION**{2016 U.S. Dist. LEXIS 109}** OF VULNERABILITY ?
YES __ NO __ N/A __

Gov't Opp'n Post-Hr'g Mem., Ex. 103 (Current Inmate Intake Form).

As pointed out by Mr. Wise, the purpose of the form is to ascertain the risks to which a particular
inmate may be exposed:

I won't go into a long history of the development of the form, but there is a long history in the
Bureau of why we do this or why the Bureau does this. It has to do with ensuring that it's safe to
place an inmate in the general population when he first arrives at the institution before he is, in
fact, placed in the general population.

[T]he intake screening goes back decades, truly decades. And a form like this, not this form but a
form similar to this has been in use for a very long time in the Bureau.

**{198 F. Supp. 3d 63}** What they're trying to determine, number one, is if [the inmate] has

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

70354308

testified against anybody in court that may be in that institution that might want to hurt him. They want to know, number two, if there's anybody else in that population that might want to hurt him or that he might want to hurt. And the third thing is, generally, are there any particular vulnerabilities that would make it dangerous to place this guy in the general population. That's the basic reason**{2016 U.S. Dist. LEXIS 110}** for the form.Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 46:06-47:02.

At the time of intake, inmates are provided with a document that sets out the BOP's sexual abuse behavior prevention and intervention program. *See* Gov't Opp'n Post-Hr'g Mem., Ex. 105 (Federal Bureau of Prisons, *Sexually Abusive Behavior Prevention and Intervention: An Overview for Offenders* (2014)). The document provides an overview as to what amounts to sexually abusive behavior and includes details on how to prevent or report any incidents. *See id.*

Once the intake form has been completed, an "objective screening instrument" is used by **<u>BOP</u>** officials to assess whether the inmate meets any of the risk factors identified in the PREA Program Statement, and whether a referral to Psychology Services is warranted. *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 151:19-25 (Testimony of Ms. Rodman); Def.'s Ex. R (PREA Program Statement) at § 115.41(d) and Attachment A, reproduced below.

**{198 F. Supp. 3d 64} Attachment A.PREA Intake Objective Screening Instrument**

**Instructions**: Intake screening in the Bureau of Prisons is completed according to the Program Statement **Intake Screening**, In accordance with 28 C.F.R. 115.41 of the Prison Rape Elimination Act regulations, staff use this**{2016 U.S. Dist. LEXIS 111}** instalment when conducting intake screening per the Program Statement. Any specific information must be noted in the comment sections of the Intake Screening Form. If none of the criteria below apply, staff must make an entry stating "No PREA criteria met." in the comment section applicable to victimization or abusiveness.

**3. Limitations of PREA**

According to Mr. Wise, PREA achieved three main objectives: (1) it eases reporting of issues by inmates and by staff and protects them when they do report; (2) it helps codify and ensure the identification of vulnerable inmates; and (3) it requires a substantial amount of reporting and recordkeeping, to "identify what is going on there and what may be causing sexual **{198 F. Supp. 3d 65}** assaults." Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 101:18-102:02.

The parties and experts agree that, although the **<u>BOP</u>** has made progress in addressing physical and sexual abuse in its facilities, the problem is far from being solved. *See, e.g.,* Gov't Opp'n Post-Hr'g Mem. at 30 ("The defendant points out**{2016 U.S. Dist. LEXIS 114}** in his brief that, by certain measures, the rate of sexual assault in prison has not dropped since the imposition of PREA. *This is true.*") (emphasis added); *id.* at 42 (noting that the collection of data mandated by PREA "clearly indicate[s] that sexual assault persists as a problem in the prison context to a certain degree").

Sexual assaults in prisons, including staff abuse of inmates, continue to be a reality. Ms. Rodman acknowledged as much:

Q. You described a real comprehensive set of regulations and efforts to implement PREA. But, unfortunately, although it was called the Prison Rape Elimination Act, it has not, in fact, eliminated sexual assaults in prison?

