MGD

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson,<br><br>                    Plaintiff,<br><br>v.<br><br>United States, et al.,<br><br>                    Defendants. | No.  CV 19-00422-TUC-RM<br><br><br>**ORDER** |

Plaintiff Jeremy Pinson, who is currently confined in the United States Penitentiary-Tucson, brought this pro se civil rights action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680.  Pending before the Court is Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.  (Doc. 76.)  Plaintiff was informed of her rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 78), and she opposes the Motion.  (Doc. 79.)  Also before the Court is Plaintiff's "Motion for Leave to Stay Summary Judgment, Supplement Briefing, Appoint Counsel for Limited Purposes of Discovery."  (Doc. 115.)

**I.    Background**

Plaintiff alleges the following in Count Three of the First Amended Complaint.  On June 13, 2019, Plaintiff was placed in the Special Housing Unit ("SHU"), where Officers Shields, Dukett, and Schneider "continued to loudly call Plaintiff a 'snitch' in front of other

inmates." (Doc. 22 at 5.)[1]  Around July 12, 2019, Plaintiff was placed in a cell that did not have a duress alarm, even though other SHU cells did have duress alarms. (*Id*.)  Plaintiff's cellmate accused Plaintiff of being a "snitch" based on Shields, Dukett, and Schneider calling Plaintiff a snitch. (*Id*.)  Plaintiff asked her cellmate to calm down and gave a note to Officer Vasquez, stating that she needed a new cellmate and feared for her life, but Vasquez did not separate Plaintiff from the cellmate, in violation of Bureau of Prisons ("BOP") policy.[2]  (Doc. 22 at 5.)  When Vasquez next did his rounds, Plaintiff gave Vasquez a second note stating that her cellmate had threatened to rape her, but, again, Vasquez, failed to separate Plaintiff and her cellmate, in violation of Prison Rape Elimination Act ("PREA") policy. (*Id*.)  Later that day, the cellmate attacked Plaintiff with closed fists for nearly 10 minutes and tried to rape her. (*Id*.)  Plaintiff was taken to the Tucson Medical Center with severe injuries; she suffered a broken nose, bruises, lacerations, a concussion, and mental health injuries from the attack. (*Id*.)  Plaintiff asserted an FTCA claim and Arizona state law claims of assault, battery, negligence, and intentional infliction of emotional distress ("IIED"). (*Id*.)  Plaintiff seeks damages. (*Id*. at 6.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an FTCA claim for damages against Defendant United States in Count Three and directed Defendant to answer the claim. (Doc. 21.)  The Court also directed Defendant to respond to Plaintiff's state law claims of assault, battery, negligence, and IIED in Count Three and to address whether the Court should exercise supplemental jurisdiction over the state law claims.[3]  (*Id*.)

---

[1] All record citations herein refer to the document and page numbers generated by the Court's Case Management/Electronic Case Filing system.

[2] Plaintiff refers to herself using female pronouns and the Court will do likewise.

[3] The Court also determined that Plaintiff stated an Eighth Amendment threat-to-safety claim in Count Two against various individual Defendants, but Plaintiff voluntarily dismissed those individual Defendants from this action before they answered or sought summary judgment, which made the dismissal of those Defendants and claims effective upon filing. (Doc. 25.)

1      In an Order dated July 23, 2021, the Court dismissed Plaintiff's state law claims in

2  Count Three and denied Defendant's Motion for Summary Judgment regarding exhaustion

3  of administrative remedies as to the remaining FTCA claim.  (Doc. 53.)

4      Defendant now seeks to dismiss the FTCA claim pursuant to Federal Rule of Civil

5  Procedure 12(b)(1) for lack of subject matter jurisdiction based on the FTCA's

6  discretionary function exception.  (Doc. 76.)  Alternatively, Defendant moves for summary

7  judgment pursuant to Federal Rule of Civil Procedure 56 on the basis that Plaintiff cannot

8  meet her burden of proving causation.  (*Id*.)

9  **II.    Subject Matter Jurisdiction Standard of Review**

10      Plaintiff argues in her Response that because Defendant filed an answer before filing

11  the present Motion for Summary Judgment, and because Defendant relies on evidence

12  outside the pleadings, the Motion must be treated as one for summary judgment.  (Doc. 79

13  at 2.)  The Court declines to treat Defendant's attack on subject matter jurisdiction under a

14  summary judgment standard because Rule 12(b)(1) allows a defendant to raise the defense

15  that the court lacks jurisdiction over the subject matter of an entire action or of specific

16  claims alleged in the action at any time.  *Arbaugh v. Y&H Corp*., 546 U.S. 500, 506 (2006)

17  ("The objection that a federal court lacks subject-matter jurisdiction, *see* Fed. Rule Civ.

18  Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in

19  the litigation, even after trial and the entry of judgment.").

20      A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be a

21  facial or a factual challenge to the existence of federal jurisdiction.  *White v. Lee*, 227 F.3d

22  1214, 1242 (9th Cir. 2000).  A facial challenge alleges that the pleadings are insufficient

23  to support subject matter jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

24  (9th Cir. 2004).  In resolving a facial challenge, the district court must accept the allegations

25  of the complaint as true.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (citing

26  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)).  A factual challenge alleges that

27  there is no actual existence of jurisdiction.  *Safe Air for Everyone*, 373 F.3d at 1039.  When

28  a party makes a factual challenge, the court is not required to presume the truth of the

allegations and may consider other properly presented evidence in the record for the purpose of determining the existence of subject matter jurisdiction. *Id.* The party asserting subject matter jurisdiction has the burden to prove such jurisdiction, regardless of whether it is the movant. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008); *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (holding that when a defendant files a Rule 12(b)(1) motion attacking the existence of subject-matter jurisdiction, the plaintiff bears the burden of proving that jurisdiction exists).

