United States District Court
District of Arizona

Jeremy Pinson,
    Plaintiff,

v.

United States of America,
    Defendant

No. CV-19-422-RM

FILED ___ LODGED
___ RECEIVED ___ COPY

FEB - 9 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

Reply to Response To Plaintiff's Motion For Issuance
Of Subpoenas, Notice of Additional Witnesses, And
Supplement to Motion for Counsel

Comes now the plaintiff pro se and
replies to the Response (Doc. 142) opposing
her Motion (Doc. 134).

I. Timeliness

Defendant urges the Court to deny the
Motion as untimely asserting it was her
"now, months after the close of discovery and
the resolution of dispositive motions" (Doc. 142 at
3). That "Defendant could not have been aware
the Plaintiff viewed these individuals as potential
Witnesses" (id) and *Defendants "has not had
the opportunity to depose any of these witnesses
or pursue contravening evidence." (id.).

1

The United States has certainly been aware of the evidence and it was disclosed as soon as the Plaintiff obtained it. The fact it was discovered after close of discovery is due to the lack of assistance of Counsel and the United States' own failure to give any indication it knew of such evidence.

The United States did not know about a Congressional inquiry into chronic sexual abuse in the BOP?

The United States did not know about a DOJ Office of Inspector General inquiry into its systemwide abuse and noncompliance with PREA?

The United States did not know of the allegations of PREA noncompliance at USP Tucson detailed in multiple lawsuits? (See e.g., Dial v. Blanckensee et al. No. 20-CV-00069-JGZ (D. Ariz.); Lewis v. United States, No. 22-CV-00012-RCC (D. Ariz.)(both cases allege internal complaints to BOP in 2019, 2020 and later as well).

The United States did not know it settled, for millions of dollars, lawsuits by inmates alleging chronic sexual abuse and coverups of BOP's PREA noncompliance like Beaubrun et al. V. United States, No. 19-CV-00615-TJC-PRL (M.D.Fla.) as detailed in

2

the New York Times?

The plaintiff can go on in this vein if need be. But the notion that the United States was not aware of widespread allegations of sexual abuse and staff noncompliance with PREA regulations is absurd. Counsel may personally make such a claim, he is new to this case, but defendant United States? Certainly not.

Refused the assistance of counsel over and over it is plaintiff who has been prejudiced by litigating from SHU, cut off from access to the internet, legal databases, and public sources of information that hamstrung her own efforts at discovery.

And when counsel was appointed to assist in discovery disputes (Doc. 82) her letters to plaintiff were rejected by prison officials, her motion to compel discovery was rejected by the Court and noncompliant, AUSA Foss was absent and then gone, AUSA Ambri was gone multiple times, and discovery ended with counsel unable to resolve discovery disputes and withdrew without pursuing the motion to compel plaintiff insisted upon.

The Defendant has not been prejudiced, plaintiff has, and this is precisely the kind of prejudice leading the Ninth Circuit to reverse these kinds of cases. See e.g. Agyeman v. Corrections Corp. of America, 390 F.3d 1101, 1104 (9th Cir. 2004)(noting plaintiff inmate "never got access to relevant discovery); Solis v. County of Los Angeles, 514 F.3d 946, 958 (9th Cir. 2008)(same); Johnson v. U.S. Dept. of The Treasury, 939 F.2d 820, 825 (9th Cir. 1991). The delays are not attributable to plaintiff as defendant argues.

II. Relevance/Proportionality

As argued in her reply to the Opposition to her other motions (Doc. 140, 141) the plaintiff can prove her claims by, in part, at trial showing that there was a "longstanding, pervasive, or well-documented" pattern and practice of behavior " concerning the risk" and knowledge thereof. Byerly v. Deputy Warden, 246 Fed.Appx. 512, 514-15 (9th Cir. 2007)(citing Farmer v. Brennan, 511 U.S. 825, 842-848 (1994)(" Petitioner may establish respondents' awareness by reliance" on other incidents establishing knowledge of risk)(See Att. B, also)

An excellent case in point is Holmes v. United States, No. 18-cv-00487-JMS (S.D. Ind. Sept. 1, 2022)(Att. A, Excerpts) where the district court held

4

BOP "breached its duty to protect Holmes from the assault. Spratley was placed in Holmes cell even though Spratley was known to be particularly dangerous. Further, officers knew that weapons trafficking was taking place in the SHU and did not take reasonable measures to prevent it." (id).

