**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson,<br><br>        Plaintiff,<br><br>v.<br><br>United States,<br><br>        Defendant. | No. CV-19-00422-TUC-RM<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

    Plaintiff Jeremy Pinson, an inmate in the custody of the Federal Bureau of Prisons ("BOP") who was formerly housed at the United States Penitentiary-Tucson ("USP-Tucson"), sues Defendant United States pursuant to the Federal Tort Claims Act ("FTCA"), seeking $299,999.00 in damages. (Doc. 22 at 5.)[1] The Court held a four-day bench trial during which the Court heard testimony from Plaintiff and witnesses Garrett Merrell, Jaclyn Avilez, Dr. Samantha Licata, Antonietta Estrada, Dr. James Hayden, Jeffrey Williams, Joe Espinoza, Miguel Vasquez, Samuel Bynum, Joseph Quesada, Jeremy Lawson, and Keith Falconer. (Docs. 251, 252, 256, 257.) On the last day of trial, Plaintiff orally moved for a new trial and for reconsideration of a summary judgment ruling, and the Court took the motions under advisement. (Doc. 257.) The Court herein rules on the pending motions and issues its findings of fact and conclusions of law.

. . . .

. . . .

---

[1] All other claims and defendants have been dismissed. (*See* Doc. 21, 25, 53.)

**I.     Motion for Reconsideration and Motion for New Trial**

    **A. Background**

In her[2] operative First Amended Complaint, Plaintiff alleges that she was placed in the Special Housing Unit ("SHU") of the USP-Tucson in a cell that lacked a functioning duress alarm. (Doc. 22 at 5.) On July 12, 2019, Plaintiff reported to Officer Miguel Vasquez that her cellmate, Ricki Makhimetas, was threatening to rape her, but Officer Vasquez failed to separate Plaintiff from Makhimetas. (*Id.*) Later that night, Makhimetas attacked Plaintiff and attempted to rape her. (*Id.*)

In her first set of requests for production served during discovery in this matter, Plaintiff requested "[a]ll post-orders in the USP Tucson SHU that describe staff duties in an emergency. . . ." Defendant objected that the request was vague, ambiguous and overbroad, unduly burdensome, not relevant to any party's claim or defense, and not proportional to the needs of the case. Defendant further stated that inmates are prohibited from having staff post orders, and Defendant averred that it was "not withholding any known documents" pursuant to its objection. In her second set of requests for production, Plaintiff requested "[a]ll post orders in place as of July 12, 2019 in the USP Tucson SHU that describe staff duties or procedures in an emergency involving inmates housed in the same cell. . . ." Defendant responded: "Without waiving any prior objection, there are no post orders responsive to this request."

On February 22, 2022, Defendant filed a Motion to Dismiss or in the Alternative Motion for Summary Judgment. (Doc. 76.) The Court granted the Motion with respect to the portion of Plaintiff's FTCA claim alleging that she was housed in a cell that lacked a functioning duress alarm ("Duress Alarm Claim"), holding that the claim fell within the discretionary function exception to the FTCA and, therefore, that the Court lacked subject-matter jurisdiction. (Doc. 117 at 15-17, 25-26.) In reaching that holding, the Court found that Plaintiff had failed to identify any statute, regulation, or policy requiring the use of functioning duress alarms. (*Id.* at 15-16.) The Court denied Defendant's

---

[2] Plaintiff is transgender and uses female pronouns.

1   Motion with respect to the portion of Plaintiff's FTCA claim alleging that USP-Tucson
2   staff failed to appropriately respond when Plaintiff reported that her cellmate was
3   threatening her. (*Id.* at 17-26.)
4          The first three days of trial in this matter were held on November 6-8, 2023. On
5   November 10, 2023, Defendant disclosed to Plaintiff a post order stating the following:

> Each cell in the Special Housing Unit contains a duress button on the wall. . . . In the event that the duress alarm is pushed, the alarm will sound in the Officers station, and a light will flash on the outer wall of the office. Staff must immediately respond to the cell.