A. Correct.

Q. That continues to happen -- people get sexually assaulted?

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

A. They can. . . .

Q. [PREA] hasn't eliminated staff abuse of inmates?

A. *I don't think anything will.*Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 179:20-180:02 and 193:01-02 (emphasis added); *see also* Br. of *Amici Curiae* Lambda Legal, NCLR, NCTE, and SRLP, in Supp. of Def., Mar. 10, 2016, ECF No. 134 at 17 (noting that PREA's goals are "significantly unfulfilled, and abuse of vulnerable prisoners persists").

The Department of Justice's Bureau of Statistics noted that, comparing data**{2016 U.S. Dist. LEXIS 115}** from 2011 and 2012 to previous years, the rate of sexual victimization had not changed in a statistically significant way:

Using the same methodology since 2007, *the change in rate of sexual victimization* among state and federal prison inmates over the three surveys (4.5% in 2007, 4.4% in 2008-09, and 4.0% in 2011-12) *was not statistically significant*. Among jail inmates, the rate of sexual victimization was nearly unchanged-3.2% in 2007, 3.1% in 2008-09, and 3.2% in 2011-12.Def.'s Ex. NN (PREA Data from Bureau of Justice Statistics (2014)) at 3 (emphasis added). A further breakdown of the data is included in the table below:

**{198 F. Supp. 3d 66} TABLE 2**

**Prevalence of sexual victimization across Inmate surveys, by type of Incident, National Inmate Survey, 2007, 2008-09, and 2011-12**

Note: Detail may not sum to total because inmates may report more than one type of victimization. They may also report victimization by both other inmates and staff. See appendix table 10 for standard errors.

*Comparison group

**Difference with comparison group is significant at the 95%-confidence level [See *Methodology* for tests of significance)

Source: Bureau of Justice Statistics, National Inmate Surrey, 2007, 2008-09, and 2011-12.

Def.'s Ex. H (Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (May 2013)) at 10.

PREA's impact is also limited in that it only relates to sexual assaults; it does not cover other types of harm or physical abuse. Ms. Rodman testified:

Q. PREA is about sexual assaults; right?

A. Right.

Q. But vulnerable inmates get beaten up; correct?

A. There are assaults in prison.

Q. A lot of assaults in the Bureau of Prisons?

A. There are a number.

Q. Right. Thousands every year?

A. Yes. . . .

Q. Inmates get killed at times in the Bureau?

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

affected by the criminal legal system." *Id.* at 104:04-07.

In 2014, the organization{**2016 U.S. Dist. LEXIS 85**} published a report addressing the experiences of LGBT people who are incarcerated in the United States. *See* Def.'s Ex. D (Coming Out of Concrete Closets: A Report on Black & Pink's National LGBTQ Prisoner Survey ("Black & Pink Report")). The report was based on data collected through a survey sent to all of the organization's subscribers-approximately 7,000 federal and State inmates. Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 107:05-18; *see also id.* at 110:12-18 (Mr. Lydon explained that survey respondents were "chosen through our membership, self-selected. They are LGBT individuals who are incarcerated in prisons. We reach prisons in every State across the U.S., and the respondents chose to answer the survey or not."). About 1,200 responses were obtained, of which 1,100 were considered usable. *Id.* at 107:21-23.

While Black & Pink's survey was stated to be "the largest ever survey of LGBT people in prison," Mr. Lydon acknowledged that it "was not a random survey." The respondents were not "representative or random," and it was not a "complete" survey of LGBT incarcerated individuals. *Id.* at 111:06-16. Approximately seventy-nine people out of the total 1,100 respondents included in the{**2016 U.S. Dist. LEXIS 86**} survey-*i.e.*, about seven percent-were federal inmates. *See id.* at 121:12-14, 130:09-11. This represents {**198 F. Supp. 3d 54**} about 0.04 percent of all federal inmates (as of July 19, 2016, the **BOP** reported a total of 194,355 federal inmates, *see* Federal Bureau of Prisons, *Statistics,*  (last visited July 19, 2016)).