Because the United States has sovereign immunity, which prevents it from being sued for damages, "whether the United States has waived its sovereign immunity against suits for damages is, in the first instance, a question of subject matter jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

**III.    Plaintiff's Motion for Leave**

In this Motion, Plaintiff asserts that in mid-September 2022 she was the victim of an assault and placed in the SHU. (Doc. 115.)  Plaintiff states that Captain Reys told her she was in the SHU because "all threats of an inmate to another require their placement in SHU for a threat assessment," which Plaintiff says contradicts Rey's Declaration submitted with Defendant's Motion for Summary Judgment in which Rey said, "no such requirement existed." (*Id*. at 4.)  Plaintiff argues that the Court should stay Defendant's Reply to the Motion for Summary Judgment and "permit the resolution of the earlier yet overlooked Motions to Compel and permit supplemental briefing thereafter, taking into account Captain Rey's reversal on BOP policy in relation to the mandatory nature of the separation and segregation of the victim and suspect following a PREA allegation or oral threats involving the two." (*Id*. at 5.)

Captain Rey's Declaration in support of the Motion for Summary Judgment says 28 C.F.R. § 541.27 gives explicit discretion to prison staff to evaluate threats by providing that an inmate *may* be placed in SHU as a protection case if staff believe the prisoner's safety may be seriously jeopardized by placement in the general population.  (Doc. 77-2 at

4 ¶ 16.)  Rey's statement that placement in the SHU is discretionary is backed up by the regulations and BOP Program Statement, as discussed later in this Order.  Even if Rey did say recently that both inmates must be placed in the SHU for a threat assessment, this possible verbal misstatement of the actual policy does not create a new BOP policy or raise a question of fact sufficient to require the Court to stay resolution of Defendant's Motion for Summary Judgment or permit further, belated discovery on the pending Motion. Moreover, the incident at issue in this case took place when Plaintiff and her cellmate were already in the SHU; therefore, the policy regarding SHU placement does not appear relevant to Plaintiff's claim.

In addition, the Court recently denied Plaintiff's renewed request to file a discovery motion related to this same issue of the mandatory versus discretionary nature of how the BOP responds to threats.  (See Doc. 114.)  The Court determined that Plaintiff had not met the requirements for re-opening discovery under Federal Rule of Civil Procedure 56(d), and the Court continues to find Plaintiff has not made the required showing.  Accordingly, the Court will deny Plaintiff's Motion.

**IV.   Relevant Facts**

From February 15, 2018 to December 4, 2020, Plaintiff was incarcerated at USP-Tucson.  (Doc. 77 (Def.'s Statement of Facts ("DSOF")) ¶ 1.)

**A.   July 12, 2019 Incident**

On July 12, 2019, a SHU officer conducting rounds observed that both prisoners in cell Z02-140, Plaintiff and Ricki Mahkimetas, appeared to have injuries consistent with a fight; both prisoners were removed from the cell, separated, hand-held metal detected, photographed, and medically assessed.  (DSOF ¶ 21.)  Plaintiff disputes paragraph 21, asserting there was no fight, she was the victim of a brutal assault and attempted rape, her injuries were "visibly serious," and witnesses told SIS investigators that Plaintiff screamed for help.  (Doc. 80 (Pl.'s Controverting Statement of Facts ("PCSOF")) ¶ 21.)  According to Defendant, at the time of the incident, Plaintiff never mentioned the alleged sexual nature of the incident to either BOP or outside medical staff, and it was not until July 15, 2019

that Plaintiff first reported the alleged sexual nature of the July 12, 2019 incident in a note provided to a BOP psychologist.  (DSOF ¶¶ 22-23.)  Plaintiff disputes paragraphs 22 and 23, asserting that she reported the sexual assault less than 24 hours later.  (PCSOF ¶¶ 22, 23.)  Plaintiff testified that the day after the incident, Lieutenant Merrell brought Plaintiff an incident report for fighting, and Plaintiff was "pretty outraged that they had written me an incident report for fighting" and she told Merrell "the man attacked me."  (Doc. 77-1 at 33 (Pl. Dep. at 31:1-7).)  Merrell said, "'if the dude attacked you, you should have called for staff," and Plaintiff responded, "I should have called for staff? How in the hell would I do that? I don't have a duress alarm in my cell." (*Id.* (Pl. Dep. at 31:8-13).)  Merrell then confirmed there was no duress alarm in the cell and "kind of shrugged his shoulders up and he said, 'we kind of fucked up on that one,'" and Plaintiff responded, "Yeah, and you are making it worse like you are trying to discipline me for being the victim of an attempted sexual assault?  The dude could have killed me. . . .  You think of writing me a bogus incident report for fighting?  I didn't fight anybody." (*Id.* at 34 (Pl. Dep. at 32:1-12).)

Defendant contends Plaintiff never reported any threat precipitating the fight with Mahkimetas and instead said "the fight had started suddenly."  (DSOF ¶ 24.)  Plaintiff disputes paragraph 24, asserting that "she made a number of attempts to be separated from Mahkimetas after he began making threats."  (PCSOF ¶ 24.)  Plaintiff testified that the threats began on July 12, 2019 around lunchtime when Mahkimetas was telling a prisoner across the hall that he had beat up a prisoner and assaulted a staff member at a different prison, and the other prisoner told Mahkimetas that Plaintiff had been to the ADX prison in Florence, Colorado so "don't be trying to beat up your celly because I don't think she's going to go for that," and Mahkimetas said "fuck that bitch and she ain't got nothing on me."  (Doc. 77-1 at 12-13 (Pl. Dep. at 10:24-11:16.)  Plaintiff interjected and told Mahkimetas "don't do that.  Don't show off," and Mahkimetas asked Plaintiff if she agreed with the other prisoner, and Plaintiff said no, "I am just asking you not to— not to threaten me or to drag me into your conversations with other inmates, particularly using me as a verbal punching bag.  And that was the first threat." (*Id.* at 13-14 (Pl. Dep. at 11:18-12:2.)

Plaintiff testified that up until 2:00 she asked officers, whose names she cannot remember, "to tell the lieutenant that I wanted to speak to him.  It was my intention to either have the lieutenant move Mr. Mahkimetas or to move myself . . . [Mahkimetas] is saying that he was in prison for sexually predacious behavior, he had attacked a staff member, he had just attacked another inmate briefly, and I took very seriously what I felt was a veiled threat." (*Id*. at 14 (Pl. Dep. at 12:12-21).)