Holmes proved causation in part because "As the Court has already discussed at length, the fact that Spratley would assault Holmes... was reasonably foreseeable." (id).

Holmes provided evidence proving "BOP officials knew, or reasonably should have known, that security measures within the prison were deficient due to the frequency of contraband trafficking, weapons possession, and assaults." (id.).

The evidence at trial will show Vasquez was trained in BOP's "zero tolerance" policies. The evidence will show Vasquez was involved in multiple PREA matters from 2018 to the present, even that he himself was subject to multiple complaints of noncompliance with PREA

that his superiors knew of and tried to cover up. See, eg. Dial v. Blanckensee, stating "sent several...letters to BOP, OIG," "spoke with" and "gave several cop-outs and ... grievances" to USP Tucson Wardens, Asst. Wardens, SHU Lieutenants for staff who "refused to protect" him "from retaliation and from getting sexualy abused.").

Another USP Tucson inmate whose PREA complaints went ignored (Lewis v. United States, No. 22-CV-00069-JGZ) would go on to kill another inmate after he was himself attacked.

In Estate of Smith v. Shartle, No. 18-CV-00323-RCC (D. Ariz.) another Judge of this Court wrote "that BOP officers did not follow the measures defined in 30P" policy, that the killer "made an unambiguous death threat against" plaintiff and "these facts suggest that the guards may have been inattentive and perhaps lazy," and therefore negligent in Smith's murder in the USP Tucson SHU citing a complaint rife with allegations staff did not protect him.

So, the evidence is definitely relevant.

Next, defendant complains plaintiff "seeks to bring two high-level government officials as witnesses to this

6

personal injury trial." (Doc. 142 at 5). That "heads of government agencies are not subject to testimony." (id.). One runs the prisons and sets policy, the other monitors and audits the prisons for abuse and noncompliance with the policies and 28 CFR Part 115 et seq.

One, has received complaints about that abuse and noncompliance with PREA and the accusation was levied by the other (and Congress) in a highly public memorandum making national news. (Doc. 134, Exhibits).

One has received complaints specific to Pinson, other victims, and ongoing PREA noncompliance and retaliation at USP Tucson (Att. C, Decl. of Ernesto Zaragosa-Solis III), the same complaints sent to attorneys for the other (id.) as well as the PREA auditors and accreditation officials with PREA Auditors of America that jointly inspected and audited USP Tucson before 2019 (and returning March 3-7, 2023)(id.) and presumably spoke to at least one of the many victims at USP Tucson and systemwide given the dozens of publicly known victims.

7

It doesn't surprise that counsel believes the victim in this case of a brutal beating and attempted sexual assault does not deserve to burden high-level government officials about the noncompliance of BOP staff with the PREA regulations and manipulation of investigations.

But, both sides in a trial have the right to call witnesses, and the power to compel witness testimony. See, Blair v. United States, 250 U.S. 273, 281-82 (1919) ("The giving of testimony and the attendance upon Court ... are public duties"). Noone, not even the President of the United States, can automatically avoid testifying in a Courtroom. See, Barnett v. Norman, 782 F.3d 417, 422 (9th Cir. 2015) (citing Clinton v. Jones, 520 U.S. 681, 704-05 (1997) and United States v. Nixon, 418 U.S. 683, 710 (1974) and Trammel v. United States, 445 U.S. 40, 50-51 (1980)).

Denial of witnesses with direct knowledge of BOP staff like Vasquez not following policy and using investigation processes to manipulate conclusions and statistics following sexual abuse and harrassment, is denial of a fair trial. That this is even being debated at all speaks volumes about what it means to be victimized in federal prisons and how victims are treated afterward by their Government.

It is, in a word, disgusting as a matter of principle.

Counsel suggests plaintiff never disclosed her witnesses to his office which has passed this case along a succession of Asst. U.S. Attorneys who resign, reassign, or become Judges before this Court. The new AUSA is wrong, witnesses were disclosed by Certified Mail to his office, (No. 7020 0640 0001 3944 7870), and the U.S. Postal Service delivered it, and if asked plaintiff can prove this. Counsel's assertion is false. Prior counsel, now a Judge of this Court, never complained of this and neither did his predecessor to plaintiff or her prior attorney Shannon Giles at any time before now with AUSA Linton. Counsel has now been reserved a second time an updated copy, Again, by Certified Mail, to maintain proof for the next time his office loses or misplaces it.