9          On November 13, 2023—the final day of trial—Plaintiff notified the Court of the
10  recently disclosed post order, moved for reconsideration of the Court's dismissal of the
11  Duress Alarm Claim, and moved for a new trial. (Doc. 257.) The Court took the motions
12  under advisement and ordered Defendant to file a written response. (*Id.*) Defendant filed
13  a response on November 21, 2023. (Doc. 267.) Plaintiff thereafter filed a written brief in
14  support of her oral motions (Doc. 279), and Defendant responded to the written brief
15  (Doc. 282).
16         Plaintiff argues that, by requiring USP-Tucson SHU staff to respond to the
17  activation of a duress alarm, the post order at issue presupposes a duty to ensure that all
18  cells have functioning duress alarms. (Doc. 279 at 15.) Plaintiff further argues that
19  discovery sanctions are warranted under Federal Rule of Civil Procedure 37 and that she
20  should be granted a new trial at which she will be unhindered by Defendant's
21  concealment of material evidence. (*Id.* at 5-23.) Plaintiff also argues that a new trial is
22  warranted based on her pro se status, the denial of appointed counsel when her first
23  appointed trial counsel withdrew, the BOP's interference with her legal mail and law
24  library/legal file access, and the Court's denial of her requests to serve certain trial
25  witness subpoenas. (*Id.* at 23-24.)
26         Defendant asserts that Plaintiff has failed to identify any grounds warranting a new
27  trial and that reconsideration of the Court's summary judgment ruling is not warranted.
28  (Docs. 267, 282.) Defendant argues that the post order at issue merely directs USP-

Tucson SHU personnel to respond to activated duress alarms but does not specifically mandate the presence of duress alarms or require staff to inspect or maintain them. (Doc. 267 at 6-8.) Defendant further argues that the issue of a functioning duress alarm is not outcome-determinative because the evidence shows that Plaintiff could not have reached a duress alarm during Makhimetas's attack, and therefore a functioning duress alarm would not have resulted in a more immediate staff response. (*Id.* at 8-9.)

### B. Applicable Law

Motions for reconsideration are ordinarily denied "absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to [the Court's] attention earlier with reasonable diligence." LRCiv 7.2(g)(1).

"The FTCA provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment." *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). Under the discretionary function exception to the FTCA's waiver of sovereign immunity, "[l]iability cannot be imposed if the tort claims stem from a federal employee's exercise of a 'discretionary function.'" *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002) (quoting 28 U.S.C. § 2680(a)). Courts use a two-part test to determine whether an act or omission falls within the discretionary function exception. *Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011). First, the court must "determine whether a federal statute, regulation, or policy mandated a specific course of action, or whether the government actor retained an element of judgment or choice with respect to carrying out the challenged action." *Id.* (citing *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008)). If a "federal statute, regulation, or policy prescribes a course of action for an employee to follow," and a government employee does not follow that course, the government is not immune from suit because "the employee has no rightful option but to adhere to the directive." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation marks omitted). But, if the challenged conduct involved an element of judgment or choice, the second step is to determine "'whether that judgment is of the

1 kind that the discretionary function exception was designed to shield, namely, only
2 governmental actions and decisions based on considerations of public policy.'" *Green*,
3 630 F.3d at 1249 (quoting *Terbush*, 516 F.3d at 1129). "If the challenged action satisfies
4 both of these two prongs, that action is immune from suit—and federal courts lack
5 subject matter jurisdiction—even if the court thinks the government abused its discretion
6 or made the wrong choice." *Id.* at 1249-50.