Prior to the hearing, the federal respondent data was sorted. *See, e.g.*, Def.'s Ex. V (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Questions 1, 5, 34), Ex. W (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Questions 70-76, 78-79, 81-84), Ex. X (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Question 77a), Ex. Y (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Question 85), Ex. Z (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Question 41a). Of these federal respondents, sixty-eight percent were gay or bisexual men. *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 109:14-17. Nineteen percent reported being "physically assaulted, either hit, punched, kicked, or beaten by prison staff." *Id.* at 112:08-10. Twenty-two percent stated they had experienced "unwanted touching by a prison{**2016 U.S. Dist. LEXIS 87**} staff person," and six percent reported being sexually assaulted or raped by prison staff. *Id.* at 112:17-22. Thirty-two percent stated they had been intentionally placed by prison staff "where they might be at high risk of being sexually assaulted [by] another prisoner." *Id.* at 113:01-04.

The survey was admitted into evidence, but with a finding that it did not meet scientific standards for such work. *Id.* at 112:01-02.

**(2) Galen Baughman**

Defendant sought to qualify Galen Baughman, Open Society Foundation Soros Justice Fellow with the Human Rights Defense Center in Washington, D.C., as an expert witness on "prison conditions including assault, sexual abuse, rapes, and solitary confinement in federal and state prisons." Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 192:24-193:01. In his position, Mr. Baughman is a "policy analyst and advocate" who focuses "on the issue of indefinite detention at . . . the federal and state [levels]." *Id.* at 183:19-25. Prior to his current position, he was incarcerated for nine years, of which four-and-a-half were spent in solitary confinement. *See id.* at 191:08-09. Most of his time was served in State facilities in Virginia. *Id.* at 191:15-16. This personal experience{**2016 U.S. Dist. LEXIS 88**} motivated him to "be a voice for change to help improve public safety through changing the way we treated people through our system." *Id.* at 191:09-13.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

The government objected to Mr. Baughman as an expert witness. *See id.* at 193:22-194:22. His testimony was excluded. While Mr. Baughman "has extensive knowledge . . . he doesn't have the skill, experience, training or education to testify in a case under [Federal Rule of Evidence] 702." *Id.* at 197:10-14 (statement of the court). His testimony as a fact witness was also precluded. *See id.* at 200:13-14 (finding that the proposed witness could not be qualified "by his personal history" since he never served in a federal prison); *see also id.* at 202:10-13 ("His knowledge is too narrow and it does not apply to the particular issues before us in the Federal Bureau of Prisons and the federal penitentiaries that we're concerned about . . . .").

**I. Amicus Curiae Briefs**

Two *amicus curiae* briefs have been submitted with the consent of the parties and the court. Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), the National Center for Lesbian Rights ("NCLR"), the National Center for **Transgender** Equality {198 F. Supp. 3d 55} ("NCTE"), and the Sylvia Rivera Law Project ("SRLP") have submitted{2016 U.S. Dist. LEXIS 89} a brief, in support of defendant, addressing the vulnerability of gay men generally, and the defendant in particular, to sexual abuse while in government custody. *See* Br. of *Amici Curiae* Lambda Legal, NCLR, NCTE, and SRLP, in Supp. of Def., Mar. 10, 2016, ECF No. 134.

The Washington Lawyers' Committee for Civil Rights and Urban Affairs ("WLC") has submitted a brief addressing the Bureau of Prisons' "overuse of solitary confinement and its failure to properly diagnose and treat mentally ill men and women subjected to solitary confinement." *See* Mem. of *Amicus Curiae* WLC, Mar. 10, 2016, ECF No. 135 ("WLC *Amicus Curiae* Mem."), at 1.

Both briefs are included in the record. Non-parties Lambda Legal, NCLR, NCTE, SRLP and WLC were added to the case as *amici. See* Order, Mar. 11, 2016, ECF No. 136.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

70354308

ATTACHMENT E

---

**CHARLES D. KELLER, Plaintiff-Appellant, v. UNITED STATES OF AMERICA, Defendant-Appellee.**
**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**
**771 F.3d 1021; 2014 U.S. App. LEXIS 21718**
**No. 13-3113**
**November 17, 2014, Decided**
**May 23, 2014\*, Submitted**
\*

---

**Editorial Information: Prior History**

{2014 U.S. App. LEXIS 1}Appeal from the United States District Court for the Southern District of Indiana, Terre Haute Division. No. 2:09-cv-297 - Jane E. Magnus-Stinson, Judge.Keller v. United States, 2013 U.S. Dist. LEXIS 104805 (S.D. Ind., July 26, 2013)

**Counsel**                       CHARLES D. KELLER, Plaintiff - Appellant, Pro se, Coleman, FL.
                                          For UNITED STATES OF AMERICA, Defendant - Appellee:
                       Jeffrey L. Hunter, Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Indianapolis,
                       IN.