After 2:00, Officer Vasquez was on duty; Plaintiff had a "fairly decent rapport" with Officer Vasquez and so, when staff made their rounds, she told Vasquez she needed to speak to the lieutenant or she needed Vasquez to remove her, which made Mahkimetas unhappy. (Doc. 77-1 at 14-15 (Pl. Dep. at 12:23-13:9).)  Mahkimetas "became increasingly belligerent" and said "well, you better hope they move you because I am going to fucking kick your ass if they don't.  I don't know why you put them in our business." (*Id*. at 15 (Pl. Dep. at 13:8-12).)  Plaintiff testified, "at one point he said that he was going to knock me out.  If I didn't want to give him my ass, he was going to take it." (*Id*. (Pl. Dep. at 13:17-20).)  When the officers made another round, Plaintiff told them, "look, this dude is threatening me and he's saying that he is going to rape me.  I am not trying to get in no more crap than I am already in.  Can you guys please just move me?" (*Id*. at 15-16 (Pl. Dep. at 13:23-14:2).)  Plaintiff said that at first, Officer Vasquez "had a smile on his face. And I said, hey, man, this ain't a joke, this ain't funny.  I don't find someone threatening to rape me funny.  I need you to move me and I need you to move right now." (*Id*. at 16 (Pl. Dep. at 14:3-8).)  Vasquez said, "well, I will have to talk to the No. 1, and he started to walk away.  And I said, look, man, I need you to cuff me up and pull me out.  I don't want to remain in here while you go and consult another staff member.  And he is, like, well, we are going to have to find you a cell.  And I said, the man just threatened to rape me. . . .  And he said, well, I don't have the authority to move you or to do anything that.  That's the lieutenant, the No. 1.  And he was just like I will tell him what you said." (*Id*. (Pl. Dep. at 14:9-21).)

Plaintiff testified that when Vasquez made additional rounds, "I would talk to him each time for several hours [sic], and he just kept telling me well, I told him, I passed it along.  It's on them now."  (*Id*. at 16-17 (Pl. Dep. at 14:23-15:1).)  After that, Vasquez "would walk by for his rounds, and I would stand in the window as he would walk by.  He would look at me and say 'I told him.'"  (*Id*. at 22 (Pl. Dep. at 20:10-13).)  Sometime after 8:00 p.m., Makhimetas attacked Plaintiff.  (*See id*. at 20-21 (Pl. Dep. at 20:18-21:3).)

Vasquez states in his Declaration that he "do[es] not recall [Plaintiff] ever giving me a note or verbally informing me that she felt unsafe in her cell or was being threatened by her cellmate.  If I would have received such a concern, I would have immediately given it to or notified the Special Housing Lieutenant or Operations Lieutenant, and I would have gone back down range along with other staff and I would have separated both inmates."  (Doc. 77-7 at 2 ¶ 3.)  Vasquez further avers that Plaintiff "did not express any concerns to me about her safety in that cell, or with that cell mate, prior to my discovery of the [July 12, 2019] incident during rounds."  (*Id.* ¶ 4.)  And Vasquez asserts that Plaintiff "never reported to me that her cell lacked a functional duress button prior to this incident.  If she had, I would have reported this information to the SHU Lieutenant for inmate re-assignment to a new cell and entry of a facilities department work order."  (*Id.* ¶ 5.)

In her Request for Administrative Remedy and her SF-95, Plaintiff did not report that she told Officer Vasquez that Mahkhimetas had threatened her, and she did not list Officer Vasquez as a witness on her SF-95.  (DSOF ¶¶ 26, 27.)  Plaintiff told psychology staff that Mahkimetas became upset with her because she confronted Mahkimetas about assaulting a mentally ill prisoner in general population; Plaintiff elaborated upon this when she spoke to investigating staff on July 17, 2019, explaining, "I said to [Mahkimetas], I didn't want to listen to war stories.  Nobody in prison gets browny [sic] points for beating up a retard.  In his mind he had to put me back in my place."  (*Id.* ¶ 28.)  Plaintiff disputes paragraph 28, asserting that her testimony reflects that she was emotional, cried, and "told her doctor full details well beyond what appears in the DSOF 28 quote."  (PCSOF ¶ 28.)  Plaintiff testified that after she spoke with the psychologist, "I'm not sure if it was the same

day, but it was pretty quickly after I talked to Dr. Licata, it had been Carvajal and another SIS guy, I believe it was Lawson, came to talk to me about the fact that Mr. Mahkimetas had attempted to sexually assault me." (Pl. Dep. at 33:2-6 (Doc. 77-1 at 35).)  Plaintiff was then asked at her deposition whether she had reported the threat from Mahkimetas to Officer Vasquez, and Plaintiff testified, "Yes, I told the investigators.  I told Mr. Lawson.  I told Mr. Carvajal.  I want to say there was a third person in the room but my mind is kind of fuzzy.  But I did.  I did tell them." (Doc. 77-1 at 35 (Pl. Dep. at 33:7-12).)

At the end of the investigation of the incident, Plaintiff's claims could not be substantiated, but it was decided that the prisoners needed to be separated.  (DSOF ¶ 29.) Prior to the incident, there had been no separation or other threat information suggesting a problem between these two prisoners.  (*Id.* ¶ 30.)  Plaintiff disputes paragraph 30, referring to her response to paragraph 24 in which she said, "she made a number of attempts to be separated from Mahkimetas after he began making threats."  (PCSOF ¶¶ 24, 30.)

According to Defendant, Plaintiff only testified that her cellmate pulled down her pants and underwear, but she did not testify there had been any touching or sexual contact, and that after the cellmate first hit her, she was knocked to the ground and remained there until the officer came into the cell.  (DSOF ¶¶ 43, 44.)  Plaintiff disputes paragraph 44, citing to her testimony that Mahkimetas "was trying to pull my panties and my lower body clothing off of me" and she grabbed her clothing to try to keep it on and screamed at him "stop, stop, stop," and Mahkimetas punched her repeatedly while tearing at her clothing and Plaintiff struggled with whether to defend herself or stay in a fetal position.  (PCSOF ¶ 44; Doc. 77-1 at 25-26 (Pl. Dep. at 23:1-24:3).)  Mahkimetas charged and attacked Plaintiff three or four times until he heard keys and an officer looked in the cell, saw a lot of blood on Plaintiff's face and that one of her eyes was nearly swollen shut, and the officer got on the radio and reported "there had been a fight and he started past the door for us to cuff up."  (Doc. 77-1 at 26 (Pl. Dep. at 24:4-17).)  Other prisoners were making noise and trying to get attention during the assault, and Plaintiff believes prisoner Sims may have hit the duress button in her cell.  (DSOF ¶ 45.)