<u>Conclusion</u>

It is worth noting that this case is now subject to review by The New York Times,

USA Today and The Marshall Project a national journalism non-profit that nationally reports on issues occurring in federal prisons. That began as a matter of other events (Doc. 134, Ex. News Article) coinciding with the Governments opposition to a fair trial in this case, of suppressing evidence in derogation of the search for truth. Prisoner litigation is often reversed by Courts of Appeals where a prisoner could not take necessary depositions and "encountered multiple obstacles in discovery, both in the resistence of the defendant and in the intricacies of the discovery rules" (Montgomery v. Pintchak, 294 F.3d 492, 502 (3d Cir. 2002)).

Without a photocopier, computer or even a typewriter, without a regular law library access, the internet, public data, regular access to public media, without investigators, paralegals, attorneys, public funding at tax-payer expense, without the prestige of government office, title or power, the plaintiff has a voice and a pen and insists that the public hear the truth, the whole truth, and nothing but the truth. Whether that occurs is now in the hands of this Court. What exactly does the defendant exercise so much time and energy to hide from the trier of fact before the eyes of the public and Press? The answer can be heard at trial like it is being read in the newspapers.

The plaintiff was brutally beaten and raped in a system with PREA rules and regulations staff do not follow or enforce. The prison staff and their lawyers did not care then and they do not care now. The last resort for justice is this trial. The plaintiff asks that it be fair by granting her Motions that seek a fair trial.

Jeremy Pinson

## Certificate of Service

I certify service upon AUSA Linton via U.S. Mail on Feb. 6, 2023 by giving it to prison staff for mailing in a postage prepaid first class envelope.

Jeremy Pinson

<u>**MICHAEL LYNN HOLMES**</u>**, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, TERRE HAUTE**
**DIVISION**
**2022 U.S. Dist. LEXIS 158138**
**No. 2:18-cv-00487-JMS-MJD**
**September 1, 2022, Decided**
**September 1, 2022, Filed**

**Editorial Information: Prior History**

Holmes v. United States, 2021 U.S. Dist. LEXIS 99598, 2021 WL 2139078 (S.D. Ind., May 26, 2021)

**Counsel**          {2022 U.S. Dist. LEXIS 1}**MICHAEL LYNN HOLMES**, Plaintiff, Pro se,
          ATWATER, CA.

                    For UNITED STATES OF AMERICA, Defendant: Julian Clifford
          Wierenga, UNITED STATES ATTORNEY'S OFFICE (Indianapolis), Indianapolis, IN.

**Judges:** Hon. Jane Magnus-Stinson, United States District Judge.

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

Att. A

64572179

## A. Duty

The parties do not dispute that{2022 U.S. Dist. LEXIS 17} the BOP owed Holmes a general duty of care during his incarceration at the USP Terre Haute. *See* 18 U.S.C. § 4042. This statute provides in pertinent part that the BOP shall "(2) provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise" and "(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)(3).

Under Indiana law, the duty and causation elements of negligence include a foreseeability requirement. *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E. 3d 384, 389-90 (Ind. 2016). The court explained:

> [A] court's task-in determining "duty"-is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" ... [in] more focused, fact-specific settings....*Id.* at 391 (quoting *Strahin v. Cleavenger*, 216 W. Va. 175, 603 S.E. 2d 197, 207 (2004)). "[T]he mere fact that a particular outcome is 'sufficiently likely'{2022 U.S. Dist. LEXIS 18} is not enough to give rise to a duty. Instead, for purposes of determining whether an act is foreseeable in the context of duty we assess 'whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it.'" *Id.* (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W. 3d 347, 366 (Tenn. 2008)).

The Court finds that it was foreseeable to BOP staff that Spratley would assault Holmes with contraband weapons. First, Spratley had a history of violence and weapons possession in the SHU. In the eight months leading up to the incident at issue here, Spratley had been found to be in possession of weapons three times. Ex. 203; 204; 205. In addition, during that time he had assaulted another inmate with one of those weapons, ex. 205, had attempted to assault prison staff, ex. 206, and had fought with his cellmate, ex. 207. In fact, Lts. Sherman and Koonce agreed that Spratley was particularly dangerous. Dkt. 214 at 40:11-16; 249:11-14; 239:20-23. And, on July 13, 2017, two days before the incident with Holmes, Spratley had disciplinary hearings for three of those charges resulting in significant discipline. Ex. 205, 206, 207.