**C. Discussion**

The post order disclosed by Defendant on November 10, 2023, is responsive to the requests for production discussed above: it describes USP-Tucson SHU staff duties in an emergency, including an emergency involving inmates housed in the same cell. The post order should have been disclosed when Defendant responded to the requests for production. Instead, Defendant withheld the post order until trial in this matter had nearly concluded. The post order materially affects the Court's summary judgment ruling and constitutes newly discovered evidence warranting reconsideration of that ruling.[3]

The post order states that each cell in the USP-Tucson SHU has a duress button that sounds an alarm in the officers' station when activated, and the post order mandates that staff immediately respond when a duress button is activated. By specifying that all SHU cells have a functioning duress alarm and by requiring staff to immediately respond to an activated duress alarm, the post order presupposes a duty to ensure that each cell's duress alarm is functioning. Furthermore, BOP Program Statement 1600.13 requires that inmates be provided with a means of reporting emergencies. The policy provides some flexibility in choosing those means, but it mandates that the means chosen be reliable. As discussed below, the evidence at trial in this matter showed that functioning duress alarms are the only reliable means that USP-Tucson SHU inmates have to report

---

[3] The Court is concerned that Defendant withheld until mid-trial evidence that was responsive to Plaintiff's discovery requests and material to this Court's summary judgment ruling. However, the record does not contain evidence of willfulness or bad faith justifying terminating sanctions, *see Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007), and the Court does not find that other sanctions under Rule 37 are appropriate or applicable under the circumstances.

1  emergencies occurring within their cells. Accordingly, pursuant to BOP Program
2  Statement 1600.13 and the post order disclosed during trial, the Court finds that USP-
3  Tucson staff have a mandatory duty to ensure that each SHU cell contains a functioning
4  duress alarm. Because ensuring SHU cells contain functioning duress alarms is
5  mandated by policy, the discretionary function exception to the FTCA does not apply to
6  Plaintiff's Duress Alarm Claim, and the Court reconsiders its summary judgment ruling
7  dismissing that claim for lack of subject-matter jurisdiction.

8  The Court will deny Plaintiff's motion for a mistrial. "After a nonjury trial, the
9  court may, on motion for a new trial, open the judgment if one has been entered, take
10 additional testimony, amend findings of fact and conclusions of law or make new ones,
11 and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2). Plaintiff does not
12 identify additional testimony or evidence that she would present in support of her Duress
13 Alarm Claim, and the Court finds that no additional evidence or testimony is required to
14 allow the Court to resolve the claim. Furthermore, none of the other grounds identified
15 by Plaintiff support granting a new trial. Plaintiff complains of this Court's denial of her
16 motion to issue subpoenas securing the trial testimony of certain witnesses, but she does
17 not explain how the Court erred or how the anticipated testimony of those witnesses
18 would affect the result in this case. Plaintiff also fails to show how her pro se status or
19 the denial of additional appointed trial counsel impeded her ability to litigate her claims;
20 the Court notes that Plaintiff is an experienced pro se litigant who skillfully presented
21 testimony and evidence at the trial in this matter.

22 **II.    Emergency Motion to Secure Impeachment Witness**

23 Shortly prior to the start of trial, Plaintiff filed an Emergency Motion to Secure
24 Impeachment Witness. (Doc. 245.) In the Motion, Plaintiff sought to present testimony
25 from two inmates for purposes of impeaching the anticipated testimony of Makhimetas.
26 (*Id.*) However, Defendant elected not to call Makhimetas at trial. Accordingly, the Court
27 will deny Plaintiff's Motion as moot.
28 . . . .

- 6 -

### III. Findings of Fact

On July 12, 2019, Plaintiff was housed with inmate Makhimetas in cell 140 of the Bravo Range of the USP-Tucson SHU. Cell 140 lacked a functioning duress alarm. At approximately 9:20 p.m., Makhimetas attacked Plaintiff, hitting her from behind and then beating her in the face and head. Plaintiff did not fight back; she lied on the ground in a fetal position and attempted to protect her head with her hands. Plaintiff testified that, during the attack, Makhimetas tried to pull down her pants and threatened to sexually assault her. Plaintiff called for help, and other inmates began kicking their doors to alert USP-Tucson staff.