**Judges:** Before WILLIAMS, TINDER, and HAMILTON, Circuit Judges.

**CASE SUMMARY**Government did not prove as a matter of law that the discretionary function exception, 28 U.S.C.S. § 2680(a), shielded it from liability to a prisoner who was injured by another prisoner's attack, because the complaint alleged that mandatory regulations were violated when prison guards failed to monitor the yard due to laziness or inattentiveness.

**OVERVIEW:** HOLDINGS: [1]-The government did not prove as a matter of law that the discretionary function exception under 28 U.S.C.S. § 2680(a) shielded it from liability to an prisoner who was injured by another prisoner's attack, because the complaint alleged that mandatory regulations were violated when an intake psychologist failed to examine available medical documents before deciding to release the prisoner into the general population and when guards failed to monitor their assigned areas of the yard due to laziness or inattentiveness.

**OUTCOME:** Reversed and remanded.

**LexisNexis Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*

On an appeal from a grant of summary judgment, the court must consider the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor. The reviewing court must assume the facts as stated in the light most favorable to the nonmovant, but without vouching for their objective truth.

*Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Jurisdiction*
*Civil Rights Law > Prisoner Rights > Safety*
*Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions*

A07CASES                                       1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The Federal Tort Claims Act (FTCA) gives district courts exclusive jurisdiction over claims for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C.S. § 1346(b)(1); 28 U.S.C.S. § 2674. Prisoners can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee. This waiver of the United States' sovereign immunity is limited by several exceptions, including the discretionary function exception codified in 28 U.S.C.S. § 2680(a).

***Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions***

See 28 U.S.C.S. § 2680(a).

***Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions***

Case law elaborates the scope of the discretionary function exception under 28 U.S.C.S. § 2680(a). Two requirements must be met. First, the act involved must be discretionary in the sense that it involves an element of judgment or choice. This means that where an employee deviates from a course of action prescribed by federal statute, regulation or policy, the employee's acts are not immune from suit. Second, the exception protects only governmental actions and decisions based on considerations of public policy.

***Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions***
***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants***

The discretionary function exception is an affirmative defense to liability under the Federal Tort Claims Act, 28 U.S.C.S. § 2674 that the government must plead and prove. To support summary judgment under the exception, the government must offer evidence that shows beyond reasonable dispute that its conduct was shielded by the exception.

***Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions***
***Civil Rights Law > Prisoner Rights > General Overview***

If prison officials behaved negligently without making a discretionary judgment of the type shielded by the exception, the discretionary function exception under 28 U.S.C.S. § 2680(a) would not apply to their conduct. Prison guards who have left a unit unattended in order to enjoy a cigarette or a snack, for example, would not be covered by the exception, because they would not have made the kind of discretionary judgment that the exception is designed to protect. In other words, if prison personnel violate a mandatory regulation, the exception does not apply because there is no room for choice and the action will be contrary to policy.

***Torts > Public Entity Liability > Liability > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions***

The type of carelessness caused by laziness or inattentiveness would not be covered by the

A07CASES                                     2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

discretionary function exception under 28 U.S.C.S. § 2680(a), as it involves no element of choice or judgment grounded in public policy considerations.

**Opinion**

**Opinion by:**             HAMILTON

**Opinion**

{771 F.3d 1022} Hamilton, *Circuit Judge*. Plaintiff Charles D. Keller, a federal prisoner, has sued the federal government to recover damages for an assault by another prisoner that he suffered in the United States Penitentiary in Terre Haute, Indiana. Keller appeals from a grant of summary judgment in the government's favor, so we must consider the evidence in the light most favorable to him and draw all reasonable inferences in his favor. *Parrott v. United States*, 536 F.3d 629, 630-31 (7th Cir. 2008). Accordingly, we must assume the facts are as stated in this opinion, but without vouching for their objective truth.