### B.    Duress Alarms

No federal statute, policy, or regulation requires that each cell in the SHU be equipped with a functioning duress button or alarm.  (DSOF ¶ 3.)  The applicable policy found in Bureau of Prisons ("BOP") Program Statement 1600.13 merely requires that prisoners "be provided with the means to notify staff of a fire or similar emergency.  This can be accomplished by duress alarms, audible supervision, visual supervision, or other reliable means."  (*Id*.)  Though not mandated by policy, all cells at USP-Tucson are equipped with a duress alarm.  (*Id*. ¶ 6.)  The Program Statement states that "Duress buttons, if present, will be utilized only for emergency and/or life threatening situations, to include health related issues." (DSOF ¶ 5.) Plaintiff disputes paragraphs 5 and 6, asserting that BOP policy requires staff to respond to all emergencies and once duress alarms "were adopted for use in reporting emergencies staff had no discretion in responding to them." (PCSOF ¶¶ 5, 6.)

Prisoners in the SHU at USP-Tucson are also subject to constant audible supervision by staff.  (DSOF ¶ 4.)  Plaintiff disputes paragraph 4, asserting that officers often watched movies, which prevented them from audibly supervising prisoners, and prisoners told investigators that "it took a tier of inmates kicking their doors to summon staff" when Plaintiff was assaulted.  (PCSOF ¶ 4.)  USP-Tucson SHU Staff used large flat screen televisions in the SHU Control Center to watch movies at full volume instead of watching the SHU surveillance cameras' live images.  (Doc. 80 at 10 (Pl. Decl.) ¶ 2.)

When a prisoner is assigned to a SHU cell, the prisoner is instructed to inspect the cell and check the toilet, shower, sink, and duress alarm for function.  (DSOF ¶ 7.)  The duress alarm is activated during each cell placement to ensure it works.  (*Id*.)  In addition to ensuring the alarm is functional, this check confirms that if a duress alarm is damaged or has been tampered with, the tampering was done by one of the prisoners in that cell. (*Id*.)  Plaintiff disputes paragraph 7, asserting that "staff were told about the missing duress button the moment she moved into the cell" and "staff visually observed the missing button and reported it to a lieutenant, an assistant warden, and other staff members."  (PCSOF

¶ 7.)  Plaintiff testified that when she was moved into the SHU cell, she noticed that in the place that usually held a duress alarm "there was just an empty hole in the wall with torn wires hanging."  (Doc. 77-1 at 27 (Pl. Dep. at 27:4-9).)  Plaintiff told Officer Dukett, "hey, there's no button here.  And he just looked at it and he said, 'I don't think there's ever been a button in this cell since I have been working down here.'"  (Doc. 77-1 at 27 (Pl. Dep. at 25:10-13).)  Plaintiff then asked Dukett to place them in a different cell, "and he shrugged it off," and when Plaintiff asked Dukett to put in a work order, "he was like, dude, there's been a work order in for all kinds of things broken in the SHU and they never fix it" and "putting in another work order is not going to make a difference."  (Doc. 77-1 at 27 (Pl. Dep. at 25:14-26:1).)  Plaintiff "spoke to the lieutenant about the lack of a duress alarm" and she "pointed it out" to Assistant Warden Koger who said, "oh, yeah, we are going to have to fix that," but "ultimately the maintenance staff never did come," and Plaintiff was in the cell with her cellmate for about "ten days without a duress alarm by the time he had attacked [her]."  (Doc. 77-1 at 28 (Pl. Dep. at 26:3-12).)

Defendant contends that Plaintiff never reported that her cell lacked a functional duress button.  (DSOF ¶ 12.)  If Plaintiff had made such a report, prison staff would have reported this to the SHU Lieutenant for prisoner re-assignment to a new cell and entered a facilities department work order.  (*Id*. ¶ 13.)  No staff reported any issues with the duress alarm system in the SHU between May 15, 2019 and July 12, 2019.  (DSOF ¶ 15.)  Plaintiff disputes paragraphs 12, 13 and 14, citing to her deposition testimony showing that she "testified that she had repeatedly" reported the lack of a duress alarm and "it was observed by staff and nothing was done."  (PCSOF ¶¶ 12, 13, 14.)

### C.   Ensuring Prisoner Safety

No federal statute, policy or regulation sets out the precise steps that must be taken to ensure the safety of a prisoner, and BOP Program Statements provide that such decisions are left to the discretion and judgment of the BOP personnel performing threat assessments.  (DSOF ¶ 31.)  28 C.F.R. § 541.27 makes explicit that prison staff have discretion to evaluate threats and states that a prisoner "may" be placed in SHU as a protection case if,

"based on evidence," staff believe the prisoner's safety may be seriously jeopardized by placement in the general population.  (*Id.* ¶ 32.)  Plaintiff disputes Defendant's paragraphs 31 and 32, asserting that 28 C.F.R. § 115.62 requires that "when an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate."  (PCSOF ¶ 31.)  Plaintiff further asserts that she disputes paragraph 32 "insofar as it suggests 28 C.F.R. [§] 541.27 overrules 28 C.F.R. [§] 115.62 or relieves staff of their duties under 115.62."  (*Id.* ¶ 32.)

A prisoner may be placed in administrative detention status for protective custody if the prisoner is a victim of assault or is threatened by another prisoner, if the prisoner is threatened because he or she is perceived to have provided information or assistance to staff or law enforcement, or if the prisoner refused to enter the general population because of safety concerns.  (DSOF ¶ 33.)  Investigating staff weigh information from several sources in determining the validity of an alleged threat and how to respond to it; these factors include the source and credibility of the information, the resources available to address credible threats, and the rights of prisoners at the institution.  (*Id.* ¶ 34.)  Plaintiff disputes paragraph 34 "insofar as it suggests invalidation of 28 C.F.R. [§] 115.62."  (PCSOF ¶ 34.)