In addition to his general history of violence, Spratley had expressed{2022 U.S. Dist. LEXIS 19} specific displeasure with his assignment to a cell with Holmes more than once. The first day he was celled with Holmes, Spratley covered the cell window to get the officers' attention and asked to be removed from Holmes's cell. Dkt. 213 at 63:23-64:11. While he was removed that day, he was placed back with Holmes three days later. Ex. 110. At that point, Holmes also objected to Spratley's placement with him. Dkt. 213 at 68:7-9. Holmes explained that he was not refusing a cellmate, he was just refusing Spratley. *Id.* at 69:8-11. About a week later, Spratley covered the window again and demanded to be moved. He threatened that if he was not moved, he would tear up the cell. *Id.* at 74:13-79:15. At this time, Holmes again also objected to being celled with Spratley. *Id.* at 75:14-76:3, 79:11-15.

Resisting this conclusion, the United States points out that Holmes did not object to the placement with Spratley at any other opportunity, including when officers made rounds, to executive staff, or during weekly executive rounds. Dkt. 215 at 159:17-21. The United States also states that Holmes never told staff specifically that he was afraid of Spratley or that he felt personally threatened by him{2022 U.S. Dist. LEXIS 20} and explains that if he had done so, they would have been

DISHOT                                              1

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

64572179

separated. Dkt. 215 at 105:24-106:3. The Court credits Mr. Holmes version of events in this regard. Mr. Holmes did complain about Spratley, and when he did, he was threatened with a write-up and not separated. The Court finds sufficient evidence that, given the number and specificity of Holmes's complaints about Spratley, BOP officials had sufficient information regarding their relationship to be aware of a risk of assault.

The United States also relies on the Seventh Circuit's holding in *Parrott v. United States*, 536 U.S. 629, 637 (7th Cir. 2008), that, to prevail on an FTCA claim for failure to prevent an assault, the plaintiff must show that "BOP staff knew *or reasonably should have known* of a potential problem between the two inmates." (emphasis in *Parrott*). The United States focuses on the words "between the two inmates" and contends that BOP officers did not have reason to know of a potential problem between Spratley and Holmes. But the *Parrott* court did not define what it means to know of a potential problem between two inmates. In fact, the court reversed the district court's order granting summary judgment on the plaintiff's FTCA claim based on an assault by his former cellmate. At the time,{2022 U.S. Dist. LEXIS 21} the plaintiff had complained to prison staff because his former cellmate had written harassing letters to the plaintiff's ex-girlfriend. *Id.* at 631. In addition, the plaintiff had a separation order, but it was unclear from the record who the order required him to be separated from. *Id.* Holding that summary judgment for the United States was not appropriate, the court explained that the district court should have accommodated the plaintiff's discovery requests regarding the subject of the separation order, suggesting that if the other inmate was the subject of the protection order, this would give the BOP reason to know of a potential problem between the two. *Id.* at 638. But the court did not hold that a separation order, a specific complaint, or any other particular facts are required to demonstrate a potential problem. Here, as discussed above, there is ample evidence that BOP officials should reasonably have been aware of a potential problem between Spratley and Holmes.

The United States also relies on the district court order in *Millbrook v. United States*, No. 2:10-CV-245-WTL-WGH, 2012 U.S. Dist. LEXIS 39999, 2012 WL 1014977, at *6 (S.D. Ind. Mar. 23, 2012), another case involving an FTCA claim by a prisoner at USP Terre Haute based on an assault by his cellmate. While the assailant{2022 U.S. Dist. LEXIS 22} in *Millbrook* had a history of violence within the prison, the court held that the United States did not breach a duty to the plaintiff because there was "no reason to believe that [the alleged assailant] posed a particular and specific threat" to the plaintiff. *Id.* Unlike the prisoners in *Millbrook*, however, not only did Spratley have a history of violence, but prison officials were aware of conflict between Holmes and Spratley based on the multiple times that they objected to being celled together.

The Court further finds that it was foreseeable that Spratley would assault Holmes with contraband weapons. Weapons possession and assaults were common in the SHU at the time of the assault. Thus, BOP officials knew, or reasonably should have known, that security measures within the prison were deficient due to the frequency of contraband trafficking, weapons possession, and assaults involving weapons. Nonetheless, while BOP officials took some measures to attempt to prevent fishing and other trafficking, those measures were not sufficiently thorough. Notably, the Court credits Holmes's testimony that officers sometimes would not perform through searches during cell rotations and would often{2022 U.S. Dist. LEXIS 23} ignore fishlines on the floor and within the ventilation system. Dkt. 213 at 31:15-32:14; 45:10-46:16.