Officer Vasquez and other officers responded, handcuffed Plaintiff and Makhimetas, removed them from the cell, and sent them to be photographed and medically assessed. It took approximately five minutes for staff to respond to the assault. It takes less than a minute for USP-Tucson staff to respond to an activated duress alarm in the SHU.

USP-Tucson staff did not treat cell 140 as a crime scene and did not refer investigation of the incident to the Federal Bureau of Prisons.

Senior Officer Specialist Miguel Vasquez wrote incident reports charging both Plaintiff and Makhimetas with violating code 201, fighting with another person. Officer Vasquez noted that both Plaintiff and Makhimetas were observed to have injuries consistent with fighting; however, Makhimetas did not sustain injuries during the altercation that required medical treatment. When an inmate altercation is not witnessed by staff, it is common for both or all inmates involved to be charged with fighting, pending an investigation by Special Investigative Services ("SIS"). Plaintiff was upset that Officer Vasquez wrote her an incident report.

SIS Technician Joe Espinoza photographed Plaintiff after the incident, and the photographs show facial swelling, bruising, and bleeding. Nurse Jaclyn Avilez conducted an injury assessment, noting that Plaintiff had sustained multiple facial traumas, that her right eye was nearly swollen shut, and that her nose had a visible

deformity and tenderness to palpation. Plaintiff reported a pain level of 7 out of 10. Plaintiff did not tell Nurse Avilez that Makhimetas had attempted to sexually assault her, nor did she tell her that Makhimetas had been threatening her prior to the altercation, that she had told Officer Vasquez about the threats, or that she had asked Officer Vasquez to move her.

At approximately 11:00 or 11:30 p.m., Plaintiff was taken by emergency medical services to the Tucson Medical Center for evaluation of head trauma. She was diagnosed with nasal bone fractures, in addition to bruising and swelling. She was discharged with a prescription for ibuprofen, and she returned to USP-Tucson at approximately 3:30 a.m. on July 13, 2019. She did not receive her prescribed pain medication upon her return. Plaintiff was not billed for any medical treatment arising from the July 12, 2019 altercation.

On July 13, 2019, Lieutenant Garrett Merrell served the incident reports drafted by Officer Vasquez on Plaintiff and Makhimetas, and he obtained inmate statements. Plaintiff did not communicate to Merrell that Makhimetas had been threatening her prior to the altercation or that she had communicated any threats to Officer Vasquez. She also did not mention that Makhimetas had attempted to sexually assault her.

On July 15, 2019, advanced care level psychologist Dr. Samantha Licata performed a suicide risk assessment of Plaintiff. During the assessment, Plaintiff gave Dr. Licata a BP-9 request for administrative remedy form that she had hand-labeled "SENSITIVE PREA." In the form, Plaintiff wrote that Makhimetas had violently assaulted her by repeatedly punching and kicking her in the face and head; that she had been unable to summon emergency assistance because cell 140 lacked a duress alarm; and that Makhimetas tried to forcibly remove her pants and sexually assault her during the incident. Plaintiff also complained that cell 140 was not treated as a crime scene and that the Federal Bureau of Investigations was not notified of the incident. Plaintiff did not state that Makhimetas had been threatening her prior to the altercation, that she had reported threats to Officer Vasquez, or that she had asked Officer Vasquez to be moved.

Upon receiving Plaintiff's BP-9 form containing allegations of an attempted sexual assault, Dr. Licata filled out a Prison Rape Elimination Act ("PREA") First Responder Notification form and conducted a sexual abuse intervention evaluation. At no time during the suicide risk assessment or sexual abuse intervention evaluation did Plaintiff tell Dr. Licata that Makhimetas had been threatening her prior to the assault, that she had reported the threats to Officer Vasquez, or that she had asked Officer Vasquez to be moved.