When Keller was admitted to the Terre Haute facility, he told the intake psychologist, Dr. Joseph Bleier, that he suffered from mental illness that affected his ability to function and feared that he would be attacked if he were placed in the{2014 U.S. App. LEXIS 2} general prison population. Dr. Bleier nevertheless placed Keller in the general population. While on his way to lunch on October 25, 2007, Keller was attacked by another **inmate** without provocation. The attack lasted several minutes without intervention by guards. Keller was beaten brutally and left lying unconscious in the prison yard. The attack occurred at the base of prison watchtower 7, which stands at the boundary between Units 1 and 2 of the prison yard. No prison guard saw the attack. Keller was eventually spotted lying face-down and unconscious on the ground. Examinations by the prison medical staff and a nearby hospital emergency room revealed extensive injuries to his face and head.

Keller filed suit against the United States under the Federal Tort Claims Act, see 28 U.S.C. § 2674, alleging that the attack resulted from the prison's negligence. He argues that several prison employees violated mandatory regulations and orders governing their conduct, thus allowing the attack to occur and continue. According to Keller, Dr. Bleier did not examine all of his available medical documents before deciding to release him into the general prison population, as required by applicable regulations. Keller{2014 U.S. App. LEXIS 3} also contends that the prison guards assigned to Tower 7, Unit 1, and Unit 2 failed to monitor their assigned areas of the yard because they were lazy or inattentive in violation of their post orders. The district court granted the government's motion for summary judgment based on the **discretionary function exception** to liability under the Act. See 28 U.S.C. § 2680(a). This appeal followed.

The Federal Tort Claims Act (FTCA) gives district courts exclusive jurisdiction over claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); see also 28 U.S.C. § 2674. Prisoners can sue under the FTCA "to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." *United States v. Muniz*, 374 U.S. 150, 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963); see also, e.g., *Coulthurst v. United States*, 214 F.3d 106 (2d Cir.

A07CASES                                          3

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2000) (allowing prisoner to pursue {771 F.3d **1023**} FTCA claim); *Bultema v. United States*, 359 F.3d 379 (6th Cir. 2004) (same); *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004) (same); *Mackovich v. United States*, 630 F.3d 1134 (8th Cir. 2011) (same).

This waiver of the United States' sovereign{2014 U.S. App. LEXIS 4} immunity is limited by several exceptions, including the **discretionary function exception** codified in 28 U.S.C. § 2680(a). The exception is in the second half of a provision that states in full: "The provisions of this chapter and section 1346(b) of this title shall not apply to-(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Case law elaborates the scope of this **discretionary function exception**. Two requirements must be met. First, the act involved must be discretionary in the sense that it "involves an element of judgment or choice." *Palay v. United States*, 349 F.3d 418, 427 (7th Cir. 2003), quoting *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991) (internal formatting omitted). This means that where an employee deviates from a course of action prescribed by federal statute, regulation or policy, the employee's acts are not immune from suit. *Gaubert*, 499 U.S. at 322; *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988); *Palay*, 349 F.3d at 427. Second, "the exception protects only governmental actions and decisions based on considerations of public{2014 U.S. App. LEXIS 5} policy." *Gaubert*, 499 U.S. at 322; *Palay*, 349 F.3d at 427-28; *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997).

The **discretionary function exception** is an affirmative defense to liability under the FTCA that the government must plead and prove. *Parrott v. United States*, 536 F.3d 629, 634-35 (7th Cir. 2008); *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008); *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952); *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 n.2, 56 V.I. 901 (3d Cir. 2012) (collecting cases from other circuits). To support summary judgment under the exception, the government must offer evidence that shows beyond reasonable dispute that its conduct was shielded by the exception. The district court, however, placed the burden on Keller to prove that the exception did not apply. This was a legal error that requires reversal unless the error was harmless.

The government argued in its summary judgment briefs that the **discretionary function exception** always shields the government from liability for **inmate** violence, citing our decision in *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997). That argument substantially overstates our holding in *Calderon* and overlooks other cases on point. See, e.g., *Parrott*, 536 F.3d at 638 (reversing summary judgment based on **discretionary function exception** where prisoner alleged guards failed to comply with order separating him from another prisoner); *Palay*, 349 F.3d at 432 (reversing dismissal on pleadings based on **discretionary function exception** where prisoner alleged guards' negligence allowed other prisoners to beat him). "Unstated but implicit in *Calderon* is the{2014 U.S. App. LEXIS 6} assumption that prison officials in that case had taken note of the threats against the plaintiff in that case and weighed the relevant considerations in deciding how best to act (or not) in response to those threats." *Palay*, 349 F.3d at 432.