Policy does not dictate any particular response to a prisoner's reported threat and instead affords discretion for the officials to exercise correctional judgment in evaluating and responding to an alleged threat.  (DSOF ¶ 35.)  Plaintiff disputes paragraph 35 but does not explain her dispute or what in the multi-page documents she cites supports her dispute.

Defendant asserts that prison officials also have discretion when investigating threats of a sexual nature.  (DSOF ¶ 36.)  Even if a prisoner is "subject to a substantial risk of imminent sexual abuse," there is still discretion in the response which can "include monitoring the situation, changing housing assignments, changing work assignment, placing alleged victim and perpetrator in Special Housing, etc."  (*Id.*)  Plaintiff disputes paragraph 36, asserting that 28 C.F.R. § 115.62 "contains no such language" and that when

the alleged perpetrator is another prisoner, the policy states that "the Operations Lieutenant is notified immediately and immediately safeguards the inmate." (PCSOF ¶ 36.)

According to Defendant, immediate separation of the involved prisoners is mandated only when contact has occurred and is not mandated for allegations of harassment or threats. (DSOF ¶ 37.) Plaintiff disputes paragraph 37, asserting that the BOP Program Statement more narrowly defines "sexual abuse" to include both a "threat" and "attempt" to make contact. (PCSOF ¶ 37.)

## V. Subject Matter Jurisdiction Under the FTCA

### A. Legal Standard

The FTCA waives the sovereign immunity of the United States for certain torts committed by federal employees. 28 U.S.C. §§ 1346(b), 2671-2680; *see F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *Myers v. United States*, 652 F.3d 1021, 1028 (9th Cir. 2011) ("The FTCA waives the government's sovereign immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment."). But that waiver is limited. *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002). "Liability cannot be imposed if the tort claims stem from a federal employee's exercise of 'discretionary function.'" *Id.*; *see Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011) (noting that the United States is immune to suit for claims based on a federal agency or employee's performance or failure to perform a discretionary function, even if the discretion involved is abused).

Courts use a two-part test to determine whether an act or omission falls within the discretionary function exception to the FTCA. *Green*, 630 F.3d at 1249. First, the court must "determine whether a federal statute, regulation, or policy mandated a specific course of action, or whether the government actor retained an element of judgment or choice with respect to carrying out the challenged action." *Id.* (citing *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir.2008)). If a "federal statute, regulation, or policy prescribes a course of action for an employee to follow," and the prison official does not follow that course, the official is not immune from suit because "the employee has no rightful option

but to adhere to the directive." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation and citation omitted). But, if the challenged conduct involved an element of choice or judgment, the second step is to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy." *Green*, 630 F.3d at 1249 (quoting *Terbush*, 516 F.3d at 1129). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The discretionary function exception is designed to shield "legislative and administrative decisions grounded in social, economic, and political policy[.]'" *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) (internal quotation marks omitted).

"If the challenged action satisfies both of these two prongs, that action is immune from suit—and federal courts lack subject matter jurisdiction—even if the court thinks the government abused its discretion or made the wrong choice." *Green*, 630 F.3d at 1249-50. But, if a "federal statute, regulation, or policy prescribes a course of action for an employee to follow," and the prison official does not follow that course, the government is not immune from suit. *Gaubert*, 499 U.S. at 322 (citation omitted).

**B.    Discussion**

Defendant argues the discretionary function exception applies to Plaintiff's FTCA claim because, as to the first prong, no federal statute, regulation, or policy mandates specific measures applicable to Plaintiff's claims that prison officials failed to respond to the threats she allegedly reported or that her cell lacked a functioning duress button. (Doc. 76 at 6-7.) Instead, Defendant argues, the BOP Program Statements, which are based on regulations and statutes, provide that decisions are left to the discretion and judgment of BOP personnel performing threat assessments. (*Id.*) Defendant cites 28 C.F.R. § 541.27, which gives discretion to prison staff in deciding whether to place a prisoner in SHU as a

protection case.[4]  (*Id*. at 6.)  Defendant also argues that under 28 C.F.R. § 115.62 a duty to act in response to threats of a sexual nature only arises when the agency determines the prisoner "is subject to a substantial risk of imminent sexual abuse," and even then, staff are given discretion in deciding the appropriate response, including "monitoring the situation, changing housing assignments, changing work assignment, placing alleged victim and perpetrator in Special Housing, etc." (*Id*. at 6-7.)  As to the duress button in Plaintiff's cell, Defendant argues there is no statute, regulation or policy mandating specific measures, and the applicable policy only requires that prisoner "be provided with the means to notify staff of a fire or similar emergency," which may include duress alarms.  (*Id*. at 7.)

Plaintiff responds that the BOP's "zero tolerance" policy on sexual abuse or harassment did not permit Officer Vasquez to ignore Mahkimetas' rape threats.  (Doc. 79 at 12; see also Doc. 79 at 7.)  Plaintiff argues that "whether or not a duress alarm was mandatory under BOP policy, Defendants submit no evidence that they had discretion to deviate from the local choice to equip all USP Tucson SHU cells with duress alarm buttons once selected under Program Statement 1600.13." (Doc. 79 at 6.)  Plaintiff also argues that PREA regulations and BOP rules provide a nondiscretionary and specific course of action for the staff to follow when dealing with prisoner reports of sexual abuse and harassment. (*Id*. at 9, citing PREA, 42 U.S.C. § 15607, 28 C.F.R. § 115.5, and "new policies which went into effect on June 24, 2015".)[5]

### 1.    Duress Alarms

Here, Plaintiff has not presented evidence or pointed to a statute, regulation or policy requiring that a duress alarm system be used or fully operable.  BOP Program Statement

---

[4] Under 28 C.F.R. § 541.27, a prisoner "may be placed in administrative detention status" for protection under the following circumstances: if the prisoner is (a) the "victim of inmate assaults or threats," (b) an "inmate informant" whose safety is threatened, (c) refuses to house in the general population, or (d) if staff believe the prisoner's safety is threatened in the general population.  28 C.F.R. § 541.27 does not appear particularly relevant here because both Plaintiff and Mahkimetas were already in SHU.__

[5] By "new policies" Plaintiff may be referring to BOP Program Statement 5324.12, *Sexually Abusive Behavior Prevention and Intervention Program*, which has an effective date of June 4, 2015.  (Doc. 77-2 at 69-130.)