In sum, BOP officers were aware that Spratley had a history of violence and a history of conflict with Holmes. This was enough for a reasonable officer to be aware of a potential problem between Holmes and Spratley. Further, officials were aware of weapons trafficking and reasonably should have been aware of a risk that Spratley would assault Holmes with a weapon. The assault on Holmes was therefore reasonably foreseeable and the BOP had a duty to prevent it.

DISHOT                                                                       2

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

64572179

**B. Breach**

The Court next finds that the BOP breached its duty to protect Holmes from the assault. Spratley was placed in Holmes's cell even though Spratley was known to be particularly dangerous, was acting angry and belligerent with officers, and both inmates objected to the placement. Further, officers knew that weapons trafficking was taking place in the SHU and did not take reasonable measures to prevent it. By failing to take measures to prevent the assault, the BOP breached its duty to Holmes. The Court recognizes the United States' argument that "[r]unning a prison is an inordinately difficult undertaking" that should be{2022 U.S. Dist. LEXIS 24} committed to the discretion of prison administrators. *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1978). But the Court's finding here is not a direction on how the officials should run the USP Terre Haute, but simply an acknowledgement that prison officials were negligent in this case.

**C. Causation and Injury**

Finally, the BOP's breach of its duty to Holmes caused him injury. "A negligent act is said to be the proximate cause of an injury 'if the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.'" *Paragon Fam. Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000)). As the Court has already discussed at length, the fact that Spratley would assault Holmes with contraband weapons was reasonably foreseeable. As a result of the assault, Holmes suffered a broken nose and 17 stab wounds that required 23 staples to close and which were painful to remove. He experienced excruciating pain, headaches, and loss of sleep. The Court finds that these injuries were caused by the BOP's failure to prevent the assault.

Holmes also contends that he has suffered additional serious physical injuries that continue to this day, including frequent and excruciating headaches; worsened vision, particularly in his right eye where he was stabbed{2022 U.S. Dist. LEXIS 25} on the brow line; numbness, pain, and swelling in his extremities; trouble breathing (which Holmes has only had issue with since receiving a fractured nose from the attack); and aggravation to existing back issues. Dkt. 213 at 121:22-134:22. Holmes further asserts that he has experienced psychological injury because of the assault. But Holmes has never received an opinion from a medical professional that the ongoing frequent headaches, blurred vision, paranoia, alleged post-traumatic stress disorder, and bad dreams were caused by this assault. Dkt. 215 at 674:13-675:2. The Court finds that Holmes has not shown that any long-term physical or psychological injuries were caused by the failure to prevent the assault by Spratley.

**III. Conclusion**

As discussed above, based on its evaluation of the evidence and testimony presented at the bench trial, the Court finds that Roderick Spratley assaulted Holmes on July 15, 2017, and that the United States was negligent in failing to prevent that assault. As a result, Holmes suffered several physical injuries, including 17 stab wounds that required staples to close, and a fractured nose that caused him serious physical pain. Accordingly, the Court{2022 U.S. Dist. LEXIS 26} awards $20,000 in damages against the United States and in Holmes's favor.6 Judgment consistent with the Order granting summary judgment on Holmes's claims against the individual defendants based on his failure to exhaust available administrative remedies, dkt. 77, and this Order shall now issue.

**IT IS SO ORDERED**.

Date: 9/1/2022

/s/ Jane Magnus-Stinson

DISHOT                                                    3

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

64572179

Hon. Jane Magnus-Stinson, Judge

United States District Court

Southern District{2022 U.S. Dist. LEXIS 27} of Indiana

### FINAL JUDGMENT

The Court having this day made its Entry directing the entry of final judgment, the Court now enters FINAL JUDGMENT.

Plaintiff Michael Holmes's claims against individual defendants Warden J.E. Krueger, Warden Lammer, Captain Bondurant, Lieutenant Koonce, Lieutenant Sherman, Lieutenant Thompson, Officer Tindall, and Officer Porter are **dismissed without prejudice**.