On the same day, Nurse Joseph Quesada conducted a PREA injury assessment, during which Plaintiff reported a pain level of 8 out of 10. Plaintiff told Nurse Quesada that she and Makhimetas were in their cell talking when something she said set him off and he attacked her. Plaintiff did not tell Nurse Quesada that Makhimetas had been threatening her prior to the assault, that she had reported the threats to Officer Vasquez, or that she had asked Officer Vasquez to be moved.

On July 16, 2019, Nurse Jeffrey Williams conducted an additional PREA injury assessment, during which Plaintiff reported a pain level of 5 out of 10. Plaintiff told Nurse Williams that Makhimetas was being teased by other inmates on the range for beating up a mentally handicapped inmate. Plaintiff was lying on her bunk reading a book, and she told Makhimetas that he got no brownie points in prison for beating up a "retard." Makhimetas then began to threaten Plaintiff, and when she got up to get some water, he punched her in the back of the head. After she went down, he continued to beat her and attempted to pull down her pants. Plaintiff did not tell Nurse Williams that Makhimetas had been threatening her for an extended period prior to the assault or that she had reported the threats to staff.

SIS Technician Jeremy Lawson investigated the July 12, 2019 incident and, as part of the investigation, interviewed Plaintiff, Makhimetas, and several inmates who were housed on the Bravo range during the incident. Plaintiff told Lawson that Makhimetas attacked her after she told him that nobody gets brownie points for beating up a "retard." Plaintiff did not tell Lawson that Makhimetas had been threatening her prior to the

altercation, that she had reported threats to Officer Vasquez, or that she had asked Officer Vasquez to be moved. Makhimetas told Lawson that he and Pinson were arguing and he felt threatened, so they fought. Makhimetas initially denied hitting Pinson but later admitted to hitting her in the nose. He stated that Pinson did not hit him. Other inmates who were interviewed by Lawson described hearing scuffling and fighting, and they reported that Pinson was yelling "stop" and screaming for help during the altercation. No inmates mentioned hearing prior threats by Makhimetas to Pinson or hearing Pinson report any threats to Officer Vasquez. Lawson drafted an Inmate Investigative Report finding Plaintiff's PREA allegations unsubstantiated due to an inability to obtain evidence of actual occurrence. In the report, Lawson found that Plaintiff did not strike Makhimetas during the July 12, 2019 altercation. He also noted that a review of surveillance footage did not provide anything pertinent to the investigation.

Video surveillance in the SHU shows corridors but not the interiors of cells, and it contains no audio. Surveillance footage is destroyed after ten days if not deemed pertinent to an investigation. Video surveillance footage of the Bravo range from July 12, 2019, was not retained.

Disciplinary Hearing Officer ("DHO") Antonietta Estrada held a hearing on Plaintiff's incident report arising from the July 12, 2019 altercation, found that the evidence did not support the charge, and expunged the incident report. Plaintiff did not tell DHO Estrada that Makhimetas had been threatening her prior to the altercation, that she had reported threats to a staff member, or that she had asked to be moved prior to the altercation.

On August 5, 2019, Plaintiff completed a Standard Form 95 ("SF-95") administrative claim seeking $299,999.00 for personal injury arising from the July 12, 2019 incident. In the form, Plaintiff stated that her cellmate brutally beat her and attempted to sexually assault her on July 12, 2019, and that she was unable to summon staff assistance because her cell was not equipped with a duress alarm. Plaintiff also stated that she was not examined by a doctor or given her prescribed pain medication

when she returned from the hospital following the incident. Plaintiff did not state that her cellmate had been threatening her prior to the altercation, that she had reported the threats to USP-Tucson staff, or that she had requested to be moved prior to the altercation.

Chief Psychologist Dr. James Hayden became Plaintiff's treating physician in 2023 and diagnosed her with post-traumatic stress disorder ("PTSD"), among other psychological disorders. In reaching a diagnosis of PTSD, Dr. Hayden considered a number of violent inmate attacks on Plaintiff, including the 2019 incident.