{771 F.3d **1024**} By contrast, if prison officials behaved negligently without making a discretionary judgment of the type shielded by the exception, the **discretionary function exception** would not apply to their conduct. *Id.* Prison guards who "left the unit unattended in order to enjoy a cigarette or a snack," for example, would not be covered by the exception, because they would not have made the kind of discretionary judgment that the exception is designed to protect. *Id.* In other words, if

A07CASES                                          4

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

prison personnel violate a mandatory regulation, the exception does not apply because "there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324; see also *Parrott*, 536 F.3d at 638.

Here, Keller has alleged that both the intake psychologist and the prison guards assigned to monitor the relevant sections of the yard violated mandatory regulations that governed their conduct. Unlike the guards in *Calderon*, Keller argues, the guards and intake psychologist in this case did not exercise discretion allowed to them{2014 U.S. App. LEXIS 7} under applicable regulations, but rather failed to comply with mandatory regulations and orders. If that is the case, then their alleged negligence would not fall within the scope of the **discretionary function exception**. See *Gaubert*, 499 U.S. at 324; *Parrott*, 536 F.3d at 638; *Palay*, 349 F.3d at 432.

At this stage, the record in this case presents a situation similar to *Parrott v. United States*, 536 F.3d 629 (7th Cir. 2008). Parrott, also a federal prisoner at the Terre Haute facility, alleged that prison guards violated a mandatory separation order so that another **inmate** was able to attack him. We reversed summary judgment for the government because the **discretionary function exception** would not protect the government from liability under those circumstances. *Parrott*, 536 F.3d at 638. We see no reason to take a different approach in this case. We reject the government's argument that all prisoner attacks fall within the **discretionary function exception**.

We therefore turn to the record to determine whether the **discretionary function exception** applied in this case. We cannot conclude, based on the evidence in the record, that the exception necessarily shields the government from liability for the attack on Keller. Keller contends that both the intake psychologist who screened him upon arrival at the Terre Haute facility and the prison{2014 U.S. App. LEXIS 8} guards assigned to Units 1 and 2 violated mandatory orders before the attack. According to Keller, the intake psychologist did not examine all of his available medical documents, as required by applicable regulations, before deciding to release him into the general prison population. Keller also argues that the prison guards assigned to Unit 1 and Unit 2 failed to monitor their assigned areas of the yard because they were lazy or inattentive, violating their post orders.1

The scant record available to both the district court and this panel makes it difficult to determine what procedures and regulations applied to the intake psychologist and prison guards at the Terre Haute facility. The government objected to nearly all of Keller's discovery requests on the ground that releasing the information requested to a prisoner would create safety concerns. A magistrate judge reviewed the disputed documents *in camera*, concluded that many were not relevant to Keller's{2014 U.S. App. LEXIS 9} case, and allowed the government to release the rest in heavily redacted {771 F.3d 1025} form. The district court did not have the unredacted documents before it when it ruled on the government's summary judgment motion, which was based on the court's determination that the documents contained no mandatory procedures or directives violated by the prison guards stationed at Units 1 and 2.

These extensive redactions make it impossible for this court to ascertain exactly what regulations and procedures governed the conduct of the intake psychologist and the prison guards. The information we do have, however, suggests that both the intake psychologist and the prison guards were subject to specific regulations and orders governing their conduct. For example, we know from the record that Program Statement 5324.07 requires psychology services to "develop local procedures to clear inmates with a PSY ALERT assignment," which suggests that the Terre Haute facility had mandatory local procedures that needed to be followed when clearing inmates. Dr. Bleier's affidavit similarly refers to procedures used to clear inmates like Keller who had a "PSY ALERT." Those procedures are not in the record, and in their absence,{2014 U.S. App. LEXIS 10} we cannot conclude as a matter of law that they did not constrain Dr. Bleier's discretion to place