1600.13 only requires that prisoners "be provided with the means to notify staff of a fire or similar emergency. This can be accomplished by duress alarms, audible supervision, visual supervision, or other reliable means." While duress alarms are an option, they are not mandatory, and the policy does not state that duress alarms, if used, be maintained in any particular manner. Thus, no "federal statute, regulation, or policy specifically prescribes a course of action" to which the prison did not adhere. *Berkovitz*, 486 U.S. at 536. Though failing to ensure duress alarms are operable is far from commendable, maintaining existing duress alarms in operable condition is a discretionary function. The discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see, e.g.*, *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002) ("Because the government did not deviate from actions or policies mandated by statute or regulation in failing to adequately maintain the Bowler Ranch irrigation system, the BIA's irrigation repair decisions were the product of choice, protected under the first part of the discretionary function exception test.").

Because the decision to have duress alarms is discretionary, the Court "must consider whether that discretion involved the type of public policy judgment that the discretionary function exception is designed to shield." *Green*, 630 F.3d at 1251. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

Although Plaintiff's claim that the duress alarm in her cell was not functioning is troubling, decisions by government officials as to the day-to-day security needs of the prison, including how prisoners are to be monitored and how they are to report emergencies, are judgment calls and choices based on policy determinations that seek to accommodate safety and security goals in addition to finite agency resources. *See, e.g., Gladney v. United States*, 858 F. App'x 221, 223 (9th Cir. May 3, 2021), *cert. denied,* 142 S. Ct. 909 (2022) (affirming that neither PREA "nor any implementing regulation imposes

a mandatory duty on the [BOP] to monitor prisoners continuously"). Maintenance of the duress alarm system is the type of policy decision that is within the discretion of Defendant.

Based on the above, both prongs of the discretionary function exception are met with respect to Plaintiff's claim that her cell lacked an operating duress alarm. Because the Court finds that the decisions involved here with respect to the duress alarms were discretionary and that the discretion was grounded in public policy considerations, the discretionary function exception to the FTCA protects Defendant from suit, even if Defendant abused its discretion or was negligent in the performance of its discretionary function. *See Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997). The Court will dismiss this aspect of Plaintiff's claim in Count Three regarding the duress alarm for lack of subject matter jurisdiction.

## 2.      Reporting Sexual Harassment

As to Plaintiff's reports of Mahkimetas' threats, 28 C.F.R. § 115.61 requires "all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." 28 C.F.R. § 115.62 states that "[w]hen an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate."

BOP Program Statement 5324.12, *Sexually Abusive Behavior Prevention and Intervention Program*, states that its purpose is to "implement[] zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment . . . ." (Doc. 77-2 at 69.) "Sexual abuse" is defined as specific acts of sexual touching to which the victim does not consent. (*Id.* at 78-79.) "Sexual harassment" is defined to include "Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another" and "repeated verbal comments or gestures of a sexual nature . . . . including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures." (*Id.* at 79-80.) The policy

requires "all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." (*Id.* at 105.)  And "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or, where appropriate, in accordance with the Program Statement Standards of Employee Conduct." (*Id.*)  In addition to reporting the information, "staff intervene as appropriate (e.g., writing an incident report), in behaviors that may subsequently lead to an incident of sexual abuse." (*Id.*)

The Program Statement requires that "[w]hen an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate." (*Id.* at 106.)  When the "alleged perpetrator is another inmate, the Operations Lieutenant is notified immediately and immediately safeguards the inmate (which will vary depending on the severity of the alleged sexually abusive behavior and could include monitoring the situation, changing housing assignments, changing work assignment, placing allege victim and perpetrator in Special Housing, etc.)." (*Id.* at 107.)

Both 28 C.F.R. § 115.61 and BOP Program Statement 5324.12 contain non-discretionary language about what steps must be taken when a prison official receives a report of sexual harassment or sexual abuse.  Prior to the attack by prisoner Mahkimetas, Plaintiff told Vasquez and other officers that Mahkimetas was threatening to rape her.  Threats of rape presumably qualify as sexual harassment under the Program Statement's definition.  Vasquez states that he does not recall Plaintiff reporting these threats, but a failure to remember factual information, like having a "belief" in factual information, is insufficient because it does not show personal knowledge.  *See Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412–13 (9th Cir.1995) (declaration on information and belief are entitled to no weight where declarant lacks personal knowledge).

Plaintiff's reports of threatened rape triggered a mandatory duty on the part of Vasquez and any other officer to report the information to the Operations Lieutenant.  *See James v. Lacroix*, No. 16-cv-00138, 2017 WL 2588570, at *1 (W.D. La. April 17, 2017) (28 C.F.R. §§ 115.61, 115.62, 115.64, and 115.65 and PS 5324.12 provide "a non-discretionary and specific course of action for the staff at USP-Pollock to follow when reporting and dealing with inmate complaints of sexual abuse and harassment, rendering the discretionary function exception to liability under the FTCA inapplicable), *report and recommendation adopted*, 2017 WL 2588570 (June 14, 2017).  While the policy allows various means of immediately safeguarding the victim, thus permitting discretion, there is no discretion in the requirement to report the information to the Operations Lieutenant, and there is no evidence that anyone reported Mahkimetas' rape threats to the Operations Lieutenant.  Plaintiff testified that Officer Vasquez told her that he told someone about Plaintiff, but there is no evidence that Vasquez reported Plaintiff's rape threats to the Operations Lieutenant as required by regulation and policy.