On his claim under the Federal Tort Claims Act, judgment is entered in favor of Plaintiff Michael Holmes and against the Defendant United States. Compensatory damages in the amount of $20,000 are awarded against the United States. Roger A. G. Sharpe, Clerk

Date: 9/1/2022

/s/ Jane Magnus-Stinson

Hon. Jane Magnus-Stinson, Judge

United States District Court

Southern District of Indiana

DISHOT                                          4

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

64572179

The failure of a prison official to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the objective component-the deprivation alleged must be sufficiently serious, and (2) the subjective component-the prison official must possess a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). For a failure to protect claim, the "sufficiently serious" requirement is satisfied by showing the existence of "conditions posing a substantial risk of serious harm." *Farmer, 511* U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 33-34, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993). "The objective question of whether a prison officer's actions have exposed an **inmate** to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075-76 (9th Cir. 2013) (citation omitted).

To meet the subjective component, a prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *See Farmer*, 511 U.S. at 834. A prison official can be held liable under the Eighth Amendment for failing{2017 U.S. Dist. LEXIS 16} to guarantee the safety of a prisoner if they know of and disregard an excessive risk to an inmate's health or safety. *See Farmer*, 511 U.S. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.* Deliberate indifference describes a state of mind more blameworthy than negligence. *See Farmer*, 511 U.S. at 835 (*citing Estelle*, 429 U.S. at 104). Neither negligence nor gross negligence will constitute deliberate indifference. *See Farmer*, 511 U.S. at 835-36 & n. 4; *see also Estelle*, 429 U.S. at 106 (establishing that deliberate indifference requires more than negligence).

Deliberate indifference can be established by demonstrating that a defendant disregarded evidence of a specific threat to the plaintiff or if the plaintiff was assaulted as a result of prison conditions or practices that are dangerous to all prisoners or to any identifiable groups of prisoners. As set forth in *Farmer*,

The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether{2017 U.S. Dist. LEXIS 17} a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.*Farmer*, 511 U.S. at 843. To prove knowledge of the risk, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. *Farmer*, 511 U.S. at 842.

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Att. B

64572179

The Supreme Court made it clear that even though it was adopting a subjective definition of recklessness, an official's subjective knowledge can be proven by drawing inferences from all available evidence, including objective facts. For instance, a fact finder could conclude that a prison official actually knew of a substantial risk from the fact that the risk was obvious.  Farmer, 511 U.S. at 842.

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, **pervasive, well-documented**, or expressly noted by prison officials in the past, and the circumstances{2000 U.S. Dist. LEXIS 31} suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk. Farmer, 511 U.S. at 842-43 (quotation omitted).

Because a prison official's actual, subjective awareness of a substantial risk is to be determined from all available evidence, a plaintiff's failure to give prior notice that he was facing a risk of harm is not dispositive. Thus, in Farmer, the plaintiff's failure to express any concern for his safety to the defendants was not dispositive.  Farmer, 511 U.S. at 848. Advance notice from a plaintiff might be sufficient to establish a prison official's subjective awareness of a substantial risk of harm, but it is not required. A plaintiff may establish the official's subjective awareness by relying on any relevant evidence. Id.

The Supreme Court was also quick to point out that a prison official need not know that harm would actually befall a particular inmate. The Eighth Amendment is violated by allowing a substantial risk{2000 U.S. Dist. LEXIS 32} to safety to exist, regardless of whether harm actually befalls an inmate. 9 Consequently, a prison official cannot escape liability by showing that "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [plaintiff] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843 and 849 n. 10. It is enough that the official fails to take reasonable steps to alleviate a substantial risk once he is actually aware of it. If a prison official is aware of a substantial risk of harm, it is irrelevant to liability that the official could not guess beforehand precisely who would attack whom.  Id. at 843-44.

{2000 U.S. Dist. LEXIS 33} If a prison official is actually aware of a substantial risk of harm, he must respond reasonably to the risk. That is, a prison official's duty under the Eighth Amendment is to ensure reasonable safety, a "standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" Farmer, 511 U.S. at 845-46 (quoting {88 F. Supp. 2d 1261} Spain v. Procunier, 600 F.2d 189, 193 (9th Cir. 1979)). A prison official cannot be held liable, therefore, if he responded reasonably to the risk, even if harm to an inmate was not ultimately averted.  511 U.S. at 845. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. See also Mitchell v. Maynard, 80 F.3d 1433, 1442 (10th Cir. 1996).