The visual surveillance system in the USP-Tucson SHU does not reliably allow inmates to notify staff of an emergency within a cell because it records only visual and not auditory information and does not record the interior of cells. The rounds conducted by USP-Tucson staff approximately every 30 minutes do not occur frequently enough to constitute a reliable means for inmates to notify staff of an emergency. Furthermore, auditory surveillance in the SHU is insufficient to reliably allow inmates to notify staff of an emergency. The testimony and evidence at trial indicated that USP-Tucson staff are able to hear and respond if numerous inmates on a range kick their doors. However, the evidence did not indicate that USP-Tucson staff are able to hear and respond to a single inmate screaming for help. Rather, the evidence indicated that Plaintiff screamed for help for approximately five minutes, and that staff responded only when other inmates began kicking their cell doors. An inmate who needs the voluntary cooperation of multiple other inmates in order to summon emergency assistance has not been provided with a reliable means of notifying staff of an emergency. Duress alarms are the only reliable means that USP-Tucson SHU inmates have of notifying staff of emergencies occurring within their cells, and Plaintiff's cell lacked a functioning alarm.

The parties dispute whether Plaintiff could have activated a duress alarm during Makhimetas's attack if her cell had contained a functioning alarm. (*See* Doc. 267 at 8-9.) The trial evidence showed that Makhimetas hit Plaintiff from behind, knocking her to the floor, and Plaintiff thereafter remained on the floor in a fetal position, attempting to protect her head from Makhimetas's blows. However, the evidence does not support a

finding that Plaintiff would have been unable to get off the floor and reach a duress alarm, had one been in her cell. Plaintiff remained in the fetal position because she did not want to fight Makhimetas. She knew there was no duress alarm in her cell and thus had no reason to try to get up to reach one. If cell 140 had contained a functioning duress alarm, the Court finds, based on Plaintiff's physical attributes and the totality of the evidence, that Plaintiff could have and would have gotten up to activate it. If Plaintiff had activated the duress alarm, USP-Tucson staff would have responded within one minute. Instead, it took approximately five minutes before staff responded. Accordingly, the lack of a functioning duress alarm in cell 140 caused Plaintiff to continue to be beaten for an additional four minutes.

The parties also dispute whether Plaintiff notified Officer Vasquez prior to the July 12, 2019 assault that Makhimetas had been threatening her. Plaintiff testified that Makhimetas awoke early on July 12, 2019, and spent hours yelling to gay or transgender inmates, searching for someone he could have sex with. The other inmates turned him down. Makhimetas then began bragging about attacking a mentally disturbed inmate prior to being placed in cell 140 with Plaintiff. Makhimetas and Plaintiff proceeded to have a verbal altercation. Plaintiff felt that Makhimetas was a potential threat to her and asked Officer Vasquez to be moved out of the cell until she could speak to a lieutenant. The request made Makhimetas angry, and he grew increasingly belligerent. Makhimetas then demanded that Plaintiff have sex with him and, when she refused, threatened to rape her. When Officer Vasquez made another round, Plaintiff told him that she needed to be moved immediately because Makhimetas was threatening to fight and rape her. Officer Vasquez told Plaintiff he would speak to a lieutenant and then walked away. Later that afternoon, Officer Vasquez told Plaintiff that he had told a lieutenant about the reported threats, and that it was up to the lieutenant to decide how to proceed.

Inmate Anthony Bennett testified that, after the July 12, 2019 altercation, Officer Vasquez told him that he made a mistake and asked him to tell Plaintiff that he was sorry.

Officer Vasquez testified that Plaintiff did not report to him, prior to the July 12,

2019 altercation, that Makhimetas had been threatening to physically or sexually assault her, nor did Plaintiff ask to be separated from Makhimetas. Officer Vasquez further testified that, if Plaintiff had reported threats to him, he would have separated the inmates. Officer Vasquez denied speaking to Bennett, telling him that he had made a mistake, or asking him to apologize to Plaintiff.