A07CASES                                                                5

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Keller in the general population.2

The government has also failed to establish that the actions of the prison guards assigned to Units 1 and 2 are protected by the **discretionary function exception**. The government relies on the declaration of a prison administrator that guards assigned to different areas of the compound are interchangeable and that guards do not need to be in any particular area at any given time. However, the heavily redacted documents in the record suggest that prison guards are assigned to specific areas of the yard and are{2014 U.S. App. LEXIS 11} required to monitor their areas and to respond to emergency situations within them. In other words, guards cannot choose, at least without a good reason, to stop monitoring their assigned areas without violating their explicit responsibilities under the post orders. Keller alleges that the guards stopped monitoring their assigned areas as required by the post orders because they were lazy and inattentive. There is no evidence to the contrary in the record. Based on the summary judgment record, then, we cannot conclude as a matter of law that the guards' behavior is shielded by the **discretionary function exception**.

If as the government suggests in its brief the guards made a "policy" choice that caused them to neglect an area of the yard because they were pursuing other policy objectives within their discretion (such as walking the perimeter or supervising trash collection), then perhaps that would be shielded by the **discretionary function exception**. But there is no evidence to that effect in the record, and the government's say-so in its briefs is not enough to support summary judgment. The government points to no evidence in the record to contradict Keller's claims that the guards{2014 U.S. App. LEXIS 12} were simply lazy or inattentive. "That type of carelessness would not be covered by the **discretionary function exception**, as it involves no element of choice or judgment grounded in public policy considerations." *Palay*, 349 F.3d at 432.

{771 F.3d 1026} Accordingly, we conclude that the government did not sustain its burden to prove as a matter of law that the **discretionary function exception** shielded it from liability for the brutal attack that seriously injured Keller. Summary judgment was improperly granted for the government on that basis, and the district court's error was not harmless.

We do not reach Keller's claims that the district court abused its discretion in denying his motion to compel discovery or his motion for appointment of counsel. Keller is free to pursue further discovery on remand, and can of course renew his motion for appointment of counsel as well. We note in closing, however, that the district court may wish to revisit its determination on both matters in light of this opinion. See *Parrott*, 536 F.3d at 638-39 (finding that district court had abused its discretion in handling injured prisoner's discovery requests). The district court's resolution of the discovery disputes in this case resulted in a record so limited that it{2014 U.S. App. LEXIS 13} could not support summary judgment for the government. A better-developed record would have allowed the district court and this court to assess better the merits of the government's motion for summary judgment.

We **REVERSE** the district court's grant of summary judgment and REMAND the case for further proceedings consistent with this opinion.

### Footnotes

\*
1

Keller concedes that there is a blind spot at the base of Tower 7, so the guards stationed in Tower 7

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

cannot see the area where Keller was attacked. Accordingly, Keller cannot base his claim upon alleged negligence by the Tower 7 guards.

2

Both Dr. Bleier and the chief psychologist at the Terre Haute facility stated in their affidavits that no mandatory procedures were violated in Keller's screening. Neither affidavit, however, discusses what those procedures were or whether they constrained Dr. Bleier's discretion. On the other hand, the affidavits suggest that mandatory procedures governed intake screening at the Terre Haute facility, reinforcing our conclusion that remand is necessary to determine the nature of those procedures and whether Dr. Bleier complied with or violated them.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ATTACHMENT F

---

**JANE DOE, Plaintiff - Appellant, v. UNITED STATES OF AMERICA and JEFFREY KALANI CRUZ, Defendants - Appellees.**
**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**
**510 Fed. Appx. 614; 2013 U.S. App. LEXIS 4043**
**No. 11-16394**
**February 11, 2013, Argued and Submitted, Honolulu, Hawaii**
**February 27, 2013, Filed**

---

**Notice:**

**PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.**

**Editorial Information: Prior History**

{2013 U.S. App. LEXIS 1}
Appeal from the United States District Court for the District of Hawaii. D.C. No. 1:08-cv-00517-BMK. Barry M. Kurren, Magistrate Judge, Presiding.Doe v. United States, 2011 U.S. Dist. LEXIS 6726 (D. Haw., Jan. 24, 2011)