Defendant relies in part on *Alfrey v. United States*, 276 F.3d 557, 564 (9th Cir. 2001), which recognized that "federal regulations expressly give prison officials discretion in how to respond to reports of threats by inmates and in how to search cells."  *Alfrey*, though, was decided in 2001, whereas BOP Program Statement 5234.12 and its directives, provided by Defendant, was promulgated after *Alfrey*, on June 4, 2015.  (*See* Doc. 77-2 at 69.)  The Program Statement identifies the Prison Rape Elimination Act of 2003 and its requirement that the Attorney General "promulgate regulations concerning sexual abuse prevention." (Doc. 77-2 at 70.)  Thus, PREA, the regulations promulgated thereunder, and Program Statement 5234.12 post-date the *Alfrey* decision and contain the non-discretionary mandates noted above.  Almost all of the cases cited by Defendant pre-date PREA, none of the cases cited involve a specific prisoner's report of sexual harassment or rape threats prior to an assault by that person's cellmate, and none of the cases involve or discuss the duties of prison officials under 28 C.F.R. § 115.61 or PS 5324.12.  (*See* Doc. 76 at 9-10 and Doc. 116 at 4 (citing cases involving assaults on prisoners).)

1    Because elevating Plaintiff's threats of rape to the Operations Lieutenant was not

2    discretionary, the government is not immune from suit, and the Court need not proceed to

3    the second step of the discretionary function exception analysis as to Plaintiff's claim that

4    her reports of threatened rape were not acted on.  *See Alfrey*, 276 F.3d at 561.  The Court

5    will therefore address the merits of Plaintiff's claim that prison officials did not address

6    her reports that her cellmate was threatening to rape her.

7    **VI.    Summary Judgment**

8        **A.    Legal Standard**

9        A court must grant summary judgment "if the movant shows that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

12   movant bears the initial responsibility of presenting the basis for its motion and identifying

13   those portions of the record, together with affidavits, if any, that it believes demonstrate

14   the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

15       If the movant fails to carry its initial burden of production, the nonmovant need not

16   produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03

17   (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the

18   nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact

19   in contention is material, i.e., a fact that might affect the outcome of the suit under the

20   governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a

21   reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*,

22   477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216,

23   1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact

24   conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-

25   89 (1968); however, it must "come forward with specific facts showing that there is a

26   genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

27   587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

28

1    At summary judgment, the judge's function is not to weigh the evidence and

2    determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

3    477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

4    all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited

5    materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

6    **B.    Physical Injury Requirement**

7    Defendant argues that Plaintiff's claim for attempted sexual assault is barred under

8    the Prison Litigation Reform Act ("PLRA"), which requires a showing of physical injury

9    or the commission of a sexual act. (Doc. 76 at 11.) Defendant argues that Plaintiff's claim

10   that her cellmate threatened her and pulled her pants and underwear down do not constitute

11   a "sexual act" as defined in the PLRA, and to the extent Plaintiff's claim is based on the

12   alleged attempted sexual assault, it is barred by the PLRA. (*Id.*)

13   Section 1997e(e) of the PLRA states that "[n]o Federal civil action may be brought

14   by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional

15   injury suffered while in custody without a prior showing of physical injury or the

16   commission of a sexual act (as defined in section 2246 of Title 18)." 42 USC § 1997e(e).

17   This means that a prisoner may not obtain compensatory damages for mental or emotional

18   injury if the physical injury is de minimis. *Oliver v. Keller*, 289 F.3d 623, 629 (9th Cir.

19   2002) (finding a jail detainee's alleged minor back and leg pain and a canker sore, allegedly

20   due to being confined in overcrowded conditions, were de minimis, warranting dismissal

21   of his damages claims for emotional injuries under § 1997e(e)). "Sexual act" is defined as

22   penetration, however slight, between the vulva or anus by the penis; contact between the

23   mouth and the vulva or anus; penetration between the anal or genital opening of another

24   by a hand, finger, or object with an intent to abuse, humiliate, harass, degrade, arouse or

25   gratify the sexual desire of any person; intentional touching, not through clothing, of the

26   genitalia of another person who is under 16 with the intent to abuse, humiliate, harass,

27   degrade, arouse or gratify the sexual desire of any person. 18 U.S.C. § 2246(2).

28

1   Plaintiff does not argue there was any sexual contact as defined by 18 U.S.C. § 2246.
2   Rather, Plaintiff argues that at her PREA exam, staff noted "multiple traumas to the face,
3   her right eye almost swollen shut."  (Doc. 79 at 15.)  In addition, Plaintiff appears to cite
4   to her Medical Records from Tucson Medical Center dated July 13, 2019 showing closed
5   fracture of nasal bone, periorbital hematoma of right eye, and contusion of occipital region
6   of scalp.  (Doc. 77-2 at 34.)  Plaintiff argues that the after-attack photos, which Defendant
7   omitted from its Motion, "plainly shows the Plaintiff suffered a 'physical injury,' that
8   included an attempted rape."  (*Id*. at 16.)  But the medical records do not indicate there was
9   any sexual contact as defined by the statute.

10   Because there is no evidence before the Court of any sexual contact between
11   Plaintiff and her cellmate, the PLRA bars damages for a claim of emotional distress related
12   to the alleged attempted rape.  Defendant, though, does not dispute that Plaintiff's other
13   physical injuries were more than de minimis, and the claim for those injuries is not barred
14   by the PLRA.

15   ### C.   Negligence

16   Under the FTCA, the United States may be held liable for injury caused by the
17   negligent act of an employee under circumstances where a private person would be liable
18   to the claimant in accordance with the law of the place where the act or omission occurred.
19   28 U.S.C. § 1346(b); *see Sosa v. Alvarez–Machain*, 542 U.S. 692, 700 ("[t]he FTCA 'was
20   designed . . . to render the Government liable in tort as a private individual would be under
21   like circumstances'") (quotation omitted).

22   To establish a claim for negligence under Arizona law, a plaintiff must prove: 1) a
23   duty requiring the defendant to conform to a certain standard of care; 2) a breach by the
24   defendant of that standard; 3) a causal connection between the defendant's breach and the
25   resulting injury; and 4) actual damages.  *Gipson v. Kasey*, 150 P.3d 228 (Ariz. 2007)
26   (citation omitted).  The plaintiff bears the burden of proving the defendant's negligence by
27   a preponderance of the evidence.  *Guardas v. United States*, 600 F. Supp. 2d 1059, 1063
28   (D. Ariz. 2009) (citing *Harvest v. Craig*, 990 P.2d 1080, 1082 (Ariz. Ct. App. 1999)).