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

64572179

Attachment C

Declaration of Ernesto Zaragosa-Solis III

Declaration of Ernesto Zaragosa-Solis III

I declare under penalty of perjury the following is true:

1. I am providing this declaration to Jeremy Pinson #16267-064 of my own free will.

2. I have not been promised anything, I have not been threatened, manipulated, or anything else to write and provide this declaration.

3. The letter attached here to as attachment 1 is a true and correct copy of a letter that I wrote. This letter with minor changes for purposes of ~~Identifying~~ Identifying the recipient, was mailed to the following:.

| Recipient | Certified mail Number |
|---|---|
| American Correctional Association | 7020 2450 0000 6741 5111 |
| DOJ office of Inspector General | 7020 2450 0000 6742 4564 |
| BOP western Regional Director | 7020 2450 0000 6741 2646 |
| Attorney James Davy Esq. | 7020 2450 0000 6742 4151 |
| Pam Sonnen, PREA Auditor | 7020 2450 0000 6742 2096 |
| LAMBDA LEGAL | 7020 2450 0000 6741 4343 |

-1-

4. The letter attached here to as attachment B is a true and Correct copy of a letter that I wrote.

5. The reason that I Began writing these letters was because of on going, long standing, well documented Sexual abuse and Sexual harrassment at USP TUCSON that I have been withnesing since I arrived to this Prison in May 2020.

6. The lack of Protection for victims like me at USP TUCSON is widespread, and retaliation by the staff at USP TUCSON, including officer Vasquez but not limitted to him, so serious and pervasive at USP TUCSON against victims like me and Jeremy Pinson #16267-064 I feel a responsivility to do everything I can to prevent myself and anyone else from becoming a Victim again and to hold the bad actors accountable.

7. If asked to do so I will testify to the facts contained in these letters and to the truth of the facts described in these letters.

Executed under the penalty of perjury pursuant 28 USC 1746

Ernesto Zaragosa-Solis III
Ernesto Zaragosa-Solis III

-2-

Attachment 1
to
Zaragosa-Solis Ded.

Jan 23, 2023
Ernesto Zaragosa-Solis III 64592-179
U.S.P. TUCSON
P.O. Box 24550
TUCSON AZ 85734


TO: PAM SONNEN
      Prea auditors of America


I am writing to you today in regardes to the PREA Audit that you will be under taken at the United States Penitentiary Tucson.


My Name is Ernesto Zaragosa-Solis III and I have been in the SHU since Sept. 14, 2022 because on that day inmate Tyrone Brown Attacked Two Transgender inmates Jeremy Pinson #16267-064 and Jessica Gulisano #08723-015 with a weapon trying to Kill them. I deffended them and my nose was broken by Brown as well.


Brown was a Sexual Predator and he was trying to force Pinson and Gulisano to act as prostitues under threat of Serious Bodily harm you do not have to take my word for that because pinson's PREA was filed Months before Sept. 17, 2022 when the warden M Gutierrez alowed Brown out of the SHU even though pinson's lawyers had Complained to the BOP that Brown was Sending Messages from the SHU that he was going to Kill Pinson and

— 1 —

Gulisano. That lawyer is Andrew B. Talai and you may call him at (213) 894-7571. The warden let him out of the SHU anyways.

On Sept 13, 2022 I filed a PREA Complaint utilizing the TRULINCS request to Staff to the D.O.J. Sexual abuse reporting that Brown had been released from the Shu and was threating to Rape and kill Pinson and Gulisano. The Same electronic complaint was submitted by Pinson, Gulisano, Rickie Rarey #09273-028 and Albert Singer.

The evening of Sept. 13, 2022 the PREA LT. Christensen called Brown to the LT's offices and told Brown we were all snitching on him and then released Brown to his General Population housing Unit. After releasing brown to his Unit LT. Christensen called inmate Rarey to the LT's office and demanded that rarey withdraw his Electronic PREA Complaint.

As stated before Brown Attacked all of us at Breakfast the next morning. I did not speak to "Christensen again until Oct 5th 2022. During the interview LT. Christensen admitted to me that "Staff fucked up" but then threatened me by saying that if I sued Staff at U.S.P Tucson over the PREA with Brown or served as a witness for Pinson I would be kept in Shu and transfered to a more dangerous Prison. I refused to ~~wav~~ waive any lights. I have never left the SHU since and I am Designated to U.S.P Coleman II where my life would be ~~indang.~~ endangered.