The Court finds that Officer Vasquez's testimony on this issue is more credible than Plaintiff's and Bennett's testimony, for a number of reasons. First, Plaintiff did not tell USP-Tucson staff after the incident that Makhimetas had been threatening her, that she had reported the threats to Officer Vasquez, or that she had asked Officer Vasquez to be moved. Instead, when recounting the July 12, 2019 incident to USP-Tucson staff, Plaintiff repeatedly described a spontaneous altercation. Plaintiff did not mention reporting prior threats to Officer Vasquez in her BP-9 request for administrative remedy nor in her SF-95 administrative claim. In her verified First Amended Complaint, Plaintiff alleged that she passed two written notes to Officer Vasquez reporting threats by Makhimetas. (Doc. 22 at 5.) In contrast, during her trial testimony, Plaintiff indicated she verbally reported the threats to Officer Vasquez.[4] The shifting nature of Plaintiff's factual account undermines the credibility of her testimony. Furthermore, Plaintiff's testimony is inconsistent with USP-Tucson SHU documentation indicating Officer Vasquez conducted only one round in the Bravo range prior to Makhimetas's assault on July 12, 2019. In evaluating the credibility of Plaintiff's testimony, the Court takes note of Plaintiff's felony convictions, including a conviction for making false statements. The Court also notes that Plaintiff has a motive to testify falsely on the issue of reporting prior threats, given her financial interest in this matter and her anger at Officer Vasquez for writing her an incident report arising from the July 12, 2019 altercation.

The Court finds Bennett's testimony lacks credibility. Bennett indicated that he spoke to Officer Vasquez about the July 12, 2019 altercation while he was housed in the SHU and during a time when Plaintiff still had visible injuries. However, Bennett's

---

[4] Plaintiff also provided differing explanations in the First Amended Complaint and her trial testimony for the reasons why Makhimetas grew angry with her. (*See* Doc. 22 at 5.)

inmate history indicates he was housed in general population rather than the SHU from July 12, 2019 to October 16, 2019, and he therefore could not have had a conversation with Officer Vasquez in the SHU shortly after the July 12, 2019 altercation. Furthermore, Bennett conceded during his testimony that he has a poor memory. He also testified to facts indicating bias: he was in a romantic relationship with Plaintiff and Plaintiff had assisted him with legal matters related to his criminal case.

Based on the Court's evaluation of the credibility of the witnesses and in light of the totality of the evidence of record, the Court finds that the altercation between Makhimetas and Plaintiff was spontaneous, that Plaintiff did not report to Officer Vasquez prior to the altercation that Makhimetas was threatening her, and that Plaintiff did not ask Officer Vasquez prior to the altercation to be separated from Makhimetas.

## IV. Conclusions of Law

Under the FTCA, the United States may be held civilly liable for the torts of its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. To state a claim under the FTCA, a plaintiff "must show the government's actions, if committed by a private party, would constitute a tort" under state law. *Love v. United States*, 60 F.3d 642, 644 (9th Cir. 1995); 28 U.S.C. § 1346(b) (a plaintiff must allege that the United States "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"). In other words, a plaintiff must allege a state law tort claim. *F.D.I.C. v. Meyer*, 510 U.S. 471, 445, 477-78 (1994).

To establish a claim for negligence under Arizona law, a plaintiff must prove: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). The plaintiff bears the burden of proving the defendant's negligence by a preponderance of the evidence. *Guardas v. United States*, 600 F. Supp. 2d 1059, 1063 (D. Ariz. 2009) (citing *Harvest v. Craig*, 990 P.2d 1080, 1082 (Ariz. App. 1999)).

Whether a duty exists is a matter of law for the court to decide, and "[t]he other elements, including breach and causation, are factual issues." *Gipson*, 150 P.3d at 230 (internal citation omitted).