**Counsel**                        For JANE DOE, Plaintiff - Appellant: Eric A. Seitz, Esquire, Attorney, Lawrence I. Kawasaki, Esquire, Ronald N.W. Kim, Esquire, Attorney, LAW OFFICE OF ERIC A. SEITZ, Honolulu, HI; Della A. Belatti, Honolulu, HI.
                        For UNITED STATES OF AMERICA, JEFFREY KALANI CRUZ, Defendants - Appellees: Anne Murphy, Trial Attorney, DOJ - U.S. Department of Justice, Civil Division - Appellate Staff, Washington, DC; Edric Ming-Kai Ching, Assistant U.S. Attorney, USH - OFFICE OF THE U.S. ATTORNEY, Honolulu, HI.

**Judges:** Before: GRABER, BYBEE, and CHRISTEN, Circuit Judges.

**Opinion**

{510 Fed. Appx. 615} MEMORANDUM *

Plaintiff Jane Doe filed this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), against the United States and Defendant Jeffrey Kalani Cruz, a correctional officer at the Federal Detention Center in Honolulu. She appealed the district court's order dismissing her {2013 U.S. App. LEXIS 2}FTCA claims for lack of subject-matter jurisdiction and granting summary judgment in favor of Defendants as to the Bivens claim. During oral argument, Plaintiff conceded her Bivens claim and those FTCA claims that relate to the allegedly negligent hiring, training, and supervision of prison employees. We therefore consider only her FTCA claim that arises from the alleged negligence of Cruz. Reviewing de novo, Alfrey v. United States, 276 F.3d 557, 561 (9th Cir. 2002), we reverse the district court's order as to that claim and remand for further proceedings.

The **discretionary function exception** to federal courts' jurisdiction under the FTCA applies only if "the challenged actions involve an 'element of judgment or choice.'" Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008) (quoting United States v. Gaubert, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991)); see also Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531,

A09CASES                                    1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

536-37, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988) (holding that "judgment or choice" is the first of two requirements for the exception to apply). Here, Cruz stated to FBI investigators that, during training, he had been told not to go into an area that lacks video surveillance alone with a female inmate. Viewed {2013 U.S. App. LEXIS 3}in the light most favorable {510 Fed. Appx. 616} to Plaintiff, <u>Alfrey</u>, 276 F.3d at 561, that statement suggests that the prison had a mandatory policy against putting female inmates in the same kind of situation in which Cruz left Plaintiff with Bureau of Prisons electrician Markell Milsap. Although Cruz later characterized the instruction that he received during training as a strong "suggestion," that testimony merely creates a factual dispute as to whether the prison policy against leaving inmates alone with individual prison employees was mandatory or discretionary. <u>See, e.g., Espinosa v. City of San Francisco</u>, 598 F.3d 528, 538 (9th Cir. 2010) (denying summary judgment in part because inconsistent testimony revealed a material factual dispute). Because Cruz may have violated a mandatory policy, the district court erred in ruling, as a matter of law, that his decisions involved an "element of judgment or choice." <u>See</u> <u>Terbush</u>, 516 F.3d at 1128 (stating that the government has the burden of proving that the **discretionary function exception** applies).

Our decision is consistent with <u>Alfrey</u>. In <u>Alfrey</u>, a prison official's response to reported inmate threats was held to be a discretionary judgment because {2013 U.S. App. LEXIS 4}it required that he "set priorities among all <u>extant</u> risks: the risk presented by the reported threat, along with the other risks that <u>inevitably arise</u> in a prison." 276 F.3d at 565 (emphases added). Here, Cruz allegedly <u>created</u> the risk to Plaintiff through his own decision-possibly in violation of prison policy-to leave Plaintiff alone in an unsupervised closet with Milsap. <u>Alfrey</u> does not shield that decision merely because Cruz was then left to weigh the risk that he had created through his own alleged negligence against other extant risks.

Because the evidentiary record could demonstrate that the challenged actions of Defendant Cruz do not meet the first <u>Berkovitz</u> requirement, the district court erred in dismissing the action under the **discretionary function exception**.

AFFIRMED in part; **REVERSED** in part and REMANDED. The parties shall bear their own costs on appeal.

**Footnotes**

\*

This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.