Whether a duty exists is a matter of law for the court to decide, and "[t]he other elements, including breach and causation, are factual issues usually decided by the jury." *Id.* (internal citation omitted).

### 1.    Duty

It is well established that a duty exists when "the relationship of the parties [is] such that the defendant [is] under an obligation to use some care to avoid or prevent injury to the plaintiff." *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985), *superseded by statute on other grounds as recognized in Maher v. United States*, 56 F.3d 1039, 1042 n.4 (9th Cir. 1995); *Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 167 P.3d 711, 715 (Ariz. Ct. App. 2007). Arizona has recognized that a duty to protect exists in certain special relationships such as guardian-ward and jailer-prisoner. *Fedie v. Travelodge Int'l, Inc.*, 782 P.2d 739, 741 (Ariz. Ct. App. 1989); *see Markowitz*, 706 P.2d at 368; *see also Minneci v. Pollard*, 132 S. Ct. 617, 624–25 (2012) (noting that California's tort law regarding a jailor's duty of care to protect prisoners from harm "reflects general principles of tort law present, as far as we can tell, in the law of every State"). Whether a duty of care exists is not a factual matter; it is a legal determination made before specific facts in a case are considered. *Gipson*, 150 P.3d at 232. Here, a special relationship of jailer-prisoner existed thereby giving rise to a duty of care.

### 2.    Breach

A "duty is breached when conduct falls below the standard of ordinary care by creating an unreasonable risk of harm to the plaintiff." *Chavez v. Tolleson Elem. School Dist.*, 595 P.2d 1017, 1020 (Ariz. Ct. App. 1979) (citations omitted). "If reasonable men would differ as to the breach of a duty, the question becomes one for the jury based upon the evidence." *Id.*

Defendant argues that during the investigation of the assault and Plaintiff's many interviews with prison officers, outside medical staff, psychology, and investigators, or in her initial request for administrative remedy, Plaintiff never alleged that she had been threatened or reported any threats but instead said the assault was a sudden move by her

cellmate without warning.  (Doc. 76 at 12-13.)  Defendant argues that Plaintiff never named Officer Vasquez as a witness in her SF-95, Officer Vasquez declares Plaintiff never reported any threats to him, and Plaintiff's story of how she reported the threats has changed since the start of this litigation from her allegation in the Amended Complaint that she passed notes about the threats to Vasquez and then at her deposition where she alleged she verbally told Vasquez of the threats.  (*Id*. at 13.)  Lastly, Defendant argues that Plaintiff did not report any problems with the duress button to prison officials and, if she had, she would have been moved to one of the many unused cells in the SHU at that time.  (*Id*.)

As noted, the Court must accept as true Plaintiff's averments that she made multiple reports to Officer Vasquez and others that her cellmate was threatening to rape her and she asked to be moved away from the cellmate, but she was not separated from her cellmate, and her cellmate attacked her.  Defendant denies Plaintiff reported any threats and asserts that Plaintiff's story has changed over time.  These differing versions present a credibility question which the Court may not resolve at summary judgment.  Therefore, there is a question of fact on whether Defendant breached its duty to protect Plaintiff from harm.

### 3. Causation

A plaintiff must show some reasonable connection between a defendant's act or omission and the plaintiff's injury.  *Robertson*, 789 P.2d at 1047.  "The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred."  *Id.* (quoting *McDowell v. Davis*, 448 P.2d 869, 871 (Ariz. 1968)).  "The defendant's act or omission need not be a large or abundant cause of the injury; even if defendant's conduct contributes only a little to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct."  *Id.*  (internal quotation marks omitted).

Defendant argues that the lack of a duress button was not the cause of Plaintiff's harm because Plaintiff testified that she was knocked to the ground by her cellmate's first hit, so she could not have even used the duress button if she had wanted to.  (Doc. 76 at

14.)  Defendant argues that because several prisoners were "sounding the alarm, and may have used the duress buttons in their cells, the response time was the same regardless." (*Id.*)  Lastly, Defendant argues that the cause of Plaintiff's harm was the inmate's assault upon Plaintiff.  (*Id.*)

Defendant does not address Plaintiff's contention that she reported her cellmate's threats to Officer Vasquez and other officers.  A reasonable jury could conclude that if Plaintiff's reports of threats had been acted on by prison officials and Plaintiff and her cellmate had been separated, Plaintiff would not have been harmed by her cellmate.  This is sufficient to support the causation element of Plaintiff's negligence claim.

### 4.    Actual Damages

Damages are generally a factual issue to be decided by the jury.  *Gipson*, 150 P.3d at 230).  The Court must accept as true Plaintiff's facts that she reported her cellmate's threats, her request to move was not granted, and Plaintiff's cellmate attacked her later that day causing Plaintiff to suffer a broken nose, bruises, lacerations, a concussion, and mental health injuries.  On this record, a reasonable jury could find that Plaintiff sufficiently proved actual damages.  *See In re Guardianship/Conservatorship of Denton*, 945 P.2d 1283, 1286 (Ariz. 1997) (actual damages include pain and suffering).

There are material factual questions whether Defendant's employees breached their duty of care to Plaintiff, whether there is a causal connection between that breach and the resulting injury, and whether Plaintiff suffered actual damages.  In sum, there are disputed issues of fact whether those employees committed negligent acts for which the United States may be held liable.  *See* 28 U.S.C. § 1346(b).  Accordingly, the Court will deny summary judgment on the FTCA claim with respect to Plaintiff's claim that prison officials did not address her reports that her cellmate was threatening to rape her.

**IT IS ORDERED**:

(1)    Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 76) is **granted in part and denied part**.  The Motion is **granted** as to

Plaintiff's claim that her cell lacked an operating duress alarm.  The Motion is otherwise **denied**.

      (2)    Plaintiff's "Motion for Leave to Stay Summary Judgment, Supplement Briefing, Appoint Counsel for Limited Purposes of Discovery" (Doc. 115) is **denied**.

      Dated this 29th day of September, 2022.

_____
Honorable Rosemary Márquez
United States District Judge