In 2020 inmate Jose Flores tryed to Rape me. at the time I did not reported it because when inmates file PREA's The SIS staff label them as Snitches all over the Yard. I personally reported it to Asst. Warden B. Fields, Sent a Electronic PREA request to Staff, and filed a BP-9 to the Regional Director of the B.O.P. wich was Asigned REMEDY ID: 1145213-R1 But the Warden is still trying to transfer me to U.S.P Coleman II Knowing that inmate Floses is at that Prison a even though he toyed to Rape Me.

The B.O.P has regulations to protect me from Sexual abusers, 28 C.F.R 115.62, and from staff retaliation, 28 C.F.R 115.67 but at U.S.P. TUCSON they do not follow these policy's and they try to got People Hurt when they file PREA's The staff are openly hostile to any PREA filers regardless of the merit. as a resault there are alot of lawsuits pending, including one that Pinson filed (@ See, Pinson Vs. United States, Case No: 19-CV-00422-RM(D.Ariz). (FEDERAL COURT).

I would like to talk to you more and I think that you should talk to all of the inmates identified in this letter, as well as the lawyer for Pinson, as well as Allie at the law firm of Hallinan and Killpack at (520) 320-5240. Thank you for your time

Sincerely

Sumonte Banguera Solis III

3

Attachment 2
to
Zaragosa-Solis Decl.

FILE COPY

TO: B.O.P GENERAL COUNSEL
320 First Street N.W
Washington. DC, 20534

VIA: Certified Mail No.

7020 2450 0000 6742 1945

Jan 16, 2023
Ernesto Zaragosa-Solis III 64512-179
U.S.P TUCSON
P.O. Box 24550
TUCSON Az 85734.

My name is Ernesto Zaragosa-Solis III and I am housed in U.S.P TUCSON Special Housing Unit (SHU) Since Sept 14, 2022 and the reason I am in the (SHU) is because a Sexual Predator Assulted Jeremy Pinson, Jessica Gulisano, and I. AFTER The PREA LT. Christensen and M. Gutierrez (warden) released him from the SHU on a PREA that Jeremy Pinson, and Jessica Gulisano placed on him, because he wanted to Sexually trafick these two transgender women. On Sept 13, 2022 he was released and I and about 7 other inmates reported him to LT. Christensen again because he ~~stated to m~~ started to make threats all over. I ~~s~~ reported it on the TRULINCS "OIG" and I seen Tyrone Brown being Called to the LT's office to talk to LT. Christensen and let Tyrone Brown back to his ~~housed~~ housing Unit and that when the following Day in the Morning he Violently Attacked with a razor weapen Jeremy Pinson in the back of the head and Cut and Scared Jessica Gulisano for life on the face, across from ear to mouth and got to break my nose for defending these two transgender women. we have been back here in SHU since then and are being retaliated for filing on the issue. I was told that if I sued for this, or do any filing that I would stay in SHU for a long time and get shipped out of Tucson U.S.P and that is exactly what they are doing. I am being Sent to Colemen II where I will be hurt and/or Killed because of my filing a PREA on a Sexual Assult that happened to me here in 2020. This Warden is blowing off my Concerns

—1—

that I have told him about Coleman II. I have done a BP.9 about it. But no one has taken me seriously. They are too busy fucking with Jeremy Pinson

It has only come to my attention that staff members in the U.S.P Tucson Mailroom where taking legal and special mail that I sealed in there presence and ~~where~~ were not actually mailing them. This includes letters to Attorneys, federal goverment agency's, Civil rights organozations, and others concerning all the issues out lined to you in this letter. Because of this I will be resending all of the same by Certified mail. If staff members will commit felony's with U.S Postal matter to cancel what happened here I have significant concerns about spoilation of evidence. It is the responseability of The B.O.P To preserve all evidence relating to my claims that will be brought in the future. I want to be sure to be able to prove that I am asking you in writing to ensure that all videos, documents, email's and other informations relating to my claims and those of the other victim's. I am also documenting in this letter by Certified mail that I have reportedly asked to speak to agents of the OIG and Internal Affairs concerning the retaliation I have been experiencing in violation of 28 CFR 115.67 and I want to document my request to speak with the investigator of my FTCA claims to provide maximum detaile for these investigation as well. If something happens to Me my Certified Mail is the proof that you recived this.

Sincerely

Ernesto Bengoac felix III