### A. Duty

The Court ruled on summary judgment that a special relationship of jailer-prisoner existed between Plaintiff and Defendant and gave rise to a duty to protect. (Doc. 117 at 23.) This duty required Defendant to separate Plaintiff from Makhimetas if Defendant knew that Makhimetas was threatening Plaintiff. It also required Defendant to provide Plaintiff with a reliable means of notifying staff of an emergency occurring within her cell.

### B. Breach

Because Defendant was not aware that Makhimetas was a threat to Plaintiff, Defendant did not breach its duty of care by failing to separate Plaintiff and Makhimetas prior to the July 12, 2019 altercation. Accordingly, the Court finds in favor of Defendant on the portion of Plaintiff's FTCA claim alleging that USP-Tucson staff negligently responded to reports that Plaintiff's cellmate was threatening her.

Defendant breached its duty of care by failing to provide Plaintiff with a reliable means of notifying staff of an emergency, because cell 140 lacked a functioning duress alarm and Plaintiff was provided no other reliable means of summoning emergency assistance.

### C. Causation

To establish causation, a plaintiff must show a reasonable connection between a defendant's act or omission and her injury. *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1047 (Ariz. 1990). Causation has two components: actual causation and proximate causation. *Dupray v. JAI Dining Servs. (Phoenix) Inc.*, 432 P.3d 937, 942 (Ariz. App. 2018). Actual causation exists if the defendant's act or omission helped cause the plaintiff's injuries and the injuries would not have occurred but for the defendant's act or omission. *Id.* at 943. "An act that is the actual cause of injuries will

also be the proximate cause unless an intervening event supersedes the defendant's liability for the injuries." *Id.* "The defendant's act or omission need not be a large or abundant cause of the injury; even if defendant's conduct contributes only a little to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Robertson*, 789 P.2d at 1047 (internal quotation marks omitted).

As discussed above, if Plaintiff's cell had contained a functioning duress alarm, Plaintiff could and would have activated it, and staff would have responded approximately four minutes sooner than they did. Accordingly, Defendant's negligence caused Plaintiff to be beaten for approximately four minutes.

### D. Damages

Plaintiff sustained physical and emotional injuries from Makhimetas's attack, including nasal fractures, bruising, swelling, bleeding, and PTSD. She would have sustained some of these injuries even if staff had responded within one minute of the onset of the attack; however, the injuries would have been less severe if cell 140 had been equipped with a functioning duress alarm. Plaintiff did not incur any medical expenses associated with her physical or emotional injuries, nor does the evidence support a non-speculative finding of future medical expenses. Furthermore, this Court held on summary judgment that the Prison Litigation Reform Act precludes Plaintiff from obtaining emotional distress damages related to Makhimetas's attempted rape because there was no sexual contact as defined by 18 U.S.C. § 2246. (Doc. 117 at 21-22.) However, the Court finds that Plaintiff is entitled to $10,000.00 for her physical injuries, her pain and suffering, and her emotional distress arising from her physical injuries.

**IT IS ORDERED granting** Plaintiff's oral motion to reconsider the dismissal of the portion of Count Three of the First Amended Complaint alleging a lack of a functioning duress alarm in Plaintiff's cell.

**IT IS FURTHER ORDERED denying** Plaintiff's oral motion for a new trial.

**IT IS FURTHER ORDERED denying as moot** Plaintiff's Emergency Motion to Secure Impeachment Witness (Doc. 245).

**IT IS FURTHER ORDERED** finding Defendant not liable with respect to the portion of Count Three alleging that USP-Tucson staff negligently responded to reports that Plaintiff's cellmate was threatening her.

**IT IS FURTHER ORDERED** finding Defendant liable to Plaintiff in the amount of $10,000.00 with respect to the portion of Count Three alleging that Defendant was negligent in failing to ensure that Plaintiff's cell had a functioning duress alarm.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment finding Defendant liable to Plaintiff in the amount of $10,000.00, and shall close this case.

Dated this 20th day of June, 2024.

_____
Honorable Rosemary Márquez
United States District Judge